2 To Ct

ORIGINAL

(6)
3-1-01
MA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

PAUL TURPIN,                          :    CIVIL NO. 1:CV-01-0168

                                      :

        Petitioner                    :    (Judge Rambo)

                                      :

        v.                            :

                                      :

IMMIGRATION AND NATURALIZATION        :
SERVICE,                              :

                                      :

        Respondent                    :

RECD
HARRISBURG
FEB 27 2001
MARY E. D'ANDREA, CLERK
Per_____
        DEPUTY CLERK

**RESPONSE TO SHOW CAUSE ORDER**

FILED
HARRISBURG, PA

FEB 27 2001

MARY E. D'ANDREA, CLERK
Per _____
        Deputy Clerk

DAVID M. BARASCH
United States Attorney

DULCE DONOVAN
Assistant U.S. Attorney
SHELLEY L. GRANT
Paralegal Specialist
Federal Building
228 Walnut Street
Post Office Box 11754
Harrisburg, PA 17108

Dated: February 27, 2001

# **Table of Contents**

I.      Introduction . . . . . . . . . . . . . . . . . . . 1

II.     Factual and Procedural Background . . . . . . . . . . 2

III.    Argument . . . . . . . . . . . . . . . . . . . . . 3

    A.   Turpin's Custody Is Lawful . . . . . . . . . . 3

        1.   Regulations Governing Turpin's Detention. . 4

        2.   Turpin's Detention Does Not Violate Due
Process Because Turpin Has Lost His Lawful
Permanent Resident Status And Has No
Protected Liberty Interest To Remain
At Large In The United States Pending
His Deportation. . . . . . . . . . . . . . . 10

    B.   Section 212(c) Was No Longer In Effect At
The Time Turpin's Deportation Proceedings
Commendced . . . . . . . . . . . . . . . . . . 18

    C.   Section 212(h) Does Not Violate Turpin's
Right To Equal Protection. . . . . . . . . . . 19

        1.   Turpin Has No Constitutionally Protected
Liberty Interest In A § 212(h) Waiver,
But, In Any Event, LPRs And Non LPRs
Are Not Similarly Situated, Thus Equal
Protection Does Not Apply . . . . . . . . .20

        2.   Section 212(h) Complies With Equal
Protection Because The Distinction
Between LPRs and Non LPRs Is Rational . . 23

IV.  Conclusion . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

## FEDERAL CASES

Ablang v. Reno,
52 F.3d 801 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

Barrera-Echavarria v. Rison,
44 F.3d 1441 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

Berehe v. INS,
114 F.3d 159 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Board of Regents v. Roth,
408 U.S. 564 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Carlson v. Landon,
342 U.S. 524 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Castillo-Felix v. INS,
601 F.2d 459 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

Chow v. INS,
12 F.3d 34 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

DeSousa v. Reno,
190 F.3d 175 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Fiallo v. Bell,
430 U.S. 787 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Foroughi v. INS,
60 F.3d 570 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Francis v. INS,
532 F.2d 268 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Fraternal Order of Police v. United States,
173 F.3d 898 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Fristoe v. Thompson,
144 F.3d 627 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Gisbert v. Attorney General,
988 F.2d 1437 (5th Cir. 1993), amended, 997 F.2d 1122 (5th Cir. 1993) . . . . . . . . . . . . . . . . . 12, 14 ,17

Ho v. Greene,
204 F.3d 1045 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12, 14, 15, 16, 17

Jay v. Boyd,
351 U.S. 345 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Kay v. Reno,
94 F. Supp. 2d 546 (M.D. Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 10

Landon v. Plasencia,
459 U.S. 21 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Ma v. Reno,
208 F.3d 815 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Mario Rasales-Garcia v. J.T. Holland, Warden,
__ F.3d __, 2001 WL 87442 (6th Cir. Jan. 31, 2001) . . . . . . . . . . . . . . . . . . . . . . . 17

Martinez v. INS,
97 F. Supp. 2d 647 (M.D. Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Mathews v. Eldridge,
424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Matter of Chow,
20 I. & N. Dec. 647, 1993 WL 165803 (BIA 1993) . . . . . . . . . . . . . . . . . . . . . . . . 24

Matter of Gabryelsky,
20 I. & N. Dec. 750, 1993 WL 495142 (BIA 1993) . . . . . . . . . . . . . . . . . . . . . . . . 25

Matter of Rainford,
20 I. & N. Dec. 598, 1992 WL 323809 (BIA 1992) . . . . . . . . . . . . . . . . . . . . . . . . 25

Michel v. INS,
119 F. Supp. 2d 485 (M.D. Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Ngo v. INS,
192 F.3d 390 (3rd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Palma v. Verdeyen,
676 F.2d 100 (4th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12, 13, 14, 17

Parra v. Perryman,
172 F.3d 954 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Perez-Oropeza v. INS,
56 F.3d 43 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

Raya-Ledesma v. INS,
55 F.3d 418 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

Reno v. Flores,
507 U.S. 292 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Shaughnessy v. Mezei,
345 U.S. 206 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Salerno,
481 U.S. 739 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Williamson v. Lee Optical of Oklahoma, Inc.,
348 U.S. 483 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Yeung v. INS,
76 F.3d 337 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Zadvydas v. Underdown,
185 F.3d 279 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12, 13, 14, 15, 16, 17

### DOCKETED CASES

In re Mendez-Moralez,
Interim Decision No. 3272, slip op. at 5, 1996 WL 227774 (BIA Apr. 12, 1996) . . . . . . . . . . . . . . . . . 25

### FEDERAL STATUTES

8 U.S.C. § 1184 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

8 U.S.C. § 1228 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

8 U.S.C. § 1228(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

26 U.S.C. § 865 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

26 U.S.C. § 7701(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

26 U.S.C.A. §§ 865(g), 877(e), 958, 7701(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

28 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

50 U.S.C. § 456(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

65 Fed. Reg. 80281 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

65 Fed. Reg. at 80282 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

65 Fed. Reg. at 80295 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

65 Fed. Reg. at 80295-96 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

65 Fed. Reg. at 80296 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

65 Fed. Reg. at 80297 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8, 9

8 C.F.R. §§ 1.1(p), 3.39, 241.1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

8 C.F.R. § 212.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

8 C.F.R. § 241.4 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

8 C.F.R. § 241.4(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

8 C.F.R. § 241.4(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

8 C.F.R. § 241.4(h)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8 C.F.R. § 241.4(k)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

8 C.F.R. § 241.4(k)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9

8 U.S.C. §§ 1101(a)(20), 1101(a)(47)(B)(ii) (Supp. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 11

8 U.S.C. § 1227(a)(2)(A)(iii), 8 U.S.C. § 1101(a)(43)(G) . . . . . . . . . . . . . . . . . . . . . . . . . 1

8 U.S.C. § 1182(a)(2)(A)(i)(II) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

8 U.S.C. 1182(c) (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

8 U.S.C. § 1182(c) (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 24

8 U.S.C. § 1182(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

8 U.S.C. § 1182(h)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 29

8 U.S.C. § 1231 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 16

8 U.S.C. § 1183a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

8 U.S.C. § 1255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

50 App. U.S.C.A. § 453 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

141 Cong. Rec. S.7822-23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA),
Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996), . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

INA § 241(a)(1)(A)-(B)(iii), 8 U.S.C. § 1231(a)(1)(A)-(B) (iii) (1999) . . . . . . . . . . . . . . . . 4

Pub. L. No. 104-302, § 2, 110 Stat. 3656 (October 11, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Pub. L. No. 101-649, § 511(a), 104 Stat. 4978, 5052 (1990), amended by Pub. L. No. 102-232, § 306(a)(10), 105 Stat. 1733, 1751 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Pub. Law. No. 104-132, 110 Stat. 1214 (April 24, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## I.  INTRODUCTION

Petitioner Paul Turpin, an Immigration and Naturalization Service (INS) detainee brings this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 challenging his detention by Respondent INS.  Turpin, who is currently detained at the Pike County Jail, originally filed this action in the Southern District of New York.  The court stayed Turpin's deportation, and transferred the case to this Court.  On February 7, 2001, the Court issued an Order directing the INS to show cause within twenty days why Turpin should not be granted habeas corpus relief.  Presently, the INS files this Response to the Show Cause Order.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Turpin is a native and citizen of Guyana.  (Ex. 1.)  He came to the United States as a child, entering the country in 1961 as a lawful permanent resident. (Id. at 3.)

In March of 1998, in the Supreme Court of the State of New York, New York County, Turpin was sentenced to a minimum of two years imprisonment on the charge of burglary in the third degree. (Ex. 2.  See also Ex. 1, at 3.)

Pursuant to the Immigration and Nationality Act (INA), Turpin's conviction qualifies as an aggravated felony.  See 8 U.S.C. § 1227(a)(2)(A)(iii), 8 U.S.C. § 1101(a)(43)(G). Accordingly, on December 1, 1998, the INS instituted removal proceedings against Turpin.  (Ex. 1.)  On May 10, 1999, an

immigration judge (IJ) ordered Turpin removed from the United States to Guyana.  (Ex. 3.) Turpin did not appeal the IJ's order. (Pet. at 2.  See also Ex. 4.)  Thus, Turpin's removal order became final on June 9, 1999, after the thirty day appeal period had lapsed.

Turpin came into INS custody on or about July 17, 2000. (Ex. 5.)  Since that time, in its attempt to remove him, the INS has made requests for travel documents for Turpin from the Guyanian embassy.  (Ex. 6.)  To date, no travel documents have been received.

Turpin's continued detention was scheduled for review by the INS on February 17, 2001.  (Ex. 7.)  Such review occurred on February 26, 2001.  (Ex. 8.)  The reviewing officer declined to recommend Turpin's release.

Turpin makes several claims in the instant petition.  First, he claims that as a lawful permanent resident he was entitled to be released on bond by the IJ.  Turpin maintains that the denial of bond deprives him of due process.

Second, Turpin alleges that § 212(c) of INA deprives him of equal protection because as a deportable aggravated felon he is ineligible to apply for relief from deportation under the statute while excludable aggravated felons are.  Similarly, as his third argument, Turpin contends that the availability of a § 212(h) waiver to excludable aggravated felons and not deportable

2

aggravated felons also violates equal protection.

Turpin's claims fail and the petition should be denied. First, at the time that Turpin's removal order became final, he was still serving his New York criminal sentence. Once he came into INS custody, his detention was mandatory for the first ninety days. Thereafter, he is entitled to have his continued custody reviewed until the INS can remove him. His current detention is authorized under applicable INS statutes and regulations.

Turpin's allegation regarding § 212(c) is misplaced. By the time the INS commenced his deportation proceedings, § 212(c) had been eliminated in its entirety. Turpin's argument that § 212(h) violates equal protection also fails because nonlawful permanent resident aggravated felons and lawful permanent resident aggravated felons are not similarly situated, and, in any event, the distinction between the two is rational.

## II.  **ARGUMENT**

### A.  **TURPIN'S CUSTODY IS LAWFUL**

The relevant detention provision for Turpin's case is found at § 241 of the INA, 8 U.S.C. § 1231 (1999), which covers detention following entry of a final removal order. That provision generally affords the Attorney General a ninety-day period to effect removal, which, in this case, commenced once Turpin's criminal sentence expired and he came into INS custody.

3

See INA § 241(a)(1)(A)-(B)(iii), 8 U.S.C. § 1231(a)(1)(A)-(B)
(iii)(1999).  After the ninety-day removal period expires, the
Attorney General has the discretion to continue the detention of
a criminal alien who he has determined "to be a risk to the
community or unlikely to comply with the order of removal."
8 U.S.C. § 1231(a)(6)(1999).  Turpin's current detention is
governed by this statutory provision.

Respondent notes that Turpin is a deportable alien as
opposed to an inadmissable alien.  This distinction is critical
since the detention cases involve both types of aliens.  See,
e.g., Zadvydas v. Underdown, 185 F.3d 279, 287-88 (5th Cir.
1999)(deportable alien); Ho v. Greene, 204 F.3d 1045, 1057-60
(10th Cir. 2000)(same); Palma v. Verdeyen, 676 F.2d 100 (4th Cir.
1982)(excluable alien); Ngo v. INS, 192 F.3d 390 (3rd Cir.
1999)(same); Kay v. Reno, 94 F. Supp.2d 546 (M.D. Pa.
2000)(same).[1]

### 1.    Regulations Governing Turpin's Detention

The administrative regulations and procedures governing
Turpin's detention have evolved since he was initially detained

---

[1] As this Court is well aware, the immigration laws were
recently changed to refer to "exclusion" and "deportation"
proceedings as "removal" proceedings.  Additionally, "excludable"
aliens are now referred to as "inadmissible" aliens.  Although
there are still separate grounds of "inadmissibility" and
"deportability," the distinction turns on whether the alien has
gained "entry" or has been "admitted" to the United States.  Ngo,
192 F.3d at 394 n.4; Zadvydas, 185 F.3d at 289-97.

4

by the INS on July 17, 2000.  Until December 21, 2000, when superceding permanent procedures were implemented (see 65 Fed. Reg. 80281 et seq. 2000 WL 1860526 (Dec. 21, 2000)(Attachment A)), Turpin's detention was governed under then existing regulations (see 8 C.F.R. § 241.4 (1999)) supplemented by a set of interim INS procedures, known as the Interim Review Procedures discussed in Ngo v. INS, 192 F.3d 390 (3d Cir. 1999) and this Court in Kay.  Turpin's first and only custody review occurred on February 26, 2001.

On December 21, 2000, the INS promulgated new regulations, revising the Interim Review Procedures and establishing permanent procedures for postorder custody review cases.  See 8 C.F.R. § 241.4 as amended by 65 Fed. Reg. 80281 et seq. 2000 WL 1860526 (Dec. 21, 2000).  The new regulations supercede prior procedures and establish a custody review program for aliens such as Turpin modeled after the regulations establishing the Cuban Review Plan, which governs the review of excludable Mariel Cubans who are in INS custody and whose removal to Cuba is not currently possible or practicable.  See 8 C.F.R. § 212.12.  These new regulations, permit a comprehensive and fair review of the continued detention of aliens through a process that "is intended to balance the need to protect the American public from potentially dangerous aliens, who remain in the United States contrary to law with the humanitarian concerns arising from another country's unjustified

5

delay or refusal to accept the return of its nationals."  65 Fed. Reg. at 80282.

The new procedures provide for a custody review for aliens, such as Turpin, where "the alien's removal while proper, cannot be accomplished during the 90-day period because no country currently will accept the alien, or removal of the alien prior to expiration of the removal period is impractical or contrary to public interest."  See 8 C.F.R. § 241.4(k)(1), as amended, 65 Fed. Reg. at 80297.  The new procedures consist of a review by the district director of the alien's records and any written submissions in English submitted by or on behalf of the alien to the district director, or any other relevant evidence, prior to the expiration of the 90-day removal period.  See 8 C.F.R. § 241.4(h)(1), as amended, 65 Fed. Reg. at 80296.  However, the district director may in his discretion schedule a personal or telephonic interview with the alien as part of his custody review determination.  Id.  The district director must provide written notification to the alien regarding whether he will continue to be detained pending removal or will be released.  See 8 C.F.R. § 241.4(k)(1), as amended, 65 Fed. Reg. at 80297.  When release is denied pending the alien's removal, the district director in his discretion may retain the responsibility for custody determinations for up to three months after expiration of the 90-day removal period, during which time the district director may

6

conduct such additional review of the case as he deems appropriate.  See 8 C.F.R. § 241.4(k)(1), as amended, 65 Fed. Reg. at 80297.  The district director may release the alien if he is not removed within this time frame, or may refer the matter to INS Headquarters Post-Order Detention Unit (HQPDU) for further custody review.  See 8 C.F.R. § 241.4(k)(1), as amended, 65 Fed. Reg. at 80297.

If the alien is continued in custody, following the 90-day review and the alien has not been removed within three months of the district director's decision, authority over the custody determination transfers to the Executive Associate Commissioner at INS headquarters.  See 8 C.F.R. § 241.4(k)(2), as amended, 65 Fed. Reg. at 80297.  The initial HQPDU review will ordinarily be conducted at the expiration of the three-month period after the 90-day review or as soon thereafter as practicable, and the alien will be provided with approximately thirty days notice of that review.  See 8 C.F.R. § 241.4(k)(2), as amended, 65 Fed. Reg. at 80297.  The new regulation provides for subsequent reviews for a detainee to be ordinarily commenced within approximately one year of a decision by the Executive Associate Commissioner declining to grant release.  See 8 C.F.R. § 241.4(k)(2), as amended, 65 Fed. Reg. at 80297.  Not more than once every three months in the interim between annual reviews, the alien may submit a written request to the HQPDU for release consideration based on a proper

7

showing of a material change in circumstances since the last
annual review.  See 8 C.F.R. § 241.4(k)(2), as amended, 65 Fed.
Reg. at 80297.  The regulation requires the HQPDU to respond in
writing within approximately ninety days.  See 8 C.F.R.
§ 241.4(k)(2), as amended, 65 Fed. Reg. at 80297.

The new regulation also provides that the annual reviews
conducted by HQPDU shall be by a two-person panel (requiring a
unanimous vote) or three-person panel (requiring a majority vote)
that will make recommendations to the Executive Associate
Commissioner regarding whether an alien should be released or
continue to be detained.  See 8 C.F.R. § 241.4(k)(2), as amended,
65 Fed. Reg. at 80297.  At the beginning of each annual review, a
review panel member shall do a record review and if the Director
of the HQPDU does not accept a panel's recommendation to grant
release following a records review or if the alien is not
recommended for release, a review panel shall personally
interview the detainee.  See 8 C.F.R. § 241.4(k)(2), as amended,
65 Fed. Reg. at 80297.  The alien may be accompanied during the
interview by a person of his choice, with limited exceptions.
See 8 C.F.R. § 241.4(k)(2), as amended, 65 Fed. Reg. at 80297.
The alien may submit to the review panel any information in
English, that he believes presents a basis for his release.  8
C.F.R. § 241.4(k)(2), as amended, 65 Fed. Reg. at 80297.  The
panel's recommendation is required to be in writing and is to

8

include a brief statement of the factors the review panel deems material to its recommendation.  See 8 C.F.R. § 241.4(k)(2), as amended, 65 Fed. Reg. at 80297.  The Executive Associate Commissioner is not bound, however, by the review panel's recommendation.  See 8 C.F.R. § 241.4(k)(2), as amended, 65 Fed. Reg. at 80297.

To release an alien, the decision-maker must conclude that: (1) travel documents for the alien are not available or, in the opinion of the service, immediate removal, while proper, is otherwise not practicable or not in the public interest; (2) the detainee is presently a nonviolent person; (3) the detainee is likely to remain nonviolent if released; (4) the detainee is not likely to pose a threat to the community if released; (5) the detainee is not likely to violate the conditions of release; and (6) the detainee does not pose a significant flight risk if released.  See 8 C.F.R. § 241.4(e), as amended, 65 Fed. Reg. at 80295.  A list of factors for the District Director, review panel and Executive Associate Commissioner to consider in making their recommendations or decisions is provided at 8 C.F.R. § 241.4(f), as amended, 65 Fed. Reg. at 80295-96.  These administrative procedures, effective on December 21, 2000, will govern Turpin's further custody reviews.

9

2. **Turpin's Detention Does Not Violate Due Process Because Turpin Has Lost His Lawful Permanent Resident Status And Has No Protected Liberty Interest To Remain At Large In The United States Pending His Deportation**

Turpin claims that as a LPR the IJ denied him due process in failing to order his release on bond. Because he was still serving his criminal sentence at the time his removal order became final neither the INS nor the IJ possessed any authority to release Turpin. Once he came into INS custody, in accordance with the statute, his detention for the first ninety days was mandatory. Thus, it seems likely that Turpin's challenge to his detention should be interpreted as one contesting whether his continued detention pending removal violates his right to due process.

Respondent recognizes that in <u>Kay</u> this Court found that Kay possessed a significant liberty interest in being free from incarceration which was not outweighed by the government's interests in continuing to detain him. <u>Kay</u>, 94 F. Supp.2d at 552-53. Thus, the Court determined that Kay's prolonged detention was excessive.

Respondent respectfully suggests that the relatively brief period of time during which Turpin has been in INS custody and the INS' efforts to remove him distinguish this case from <u>Kay</u>. Respondent also respectfully urges that the Court reexamine its reasoning in light of other decisions from this Court, namely <u>Martinez v. INS</u>, 97 F. Supp.2d 647 (M.D. Pa. 2000) (Caldwell,

10

J.), and <u>Michel v. INS</u>, 119 F. Supp.2d 485 (M.D. Pa. 2000)
(McClure, J.), as well as the arguments provided below.

The due process protection of the Fifth Amendment has two
components, a substantive due process component and a procedural
due process component.  <u>See United States v. Salerno</u>, 481 U.S.
739, 746 (1987).  The substantive due process component precludes
the government from engaging in conduct that "shocks the
conscience" or interferes with rights "implicit in the concept of
ordered liberty."  <u>Id</u>.  The procedural due process component
precludes the government from depriving a person of life,
liberty, or property in an unfair manner.  <u>See Mathews v.
Eldridge</u>, 424 U.S. 319, 335 (1976).  Substantive and procedural
due process claims must be supported by an underlying liberty
interest.  <u>See Fristoe v. Thompson</u>, 144 F.3d 627, 630 (10th Cir.
1998).  Thus, any due process analysis must begin with a "careful
description of the asserted right."  <u>Reno v. Flores</u>, 507 U.S.
292, 302 (1993).

As an alien who has been properly ordered deported based on
his criminal conviction, Turpin has lost his former lawful
permanent resident status.  <u>See</u> 8 U.S.C. §§ 1101(a)(20),
1101(a)(47)(B)(ii) (Supp. 1998); 8 C.F.R. §§ 1.1(p), 3.39, 241.1
(1999); <u>Foroughi v. INS</u>, 60 F.3d 570, 575-76 (9th Cir. 1995).
Having forfeited his legal status, Turpin, like an inadmissable
alien, has no substantive right to be released from detention

11

pending removal notwithstanding his statutory eligibility to apply for release.  See Palma, 676 F.2d 100 (4th Cir. 1982) (holding that continued INS detention of an excludable Mariel Cuban who could not be immediately repatriated to Cuba did not violate due process under the Constitution); Ho, 204 F.3d at 1058 (the final removal orders against two aliens, one an excludable alien and one a deportable alien, "stripped [them] of any heightened constitutional status either may have possessed prior to the entry of the final removal order.  Like an alien seeking initial entry, Petitioners have no right to be at large in the United States.  As a consequence of their final removal orders, and notwithstanding their physical presence in this country, [they] have no greater constitutional rights with respect to their applications for admission than an alien seeking to enter this country for the first time"); Zadvydas, 185 F.3d at 294 (holding that "there is little, if any, room for a distinction between the rights in this respect of excludable and resident aliens when their circumstances are so similar"); Barrera-Echavarria v. Rison, 44 F.3d 1441, 1450 (9th Cir. 1995) (holding that excludable aliens have no substantive right to freedom from detention); Gisbert v. Attorney General, 988 F.2d 1437, 1442 (5th Cir. 1993), amended, 997 F.2d 1122 (5th Cir. 1993) ("continued INS detention of the [excludable] petitioners is not punishment and does not constitute a violation of the aliens' rights to

12

substantive due process.").

Accordingly, when evaluating Turpin's liberty interest in freedom from detention, the Court does not view "liberty in the abstract, but liberty in the United States by someone no longer entitled to remain in this country." Parra v. Perryman, 172 F.3d 954, 958 (7th Cir. 1999). It follows, then, that because Turpin has forfeited any right to remain in the United States by violating the criminal laws of this country, he has also necessarily forfeited any "narrow" liberty interest he may have possessed during removal proceedings. See Zadvydas, 185 F.3d at 294; see also Carlson v. Landon, 342 U.S. 524, 531 (1952)("So long, however, as aliens fail to obtain and maintain citizenship by naturalization, they remain subject to the plenary power of Congress to expel them under the sovereign right to determine what noncitizens shall be permitted to remain within our borders."). Thus, Turpin's legal status is most like that of an inadmissable alien – one who has been denied admission to the United States. Zadvydas, 185 F.3d at 294; Palma, 676 F.2d 100; see also Landon v. Plasencia, 459 U.S. 21, 32 (1982)(an alien who seeks admission to this country requests a privilege and has no constitutional rights regarding his application). As such, his desire to remain at large pending removal is narrow and detention by the INS of a criminal alien who poses a danger to the community will not only safeguard the community but also assure

13

his presence for removal once appropriate travel documents are obtained.  See e.g., Ho, 204 F.3d at 1059.

As this Court is well aware, some courts that have considered cases involving the long-term detention under INA § 241(a)(6) of deportable aliens who were also convicted criminals have upheld the detention as constitutional.  See e.g., Ho, 204 F.3d at 1045; Zadvydas, 185 F.3d at 279; but see Ma v. Reno, 208 F.3d 815 (9th Cir. 2000), cert granted, 121 S.Ct. 297 (Oct. 10, 2000)[2].  In Zadvydas, the Fifth Circuit dismissed the claim that a criminal alien and former lawful permanent resident (like Turpin) should be released from INS detention pending removal from the United States.  See Zadvydas, 185 F.3d at 294.  The Fifth Circuit rejected the contention that its decision should be distinguished from its own prior decision in Gisbert, and the Ninth Circuit's decision in Barrera-Echavarria, 44 F.3d 1441, which sustained the post-order detention of excludable Mariel Cubans who were never legally admitted into the United States, and who therefore enjoyed no statutory or constitutional entitlement to release or "parole" into the United States.  See Palma, 676 E.2d 100.  The Fifth Circuit reasoned that although Zadvydas' former permanent resident status entitled him to greater procedural due process protection in determining whether he was entitled to remain in

---

[2] Respondent also notes that Ma is presently pending before the Supreme Court and was argued on February 20, 2001.

14

the United States, that is, in the conduct of the deportation

proceedings, he did not have "a broadly privileged constitutional

status relative to excludable aliens, [and was not]

constitutionally entitled to more favorable treatment" concerning

his detention once it was finally determined that he no longer

had a right to remain in the United States.  Zadvydas, 185 F.3d

at 295; see also Shaughnessy v. Mezei, 345 U.S. 206, 215 (1953)

(former lawful permanent resident was assimilated to status of

excludable alien and lawfully detained pending removal from

United States).  The court's reasoning on this point is

instructive:

> [B]oth excludable and resident aliens may come in
> conflict with the government's sovereignty interests,
> and when this occurs their rights are constrained
> accordingly and to the same extent. . . .  In the
> circumstances presented here, the national interest in
> effectuating deportation is identical regardless of
> whether the alien was once resident or excludable.
> When a former resident alien is — with the adequate and
> unchallenged procedural due process to which his
> assertion of a right to remain in this country entitles
> him — finally ordered deported, the decision has
> irrevocably been made to expel him from the national
> community.  Nothing remains but to effectuate this
> decision.  The need to expel such an alien is
> identical, from a national sovereignty perspective, to
> the need to remove an excludable alien who has been
> finally and properly ordered returned to his country of
> origin.

185 F.3d at 295-96.

The reasoning of Zadvydas was accepted by the Tenth Circuit

in Ho.  See Ho, 204 F.3d at 1059.  Ho was a consolidated appeal

that involved consideration of the long term detention of an

15

excludable alien from Vietnam (Ho) and a deportable alien also from Vietnam (Nguyen). Id. at 1049-50. Nguyen was a former lawful permanent resident who was ordered deported from the United States after being convicted of aggravated robbery and vehicular eluding. Id. He was detained pursuant to 8 U.S.C. § 1231(a)(6) while the INS attempted to obtain travel documents from Vietnam. Id. After efforts to obtain such documents failed, Nguyen filed a habeas petition alleging that his detention was not authorized under the statute and that it was an unconstitutional infringement upon his alleged substantive and due process rights. Id. at 1050.

In upholding the constitutionality of his long-term detention under 8 U.S.C. § 1231(a)(6), the Tenth Circuit stated that "8 U.S.C. § 1231(a)(6) *expressly* allows for continued detention beyond the removal period with no time limit placed on the duration of such detention. This court will not substitute its judgement for that of Congress by reading into the statute a time limit that is not included in the plain language of the statute" Id. at 1057 (emphasis in original). Moreover, the Tenth Circuit, like Fifth Circuit in Zadvydas, also recognized that a former lawful permanent resident with a final order of deportation, has no greater constitutional rights to be at large in the United States than an excludable alien who is seeking entry into this country for the first time. Id. at 1058.

16

Accordingly, the Tenth Circuit held that "the Due Process Clause
does not provide Petitioners a liberty interest in the right they
assert. . . ." Id. at 1060.

Clearly, Zadvydas and Ho (which considered cases involving
deportable aliens) and Palma and Gisbert (which considered cases
involving excludable Mariel Cuban aliens), stand for the
proposition that the focus must be on the nature of the right
asserted.[3]  Here, the right being asserted is the alleged right
to release claimed by a deportable alien ordered removed who
remains in this country as a matter of grace, not law, because
"[n]othing remains but to effectuate this decision." Zadvydas,
185 F.3d at 296.  Like the alien in Zadvydas and Ho, Turpin was
found deportable as an aggravated felon and has lost his former
lawful permanent resident status.  He is permanently barred from
reentering the United States and has no protected liberty
interest to remain at large in the United States pending his
deportation to Guyana.  See 8 U.S.C. § 1182(a)(2)(A)(i)(II).
Accordingly, he has no liberty interest in release from custody
and to the extent Turpin's petition raises a due process claim,
it must fail.

---

[3]    The Sixth Circuit Court of Appeals in Mario Rasales-
Garcia v. J.T. Holland, Warden,__ F.3d __, 2001 WL 87442 (6th
Cir. Jan. 31, 2001)(Attachment B) issued a decision that is
contrary to every other Court of Appeals regarding the release of
excludable Mariel Cubans.  Respondent is considering whether to
seek further review.

**B.  SECTION 212(C) WAS NO LONGER IN EFFECT AT THE TIME TURPIN'S DEPORTATION PROCEEDINGS COMMENCED**

Former § 212(c) of the INA permitted the Attorney General, in the exercise of his discretion, to waive the immigration consequences of a criminal alien's convictions, if the alien was statutorily eligible for relief.  See 8 U.S.C. 1182(c) (1990). The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. Law. No. 104-132, 110 Stat. 1214 (April 24, 1996) eliminated the availability of this type of relief for certain criminal aliens subject to deportation, rather than exclusion proceedings.  See 8 U.S.C. § 1182(c) (as amended).  See also DeSousa v. Reno, 190 F.3d 175, 179 n.4 (3d Cir. 1999).  The most recent amendments to the INA eliminated the availability of § 212(c) relief altogether for aliens Like Turpin who were placed in proceedings after April 1, 1997.  See Section 304(b) of Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996), as amended by the Extension of Stay In United States For Nurses Act of October 11, 1996, Pub. L. No. 104-302, § 2, 110 Stat. 3656 (October 11, 1996).  See also  DeSousa, 190 F.3d at 179 n.4.  Thus, because § 212(c) was no longer in effect at the time of his deportation proceedings which began in December of 1998, Turpin's challenge to § 212(c) fails.

18

C.    **SECTION 212(h) DOES NOT VIOLATE TURPIN'S RIGHT TO EQUAL PROTECTION**[4]

In his habeas petition, Turpin claims that § 212(h) of the INA, 8 U.S.C. § 1182(h), violates his right to due process.  This section states in pertinent part:

> The Attorney General may, in his discretion, waive the application of subparagraphs (A)(i)(I), (B), (D), and (E) of subsection (a)(2). . .if-
> (2) the Attorney General, in his discretion, and pursuant to such terms, conditions and procedures as he may by regulations prescribe, has consented to the alien's applying or reapplying for a visa, for admission to the United States, or adjustment of status.
>
> No waiver shall be granted under this subsection in the case of an alien who has previously been admitted to the United States as an alien lawfully admitted for permanent residence if either since the date of such admission the alien has been convicted of an aggravated felony or the alien has not lawfully resided continuously in the United States for a period of not less than 7 years immediately preceding the date of initiation of proceedings to remove the alien from the United States.

INA § 212(h)(2), 8 U.S.C. § 1182(h)(2).

In the context of immigration statutes like § 212(h), the

---

[4] Briefly in advance of this Response being filed, INS District Counsel informed undersigned counsel that there is no indication in Turpin's alien file that he ever applied for § 212(h) relief.  Indeed, the Immigration Judge's order makes no mention of such an application.  If Turpin never applied for § 212(h) relief, he has neither exhausted his administrative remedies with respect to this issue nor does he have standing to raise a constitutional challenge.  If the Court desires further briefing on this issue, counsel is more than willing to provide it, but because of the late hour at which this information was communicated, this brief mention of the issue is all that could be provided.

Supreme Court has stressed that the courts should be especially
deferential, and should sustain legislative distinctions so long
as they are based upon a "'facially legitimate and bona fide
reason.'" <u>Fiallo v. Bell</u>, 430 U.S. 787, 794 (1977) (citations
omitted).

> **1.  Turpin Has No Constitutionally Protected Liberty
> Interest In A § 212(h) Waiver, But, In Any Event, LPRs
> And NonLPRs Are Not Similarly Situated, Thus Equal
> Protection Does Not Apply**

Congress amended § 212(h) of the INA to eliminate the
Attorney General's authority to grant a discretionary waiver of
inadmissibility "in the case of an alien who has previously been
admitted to the United States as an alien lawfully admitted for
permanent residence if . . . since the date of such admission the
alien has been convicted of an aggravated felony." 8 U.S.C.
§ 1182(h), <u>as amended by</u> IIRIRA, Pub. L. No. 104-208,
110 Stat. 3009-546, 3009-626 to 627 § 348.  Turpin maintains that
this statute, as amended, violates equal protection guarantees
because it irrationally distinguishes between nonlawful permanent
resident (nonLPRs) aggravated felons and lawful permanent
resident (LPR) aggravated felons by allowing the nonLPR
aggravated felon to obtain a § 212(h) waiver while disallowing
the waiver for LPR aggravated felons.

The discretionary nature of the § 212(h) waiver precludes
such a claim as a matter of law, because an alien has no
constitutionally-protected interest in the availability of purely

discretionary relief.  See, e.g., Jay v. Boyd, 351 U.S. 345, 354 (1956).  Furthermore, it is well-settled that an equal protection claim against the federal government depends entirely upon the articulation of a "liberty" interest sufficient to trigger the protection of the Due Process Clause. See Board of Regents v. Roth, 408 U.S. 564, 569 (1972).  An alien such as Turpin who is deportable, and who is seeking only discretionary relief, has absolutely no constitutionally-protected interest in remaining in the United States.  Thus, Turpin has nothing that the agency could have taken away from him in contravention of the Due Process Clause.  See Jay, 351 U.S. at 359.  Thus, Congress's amendment to § 212(h) does not implicate any constitutional interest.

Even if this were not the case, it is beyond dispute that Congress has virtually unrestricted power to regulate and differentiate among groups of aliens.  Consequently, so long as there is a "rational basis" for the distinctions between aliens in our immigration laws, the laws comply with the equal protection component of the due process clause of the Fifth Amendment.  See, e.g., Perez-Oropeza v. INS, 56 F.3d 43, 45 (9th Cir. 1995); Raya-Ledesma v. INS, 55 F.3d 418 (9th Cir. 1995); Ablang v. Reno, 52 F.3d 801, 804 (9th Cir. 1995).

Additionally, contrary to Turpin's assertions, Congress has established that LPR and nonLPR aliens are *not similarly*

21

*situated.* This Court has long recognized that:

> [t]he lawful permanent resident has met extensive
> quantitative and qualitative standards at the time of entry
> as an immigrant. He has, legally and properly, established
> ties to this country. He may work. He normally looks
> toward citizenship and will have that privilege in time. He
> enjoys greater rights than a nonimmigrant alien and assumes
> commensurate responsibilities and duties. On the other
> hand, the statutory scheme clearly reflects an entirely
> different view of the nonimmigrant. He has none of the
> foregoing attributes. (citation omitted).

Castillo-Felix v. INS, 601 F.2d 459, 465, n.13 (9th Cir. 1979),

overruled on other grounds, de Robles v. INS, 58 F.3d 1325 (9th

Cir. 1995). See also Francis v. INS, 532 F.2d 268, 273 (2d Cir.

1976)(stating that "we do not dispute the power of the Congress

*to create different standards of admission and deportation for*

*different groups of aliens*")(emphasis added).

In fact, there are various areas -- both in the INA and

other portions of our laws -- where certain classifications of

aliens, including LPRs, are accorded different treatment. For

example, § 212(d)(3) of the INA, 8 U.S.C. § 1182(d)(3), provides

a waiver for criminal grounds of inadmissibility for

nonimmigrants. No such waiver is available for immigrants.

Likewise, § 213A of the INA, 8 U.S.C. § 1183a, imposes stringent

"affidavit of support" requirements for immigrants, but not for

nonimmigrants. Compare §§ 212(a)(4) and § 213A of the INA with §

214 of the INA, 8 U.S.C. § 1184. Moreover, 8 U.S.C. § 1228(b)

grants the Attorney General authority to place nonLPR aggravated

felons into expedited "administrative removal" proceedings before

22

the INS, but does not give him authority to do the same with LPR

aggravated felons.  <u>See</u> 8 U.S.C. § 1228.

Nor is the disparate treatment between different alien

classifications limited to the immigration statutes.  The Tax

Code generally taxes LPRs (defined as "resident alien") more

onerously than nonLPRs (defined as "nonresident alien"),

particularly with respect to non-U.S. source income.  <u>See</u> 26

U.S.C. § 7701(b) (definitions of resident and nonresident

aliens); 26 U.S.C. § 865 (source rules for personal property

sales).  The Selective Service Act also generally requires draft

registration by LPRs but exempts nonLPRs from registration.  <u>See</u>

50 U.S.C. § 456(a)(1).  There is no doubt, then, that LPRs and

nonLPRs *are not similarly situated.*

    2.    **Section 212(h) Complies With Equal Protection Because
          The Distinction Between LPRs and NonLPRs Is Rational**

Even if the Court were to find that LPRs and nonLPRs are

similarly situated, § 212(h) complies with equal protection

guarantees because it has a rational basis for distinguishing

between them.  As long as there is a "rational basis" for the

distinctions between aliens in our immigration laws, the laws

comply with the equal protection component of the Due Process

Clause of the Fifth Amendment.  <u>See</u>, <u>e.g.</u>, <u>Perez-Oropeza</u>, 56 F.3d

at 45; <u>Raya-Ledesma</u>, 55 F.3d at 418; <u>Ablang</u>, 52 F.3d at 804.

Here, there are several "rational" reasons why Congress

amended the statute to prohibit LPRs convicted of aggravated

23

felonies from obtaining a § 212(h) waiver of inadmissibility.
First, the amendment to § 212(h) clearly reflects Congress'
overall purpose in IIRIRA: to expedite the removal of criminal
aliens. See, e.g., Berehe v. INS, 114 F.3d 159, 162 (10th Cir.
1997). Specifically, in eliminating § 212(h) waivers for LPR
aggravated felons, Congress merely closed a loophole that was
allowing such aliens to circumvent bars to waivers of deportation
under former § 212(c) of the INA, 8 U.S.C. § 1182(c) (1994). Cf.
Yeung v. INS, 76 F.3d 337 (11th Cir. 1995).

Amendments to § 212(c) in the early 1990s and administrative
interpretations of that section had barred relief, respectively,
to aggravated felons who had served at least five years in prison
and aliens deportable on account of firearms convictions.[5] Many
LPRs, however, could avoid these bars through the artifice of
applying to adjust their status to that of LPR (even though they
already had that status) under 8 U.S.C. § 1255. This way, they
could, through a legal fiction, be "readmitted" as LPRs and

---

[5] See Pub. L. No. 101-649, § 511(a), 104 Stat. 4978, 5052
(1990), amended by Pub. L. No. 102-232, § 306(a)(10), 105 Stat.
1733, 1751 (1991) (amending section 1182(c) to disqualify aliens
who have served at least five years in prison on one or more
aggravated felony convictions); Matter of Chow, 20 I. & N. Dec.
647, 651-52, 1993 WL 165803 (BIA 1993) (alien deportable by
reason of firearms conviction ineligible for 1182(c) relief
because that ground of deportability has no cognate ground of
excludability)(Attachment C), aff'd sub nom. Chow v. INS, 12 F.3d
34 (5th Cir. 1993).

thereby escape deportation.[6]  Because a § 212(h) waiver is a

necessary component of an adjustment application filed by most

criminal aliens, the elimination of such a waiver effectively

bars them from seeking such relief.[7]

In sum, in amending § 212(h) to disqualify LPRs who have

been convicted of aggravated felonies, Congress was merely

closing actual or potential loopholes through which such aliens

could avoid other bars to relief.

In enacting IIRIRA, Congress stated that:

> [a]liens who violate U.S. immigration law should be
> removed from this country as soon as possible.
> Exceptions should be provided only in extraordinary
> cases specified in the statute and approved by the
> Attorney General.  Aliens who are required by law or
> the judgment of our courts to leave the United States
> are not thereby subjected to a penalty.  The
> opportunity that U.S. immigration law extends to aliens
> to enter and remain in this country is a privilege, not
> an entitlement.

Purpose and Summary of the Senate Judiciary Committee on S. 1664

(ultimately enacted as IIRIRA), Sen. Jud. Comm. Rep. No. 104-249

(April 10, 1996), 1996 WL 180026, at *7.  The Report continues:

---

[6] See Matter of Gabryelsky, 20 I. & N. Dec. 750, 754-56,
1993 WL 495142 (BIA 1993)(Attachment D); Matter of Rainford, 20
I. & N. Dec. 598, 602, 1992 WL 323809 (BIA 1992)(Attachment E).

[7] An adjustment applicant must demonstrate that he "is
admissible to the United States for permanent residence."  8
U.S.C. § 1255(a).  A discretionary § 212(h) waiver, however, may
be used to waive certain criminal grounds of inadmissibility that
would otherwise preclude adjustment of status.  See In re Mendez-
Moralez, Interim Decision No. 3272, slip op. at 5, 1996 WL 227774
(BIA Apr. 12, 1996) (citing cases)(Attachment F).

25

> [a]liens who enter or remain in the United States in
> violation of our law are effectively taking immigration
> opportunities that might otherwise be extended to
> others, potential legal immigrants whose presence would
> be more consistent with the judgment of the elected
> government of this country about what is in the
> national interest.  Those who are reluctant to enforce
> the immigration laws should keep this reality in mind.

Id.

Consistent with Congress' clearly expressed view that aliens
who abuse the privileges extended to them under our immigration
laws should be removed as expeditiously as possible, Congress --
by amending § 212(h) -- obviously decided that LPR aggravated
felons (who had been extended the privilege of lawful residency
in the United States), should no longer be entitled to any
further special consideration under § 212(h).   The differential
treatment between LPR and nonLPR aggravated felons acknowledges
that an LPR "enjoys greater rights than a non-immigrant alien and
assumes commensurate responsibilities and duties."
Castillo-Felix v. INS, 601 F.2d 459, 470 (9th Cir. 1979)(emphasis
added).

This type of treatment is not unique.  It exists throughout
our immigration laws.  See, e.g., 8 U.S.C. § 1182(d)(3) (broad
waiver available only for nonimmigrants); 8 U.S.C. § 1183a
("affidavit of support" requirement imposed only on immigrants);
26 U.S.C.A. §§ 865(g), 877(e), 958, 7701(b)(1)(A) (more onerous
taxation of immigrants); 50 App. U.S.C.A. § 453 (draft
registration only for immigrants).  Therefore, the elimination of

26

a § 212(h) waiver for LPRs convicted of an aggravated felony, but not for non-LPRs convicted of an aggravated felony, has a second "rational basis" — to foster more responsible and law-abiding conduct on the part of aliens who have been granted the considerable privilege of residing permanently in this country.

Although at first glance it may appear that it is "irrational" to grant a benefit to a nonLPR while revoking it for LPRs, on the theory that LPRs, by their privileged status, should be accorded more consideration for relief, upon further reflection, Congress' disparate treatment of LPRs and nonLPRs with respect to § 212(h) waivers does have a logical premise: Congress may have left open § 212(h) waivers for nonLPR aggravated felons because it was more concerned with resolving a larger problem first -- that of closing the previously discussed loophole.  Although Congress did leave the waiver available for nonLPRs, Congress may very well have thought that the likelihood of a nonLPR even being able to obtain a § 212(h) waiver was mainly hypothetical.  This is because § 212(h) requires a showing of hardship, and nonLPRs, by the very nature of their less privileged status, are simply less likely than LPRs to demonstrate compelling favorable factors such as close family ties, ties to the community, a job or property.  For example, a nonLPR such as an undocumented alien will have more difficulty in obtaining a job or a loan to purchase property than an LPR, who

has proper documentation and is generally authorized to obtain
employment.

Congress is not required to attack every problem at once.
Rather, it can take a one-step-at-a-time approach, reforming
those aspects of the statute which seem most problematic.  As the
Supreme Court explained:

> The problem of legislative classification is a
> perennial one, admitting of no doctrinaire definition.
> Evils in the same field may be of different dimensions
> and proportions, requiring different remedies.  Or so
> the legislature may think.  Or the reform may take one
> step at a time, addressing itself to the phase of the
> problem which seems most acute to the legislative mind.
> The legislature may select one phase of one field and
> apply a remedy there, neglecting the others.  The
> prohibition of the Equal Protection Clause goes no
> further than the <u>invidious</u> discrimination.

<u>Williamson v. Lee Optical of Oklahoma, Inc.</u>, 348 U.S. 483, 489
(1955) (emphasis added).  Thus, it is reasonable for Congress to
continue to permit nonLPRs aggravated felons to obtain a § 212(h)
waiver because it wanted to first focus on a larger problem --
that of the LPR.  <u>See</u> <u>Fraternal Order of Police v. United States</u>,
173 F.3d 898, 903-04 (D.C. Cir. 1999) (Congress is "fully
entitled to weigh one characteristic more heavily than another,
even though the balance may seem baffling to the court. . .[w]hen
the government is faced with a practical determination like this
one, we are obligated to accept  'rough,' even 'illogical,'
solutions with an 'imperfect fit between means and
ends.'')(<u>citing</u> <u>Heller v. Dow</u>, 509 U.S. 312, 321 (1993)).

There is yet a third rational basis for barring LPRs who commit aggravated felonies from seeking a waiver of inadmissibility under § 212(h); namely, streamlining the process by which criminal aliens are to be removed from the country. Unlike many of the intended beneficiaries of the § 212(h) waiver who are "applying or reapplying for a visa [or] for admission to the United States," see 8 U.S.C. § 1182(h)(2), LPRs who are convicted of aggravated felonies are usually located physically in the United States.

Congress' reforms -- as evidenced in IIRIRA -- are aimed at removing those criminal aliens who are located within the United States.  The legislative history shows that Congress was concerned with stopping the growing number of criminal aliens in the United States and with eliminating the delays involved in deporting them from the country.  See 141 Cong. Rec. S.7822-23 (daily ed. June 7, 1995) (noting that a conservative estimate of the number of criminal aliens in the country is 450,000; that an estimated 20 to 25 per cent of all federal prison inmates are noncitizens; that convicted felons are removed at a rate of only four per cent each year, in part because they are able to request equitable waivers and forms of judicial review that were never meant to apply to them; and that 70 percent of aliens convicted of felonies commit a second crime).  See also S. Rep. No. 48, 104th Cong., 1st Sess. 3, 16 (1995), available in 1995 WL 170285,

29

at *46 (noting that the "deportation process for criminal aliens is byzantine to say the least").  Thus, assuring the swift removal of criminal aliens located in the United States, such as LPRs who commit aggravated felonies, by means of eliminating the opportunity for delay inherent in applying for a § 212(h) waiver, is a conceivable -- indeed, *rational*  -- basis for eliminating that relief for such aliens.

Congress, therefore, has reasonably taken a legitimate step toward accomplishing its goal of expeditiously removing criminal aliens from inside our borders by eliminating the availability of a § 212(h) inadmissibility waiver.  It was not required to take an all-or-nothing approach.  Even if it might have been wiser to eliminate § 212(h) waivers for nonLPR aggravated felons as well, the step taken by Congress was rational and legitimate and accordingly survives constitutional scrutiny.  Thus, Turpin's equal protection challenge to § 212(h) fails.

## IV.  CONCLUSION

Based upon the foregoing, Respondent respectfully requests that the Court deny the petition.

Respectfully submitted,

DAVID M. BARASCH
United States Attorney

DULCE DONOVAN
Assistant U.S. Attorney
SHELLEY L. GRANT
Paralegal Specialist
Federal Building
228 Walnut Street
Post Office Box 11754
Harrisburg, PA 17108

Dated: February 27, 2001

31

**Attachment A**

Citation                    Found Document              Rank 1 of 1              Databas
65 FR 80281-01                                                                   FR
2000 WL 1860526 (F.R.)
**(Cite as: 65 FR 80281)**

RULES and REGULATIONS

DEPARTMENT OF JUSTICE

Immigration and Naturalization Service

8 CFR Parts 212, 236, and 241

[INS No. 2029-00; AG Order No. 2349-2000]

RIN 1115-AF82

Detention of Aliens Ordered Removed

Thursday, December 21, 2000

**\*80281**  AGENCY: Immigration and Naturalization Service, Justice.

ACTION: Final rule.

SUMMARY: This rule amends the Immigration and Naturalization Service (Service)
regulations by providing a uniform review process governing the detention of
criminal, inadmissible, and other aliens, excluding Mariel Cubans, who have
received a final administrative order of removal, deportation, or exclusion but
whose departure has not been effected within the 90-day removal period.  Such a
process is necessary to ensure periodic custody reviews for aliens detained
beyond the removal period and to provide for consistency in decision-making.
Because the Service is developing a specialized, ongoing administrative review
process for these custody determinations, this rule eliminates the appellate
role of the Board of Immigration Appeals (Board) in post-final order custody
determinations.  This rule also amends the Service's regulations to reflect the
authority of the Commissioner, and through her, other designated Service
officials, to release certain aliens from Service custody, issue orders of
supervision, and grant stays of removal.  **\*80282**

DATES: This rule is effective December 21, 2000.

FOR FURTHER INFORMATION CONTACT: Joan S. Lieberman, Office of the General
Counsel, Immigration and Naturalization Service, 425 I Street NW, Room 6100,
Washington, DC 20536, telephone (202) 514-2895 (not a toll-free call).

SUPPLEMENTARY INFORMATION:

Why Is the Service Issuing This Final Rule?

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80282)**

Congress has progressively acted to restrict the release into the community of aliens convicted of certain crimes, beginning with amendments affecting aggravated felons in the Anti-Drug Abuse Act of 1988 (ADAA), Public Law 100-690, and the Immigration Act of 1990 (Immact), Public Law 101-649.  Congress extended these restrictions to other categories of crimes in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Public Law 104-132, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104-208.  Pursuant to these amendments, the Service's continued detention of aliens convicted of aggravated felonies has not been subject to the statutory time limits that apply in the case of certain noncriminal aliens. Under section 241(a)(6) of the Immigration and Nationality Act (Act), 8 U.S.C. 1231(a)(6), certain classes of aliens may be detained in the discretion of the Attorney General beyond the 90-day statutory removal period set forth in section 241(a)(1) of the Act, 8 U.S.C. 1231(a)(1), including aliens determined by the Attorney General to constitute a risk to the community or to be unlikely to comply with the order of removal.  As a result of this change in the law and other factors, there has been a considerable increase in the number of aliens in immigration custody who have a final order of removal but who the Service is unable to remove during the 90-day removal period.

The Department of Justice (Department) has determined that a separate custody review process is appropriate for aliens who are detained beyond the 90-day removal period.  This rule permits a comprehensive and fair review of such post-order detention by establishing an automatic, centralized, and multi-layered process to determine whether detainees may be released from custody and sets forth the procedures governing such release or continued detention.  As was the case with the implementation of the Mariel Cuban Review Plan, this review process is intended to balance the need to protect the American public from potentially dangerous aliens who remain in the United States contrary to law with the humanitarian concerns arising from another country's unjustified delay or refusal to accept the return of its nationals.  This provision also applies to criminal aliens granted withholding or deferral of removal for whom removal to a third country is impractical.

Currently, 8 CFR 241.4 provides the general procedures governing the detention of criminal, inadmissible, and other aliens who have received a final administrative removal order but whose departure has not been effected within the 90-day removal period specified in section 241(a)(1) of the Act, 8 U.S.C. 1231(a)(1).  In 1999, pending promulgation of more specific procedures by regulation, and to institute a more uniform process nationwide, the Service issued a series of memoranda to provide specific guidance to field offices concerning implementation of interim procedures governing post-order custody cases.  Detention Procedures for Aliens Whose Immediate Repatriation is Not Possible or Practicable, February 3, 1999; Supplemental Detention Procedures, April 30, 1999; Interim Changes and Instructions for Conduct of Post-Order Custody Reviews, August 6, 1999 (collectively "the Pearson memoranda").

This rule establishes permanent procedures for post-order custody reviews.  The rule assists the decision-maker in determining whether an alien is an appropriate candidate for release from custody after the expiration of the removal period.  On December 21, 2000, these procedures will supersede the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80282)**

Pearson memoranda.  The new procedures are modeled after those governing the
Mariel Cubans at 8 CFR 212.12 and consist of a records review, the opportunity
for a panel interview and recommendation, and a final decision by a separate
Service Headquarters unit, the Headquarters Post-Order Detention Unit (HQPDU).
Although Mariel Cuban procedures will continue to be conducted pursuant to 8 CF
212.12, the review process is similar for both groups of aliens.
 On June 30, 2000, the Department published in the Federal Register at 65 FR
40540 a proposed rule with request for comments to implement a permanent,
periodic custody review process for aliens whose removal has not been effected
at the expiration of the 90-day removal period pursuant to section 241(a)(6) of
the Act, 8 U.S.C. 1231(a)(6).  The initial comment period was for 30 days and
expired on July 31, 2000.  However, in response to several commenters' requests
for an extension, the comment period was extended for 10 days until August 11,
2000.
 The Department received numerous public comments recommending substantive
modifications to the proposed rule.  Many of the comments overlap or endorse th
submissions of other commenters.  For this reason, the Service will address the
comments by issue rather than by reference to the individual comments.
 After careful consideration of all comments, the Department will retain the
basic structure of the proposed rule, with some modifications.  This rule
implements an important program in furtherance of congressional and executive
policy to ensure the removal of aliens who commit serious crimes in this countr
and to protect the safety of our citizens and lawful residents against dangerou
individuals or those posing a flight risk.

Constitutionality and Statutory Authority

 Numerous commenters expressed the view that the proposed rule is not authorize
by statute or violates the Constitution of the United States.  Post- order
detention cases are the subject of on-going litigation.  Two courts of appeals
have upheld the Attorney General's authority to continue detention after the
removal period.  See Duy Dac Ho v.  Joseph Greene, 204 F.3d 1045 (10th Cir.
2000); Zadvydas v.  Underdown, 185 F.3d 279 (5th Cir. 1999), cert. granted, 121
S.Ct. 297 (2000).
 The Ninth Circuit held, however, in Ma v.  Reno, 208 F.3d 815, 822 (9th Cir.
2000), cert. granted, 121 S.Ct. 297 (2000), that detention may not be extended
more than a "reasonable time" beyond the statutory removal period.  The United
States Supreme Court recently granted certiorari in the Zadvydas and Ma cases t
resolve the disagreements in the courts of appeals.
 In Ho, the Tenth Circuit upheld the detention of inadmissible and deportable
criminal aliens under 8 U.S.C. 1231(a)(6) on statutory and constitutional
grounds.  204 F.3d at 1055-1060.  The court held, among other things, that
section 241(a)(6) of the Act, 8 U.S.C. 1231(a)(6), expressly allows the Attorne
General, in her discretion, to continue detaining certain aliens, including
aliens who she has determined would pose a risk of danger or flight if released
beyond the 90-day removal period while efforts are being made to remove them
from the United States.  Id. at 1057.  The court declined to impose a time lim:
on detention, stating that it will not "substitute its **\*80283** judgment for that

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80283)**

of Congress by reading into the statute a time limit that is not included in the plain language of the statute." Id. at 1057.

Like the Tenth Circuit, the Fifth Circuit, in Zadvydas, also rejected a constitutional challenge to continued detention under section 241(a)(6) of the Act, 8 U.S.C. 1231(a)(6). 185 F.3d at 294-97. The Fifth Circuit did not question the statutory authority of the Attorney General to detain a criminal alien beyond the 90-day period where the country to which the alien had been ordered removed declined to accept his return in the near future, and it held that the continued detention of a dangerous criminal alien in these circumstances does not violate substantive or procedural due process. The court analyzed the constitutional question on the premise that the detained alien is able to obtain periodic review of his detention under Service regulations, see 185 F.3d at 287-88 & n.9, and that the availability of such periodic review precluded characterization of the alien's detention as indefinite or permanent. Id. at 291 (citations omitted). While acknowledging that a deportable resident alien is entitled to greater procedural due process rights during the removal proceedings themselves than those accorded an excludable alien, the court in Zadvydas concluded that once a removal order has become final and the only act remaining to be carried out is the actual expulsion of the alien, no distinction exists between the constitutional rights of former resident aliens and those of excludable aliens. Id. at 294-97. Therefore, the continued detention of a deportable criminal alien who cannot be immediately removed under section 241(a)(6) of the Act, 8 U.S.C. 1231(a)(6), does not violate substantive due process where the government has an interest in protecting society from further criminal activity by the alien and in ensuring that he or she does not flee and thereby frustrate his or her eventual removal. Id. at 296-97.

The Ninth Circuit has interpreted the detention statute in a manner that presents a direct conflict with the decisions of the Tenth and Fifth Circuits. In Ma, the court stated that it could avoid deciding the constitutional issues by construing the statute to prohibit detention, in many cases, beyond the 90-day removal period. While recognizing that section 241(a)(6) of the Act, 8 U.S.C. 1231(a)(6), unambiguously authorizes the Attorney General to continue criminal aliens in custody "beyond the removal period," the court nevertheless found that the statute does not specify a particular length of time for detention and therefore can be construed to permit detention "only for a reasonable time beyond the statutory removal period." 208 F.3d at 821-22, 827. In Ma itself, because it concluded that there was not a reasonable likelihood that the alien would be returned to Cambodia in the reasonably foreseeable future, the court held that the Service was required to release him immediately upon the expiration of the statutory removal period. In reaching that result, the court relied on several Ninth Circuit decisions from the 1920's and 1930's interpreting a provision in the Immigration Act of 1917 and on international law. Id. at 822, 827-30. Because it concluded that detention beyond 90 days is not statutorily authorized in Ma's case, the court did not address the substantive and procedural constitutional issues that were addressed in Ho and Zadvydas.

In formulating the proposed custody review procedure, the Department did not follow the Ninth Circuit's statutory ruling because it is not supported by the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00198-SHR   Document 6   Filed 02/27/2001   Page 44 of 154

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80283)**

statute's text or history.  The Attorney General construes section 241(a)(6) to
authorize her to continue to detain, beyond the 90-day removal period, criminal
aliens and other aliens whose release would present a risk of harm to the
community or of flight by the alien.  That interpretation is supported by the
text of section 241(a)(6), which unambiguously authorizes the Attorney General
to detain the specified aliens "beyond the removal period" and imposes no time
limit; by the related detention provisions in sections 235(c) and 241(a)(2),
which make clear that granting the Attorney General even the discretion to
release criminal aliens after a notice to appear has been filed is an exception
to a general statutory rule of mandatory detention of such aliens; by section
241(a)(7), which makes clear that when Congress wanted to create a special
exception for aliens whose countries will not immediately accept their return it
did so explicitly (see also IIRIRA §§ 303(b)(3)(B)(ii) and 307(a)) (referring to
situations in which countries will not accept return of their nationals); and by
the statutory history of the amendments to the Act leading up to the enactment
of section 241(a)(6) in 1996, as well as the legislative history of that
enactment itself.

The Attorney General's authority has been sustained by the Third, Fifth, and
Tenth Circuits, which have upheld the constitutionality of post-order detention
under section 241(a)(6) of the Act, 8 U.S.C. 1231(a)(6), and the Pearson
procedures.  According to these courts, detention under section 241(a)(6) of the
Act, 8 U.S.C. 1231(a)(6), is not unconstitutional where the alien's removal
cannot be effected immediately, the alien is determined to be a danger or a
flight risk if released, and he or she is afforded a periodic and meaningful
opportunity to seek release from custody.  See, e.g., Ho, 204 F.3d at 1057-60;
Ngo v.  INS, 192 F.3d 390, 397 (3rd Cir. 1999); Zadvydas, 185 F.3d at 287-88.
The final rule is structured to afford this type of review.  It provides a
custody review procedure that is comparable to the Pearson review scheme that
two circuit courts have endorsed, see Ngo, 192 F.3d at 395-98; Zadvydas, 185
F.3d at 297, and the Mariel Cuban Plan that the Ninth Circuit approved in
Barrera-Echavarria v.  Rison, 44 F.3d 1441, 1448 (9th Cir. 1995) (en banc).  It
has the procedural mechanisms that those courts have sustained against
procedural due process challenges.

Another commenter felt that the final rule should express commitment to
protecting and restoring the alien's liberty.  Notwithstanding their physical
presence in the United States, aliens under final orders of removal have no
greater constitutional rights with respect to their application to be released
from custody than excludable aliens seeking admission to the United States for
the first time.  Ho, 204 F.3d at 1058-59; Zadvydas, 185 F.3d at 294-95.  The
government has a compelling interest in expelling aliens under final removal
orders, just as it does excludable aliens.  Ho, 204 F.3d at 1059; Zadvydas, 185
F.3d at 296.  Furthermore, the failure of another government to agree to the
return of its nationals does not divest the United States of its sovereign
authority to enforce its immigration laws, nor does it confer on the alien a
right to be released back into the United States.  See Jean v.  Nelson, 727 F.2d
957, 975 (11th Cir. 1984) (en banc), aff'd, 472 U.S. 846 (1985).  To conclude
otherwise would mean that an alien who has been ordered removed from the United
States nonetheless enjoys a constitutional right to release from custody that i

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80283)**

greater than what the alien had when he or she was still in proceedings. Zadvydas, 185 F.3d at 296.

Finally, a commenter opined that § 241.4(k)(1)(ii) is illegal and should be deleted in its entirety, as well as any other reference in the rule to the additional three-month period that the district director may retain detention authority after the expiration of the removal period.   Section 241(a)(6) of the Act, 8 U.S.C. 1231(a)(6), plainly authorizes the Attorney General to exercise her discretion in determining whether to retain custody of criminal **\*80284** aliens beyond the 90-day removal period.  See H.R. Rep. No. 104-469, pt.1, at 234 (1996). The Department, while carefully considering the views of the commenters, has determined that the government's statutory interpretation is consistent with the statutory text and history and will retain the basic structure of the proposed rule.

Scope

  One commenter suggested changes to proposed §§ 241.4(a) and (a)(4) that would circumscribe the Attorney General's authority contrary to the express language of section 241(a)(6) of the Act, 8 U.S.C. 1231(a)(6).  The commenter suggested inserting language that detention be permissible only if necessary to effectuat removal.  The Department declines to limit the Attorney General's authority to exercise her discretion in the manner suggested by the commenter.

  Some commenters objected to proposed § 241.4(a)(4) because the scope of the rule includes an alien who has been granted withholding or deferral of removal under 8 CFR 208.  The nature of the comments suggest that there may be some confusion over the reference to withholding and deferral of removal in proposed § 241.4(a)(4). This section has been revised and paragraphs 241.4(a) and (b)(3) have been added to the final rule to clarify the applicability of these custody procedures.

  Many commenters suggested that the rule should create a presumption of immediate release in the case of an alien granted withholding of removal under either section 241(b)(3) of the Act or under the Convention Against Torture. Th Department declines to adopt this suggestion, as the decision to detain an individual granted withholding or deferral of removal requires a fact-specific analysis consistent with the provisions of section 241 of the Act.  A grant of withholding or deferral of removal is limited to the specific country or countries designated in the order and does not protect an individual from removal to a third country.  Moreover, a grant of withholding or deferral of removal does not constitute a grant of admission to the United States; decision regarding detention and release are subject to section 241 of the Act.  With respect to deferral of removal, 8 CFR 208.17(c) specifically provides that persons granted deferral who are otherwise subject to detention continue to be governed by section 241 of the Act.  The grant of withholding or deferral is relevant, however, and the decision-maker may consider the grant of protection in reaching a custody determination.

Board Review and Procedural Safeguards

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80284)**

Many commenters expressed concerns over the adequacy of procedural safeguards in the proposed rule and objected to the elimination of Board review of the Service's custody determinations. One commenter opined that the Board ensures consistency of decision making through publication of decisions and suggested that if Board review is eliminated by the final rule, then the Service should publish precedent decisions made available to the public to inform and bind decision-makers in subsequent cases. Further, the commenter noted the regulations should specify that the decisions are binding on the district directors and the Headquarter Post-order Detention Unit (HQPDU). First, the law does not require independent review by the Board. See Marcello v. Bonds, 349 U.S. 302, 310 (1955). Second, the rule contemplates individualized determinations where each case must be reviewed on its particular facts and circumstances, and affords aliens periodic reconsideration in a non-adversarial process. Appropriate guidance to the public and the Service officers involved is provided by the rules themselves. Appropriate exercise of discretionary authority and consistency in decision making are further achieved by transferring the detention authority from the various district directors nationwide to the centralized HQPDU and provision for specially trained Service officers who will administer the program and make the periodic custody determinations. The Service concurs with the commenter who expressed concern over training issues and recommended that the Service staff should be trained by non-law enforcement personnel. One of the basic requirements for quality decision making is specific training of officers who will be making custody recommendations or determinations. The Service already has an on-going training program for Service officers who participate in Cuban Review Panels and that training program includes non-law enforcement trainers. Training is being provided to Service officers who will administer the program, and will be maintained and routinely monitored with the implementation of the final rule. The commenter also advocated that the final rule provide an enforcement mechanism if the established procedures are not followed, such as a complaint procedure to the Executive Associate Commissioner for Operations, or Director of the HQPDU. Nothing in the rule prevents the detainee from notifying the HQPDU Director of delays in the processing of the detainee's custody review. The Service must maintain some flexibility in scheduling reviews, but any unusual delays or other problems should be brought to the Director's attention.

Several commenters expressed concern that the proposed rule does not give the alien a full opportunity to demonstrate why he or she should be released. The rule provides the alien the opportunity to submit advance documentation pertinent to consideration for release, and the alien has a full opportunity to supplement those materials during the panel interview. The panel will not proceed with or will interrupt an interview if it becomes apparent that the alien does not understand the proceedings. Further, the alien may advise the district director or HQPDU in advance of the scheduled review that he or she requests a translator, and, if appropriate, a competent interpreter will be provided.

Representation at no expense to the government is in accord with statutory requirements at section 292 of the Act, 8 U.S.C. 1362. Far from discouraging the alien from obtaining assistance for a custody review, the rule makes

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80284)**

reasonable provision for the alien to secure legal services or assistance of hi
or her choosing at no expense to the government.  The Service will provide
detainees with a list of available pro bono or low cost legal representatives
who may assist the alien in the custody review process.

Independent Adjudicator

 The Service also received numerous comments that the district director and
HQPDU custody reviews should be conducted by an independent adjudicator. Custod
review procedures do not require an independent adjudicator.  In Marcello, whic
dealt with deportation proceedings, the court noted that the fact that the
special inquiry officer was subject to the supervision and control of Service
officials charged with investigative and prosecuting functions did not so strip
the hearing of fairness and impartiality as to make the procedure violative of
due process.  The court stated that: "The contention is without substance when
considered against the long-standing practice in deportation proceedings,
judicially approved in numerous decisions in the federal courts, and against th
special considerations applicable to deportation which the Congress may take
into account in exercising its particularly broad discretion in immigration
matters." 349 U.S. at 311.  **\*80285**
 As indicated, this rule is modeled after the Cuban Review Plan, at 8 CFR
212.12, an analogous statutory and regulatory framework providing for the
continued custody of excludable criminal aliens when, subject to periodic
reconsideration, the Attorney General determines that release of such aliens
would pose a danger to the community.  The experience of the Cuban Review Plan
concretely demonstrates that these procedures provide sound decision making for
both the Government and the alien.  Because the Cuban Review Plan's inception i
April 1988, parole has been granted in over 7,000 cases (some of these may be
the same individuals who are reparoled).
 Under the current post-order custody review procedures set forth in 8 CFR 241.
and the Pearson memorandum, approximately 6,200 aliens have been provided
custody reviews by district directors during the period from February 1999
through mid-November 2000, to determine whether detention of the alien beyond
the 90-day removal period is warranted.  Of those aliens, approximately 3,380
were released.
 The Department has carefully considered the views of the commenters, and will
retain the proposed procedures in the final rule.

Showing by the Alien

 The Service received numerous comments on the showing required of the alien
under § 241.4(d)(1). These commenters believed that the Government should bear
the burden of demonstrating why the alien should not be released.  In other
words, there should be a presumption of release.  Some commenters objected to
the standard of "to the satisfaction of the Attorney General" as confusing and
also objected to the language that the alien's release not present a danger to
the "safety of other persons or to property." One commenter expressed the belie
that this was a lesser standard than "clear and convincing evidence" and was

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80285)**

therefore unacceptable.

One commenter proposed language for § 241.4(d)(1) based on a presumption in favor of release and no detention unless conditions identified in 18 U.S.C. 3142(c) cannot reasonably ensure the alien's appearance for removal and protect against dangers to the community, other persons, or property.

A presumption in favor of release along the lines suggested by the commenters would be contrary to recent legislation. Through a series of enactments over the past 13 years, Congress has manifested a serious and growing concern regarding aliens subject to removal who abscond or commit additional crimes while released from custody. Numerous provisions of the Act, as recently amended, address this concern. See generally 63 FR 27274 (May 18, 1998) (reviewing enactments and legislative history). Moreover, removal proceedings are civil in nature, and the Supreme Court has held consistently and in a variety of contexts that criminal procedures and legal standards are not applicable to such proceedings.

The language of section 241(a)(6) of the Act, 8 U.S.C. 1231(a)(6), the current provision governing post-order detention, does not create any such presumption of release, nor does an alien enjoy a right to liberty on account of the unwillingness of his or her own or another government to accept him or her. See Gisbert v. Attorney General, 988 F.2d 1437, 1443, 1447 (5th Cir.), amended, 99 F.2d 1122 (5th Cir. 1993); Garcia-Mir v. Smith, 766 F.2d 1478, 1484 (11th Cir. 1985).

The fact that an alien has been released on parole from a criminal sentence, and has not committed any additional offenses while on parole, may be considered by the Service in determining whether an individual alien may be released, but these facts are not dispositive. For example, an alien's release from criminal custody may be based on the expiration of his or her sentence or other factors such as overcrowding in the penal facility and not related to the alien's dangerousness to the community.

After full consideration of all pertinent comments, the Department will retain the required showing by the alien as provided in the proposed rule.

The Alien's Representative and His Role

Several commenters felt that the alien's representative should have a more active role in the custody review process, including questioning the alien and making closing statements. It was also suggested that the panel interview should be modeled after asylum interviews pursuant to 8 CFR 208.9(d). Nothing in the final rule prohibits the representative from speaking and assisting the alien or making a closing statement; however, the procedures are not formal or adversarial in nature, nor is this a criminal proceeding. The representative may be of assistance in bringing factors in support of the alien's request for release to the attention of the decision-maker that the alien may have neglected to mention and which may assist in explaining any documentation that requires clarification. However, the representative is an advocate and does not replace the need for the initial decision-maker to evaluate the demeanor and credibility of the alien. The decision-maker will evaluate the alien's suitability for release based on observation as well as other relevant circumstances. If the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
(Cite as: 65 FR 80281, *80285)

representative could fulfill this function, there would be no need for an interview of the alien.  Certainly it is within the decision- maker's discretion to order the alien released after hearing from counsel and receiving any written documentation in support of release just as the decision- maker can order release after a records review.  It is not required that the alien participate in an interview, the rule requires that the opportunity be afforded to the alien, however, the decision-maker may draw negative inferences from the alien's failure to participate.  The Department finds that it is not necessary to formalize the interview process as has been done with the asylum regulations and will retain the supplemental rule language as written.

 A number of commenters objected to the language of §§ 241.4(h)(2) and (i)(3)(ii) referencing the discretion of the panel or the institution to exclude an alien's representative.  The Department will modify the language of this section with language similar to that suggested by one of the commenters. To address any security concerns the panel or institution may have in regard to a particular representative, the final rule will reflect that the alien may obtain assistance from a person of his or her choice subject to the panel's and institution's reasonable security concerns.

 One commenter also stated that assistance of counsel should be at no expense to the Service rather than at no expense to the Government.  The Department has no authority to override the language of section 292 of the Act, 8 U.S.C. 1362, or to authorize expenditures by other government components, and will make no modification to this section of the rule.

Interpreters and Record of Interviews

 Many commenters expressed the view that, at the alien's request, the Department should utilize professional interpreters only.  One commenter added that interpreters should be utilized whenever one was used in the underlying criminal court case.  The Department wishes to stress that wherever communication becomes problematic, the interview will be interrupted or postponed if necessary to secure competent translation.  The panel members take notes during the interview process and are instructed *80286  during their training to ensure that the alien understands the nature of the proceedings and has every opportunity to address the panel members and ask questions.  Advance notification that the alien desires a translator will enable the decision-maker to investigate the necessity of securing the services of a qualified interpreter and will facilitate conducting the interview as scheduled.

 The Department declines to require a taped recording of the interview as some commenters urged.  The district director (under § 241.4(c)(1)) and the HQPDU Director (under § 241.4(c)(3)) maintain appropriate files respecting each detained alien who is reviewed for possible release.  The HQPDU panel members conducting an interview make contemporaneous notes of the interview, which are made part of the alien's A file.  Similarly, when an alien is interviewed as part of the district director's custody review, any notes made of such interview are made part of the alien's A file.  In addition, decision-makers may rely on a variety of materials, including those from public records, the Executive Office for Immigration Review's administrative record, and from the alien and his

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80286)**

family members and friends.  As explained herein, access to the alien's A file
is currently provided and that policy remains in effect.  Also, as noted below,
much of the information in an alien's A file is already in the detainee's
possession or is a public record (such as a conviction), and a Freedom of
Information Act (FOIA) request can be made for additional items. Any
documentation the alien submits will become part of the A file, as does the
written recommendation and decision.

Procedural Standards

  Some commenters observed that the proposed rule did not impose criminal
standards on the custody procedures and suggested that the rule should mandate
adherence to principles of criminal law.  However, immigration proceedings are
civil, not criminal, in nature and rules that are applicable to criminal cases
are not so here.  See INS v.  Lopez-Mendoza, 468 U.S. 1032, 1038-39 (1984); Gut
v.  INS, 908 F.2d 495, 496 (9th Cir. 1992) (per curiam) (holding Bail Reform Ac
inapplicable to immigration proceedings).
  Specifically, one commenter said that requiring responses from the alien durin
the panel interview, see § 241.4(i)(4), denies the right against self-
incrimination.  It is up to the alien to demonstrate that he or she does not
constitute a danger to the public safety or a flight risk.  While responses are
not required, if the alien chooses not to answer questions put to him or her,
negative inferences may be drawn from the alien's silence.  See Bilokumsky v.
Tod, 263 U.S. 149, 153-54 (1923).

The Decision Making Process

  Many commenters felt that § 241.4(d) did not require sufficiently comprehensiv
decisions detailing how and why a decision to continue custody was made.
Several commenters offered replacement language for this section. The Departmen
will retain the language of the proposed rule that mirrors that of 8 CFR 212.12
A decision to continue custody under this rule must specify the reasons for the
continued detention.  A particular format is not required.
  Several commenters noted that the HQPDU Director should not be able to overrul
a panel recommendation of release.  One commenter expressed the view that the
HQPDU be eliminated altogether.  The Department will make no changes to the rul
in this respect.  The purpose of the HQPDU is to act as a reviewing authority.
The HQPDU must have discretion to review the panel recommendation. This
discretionary authority does not nullify the interview process as one commenter
opined.  Rather, the process gives the central reviewer crucial information
about the alien that will provide a major focal point for the custody review.
To ensure consistency, the HQPDU should be authorized to reverse a favorable as
well as an unfavorable panel recommendation in the exercise of the Attorney
General's discretion.  The procedure of centralized review has been successfull
used in the Cuban Review Plan.  Experience with that program has demonstrated
that the Headquarters decision sometimes overrules the recommendation below,
whether that recommendation is in favor of release or continued detention.
  One commenter stated that the transfer of detention authority to the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80286)**

centralized unit would cause delays in the process.  The final rule provides fo
periodic reviews at scheduled intervals.  The Service will adhere to these
timetables as provided in the final rule.  Other commenters contend that the
process has inherent bias as the composition of the panels is selected from
Service professionals who are law enforcement personnel rather than social
workers, probation officers, or mental health professionals.  Decision making
authority regarding custody has traditionally been entrusted to officers of the
Service.  The Supreme Court has long recognized the ability of Service officers
to make immigration determinations, including custody determinations, and
Service officers have long carried out this responsibility.  The present rule i
intended to draw upon significant, specialized expertise and experience within
the Service, particularly from the Mariel Cuban program, to assist the
Department in reaching sound, well-considered custody decisions.  The Departmen
believes that this rule will improve the quality and consistency of post-order
custody decisions, and will retain the pertinent provisions as currently
drafted.

District Director Responsibilities

  Several commenters stated that the district directors should be encouraged to
interview the alien; that it is insufficient to rely on a records review that
may not be complete.  Under the final rule, the district director has the
discretion to conduct a personal or telephonic interview.
  Further, under the final rule the alien has the opportunity to submit any
documentation that he or she feels supports his or her request for release.  In
that way, any recent and probative material including rehabilitative efforts ma
be considered in conducting the custody review.  Also, the recent conclusion of
immigration proceedings should mean that the A file maintained by the Service o
the alien contains the most recent information available.  The Department will
not mandate a personal or telephonic interview by the district director for the
90-day custody review.  It is impracticable to require a district director to
personally interview every alien detained within his or her district.  The
district director must delegate many duties to the officers working for him or
her in order to ensure that tasks for which he or she is responsible are carrie
out properly and as expeditiously as possible.  The final rule provides for an
interview after the HQPDU has conducted a records review and has not made an
initial determination to order the alien's release.

Travel Documents

  Some commenters expressed the view that whether or not the Service could obtai
a travel document was either irrelevant or of minimal relevance to the issue of
whether the alien was eligible for release.  In addition, several commenters
suggested that travel documents would have to be in the Service's actual
possession in order to trigger an inquiry into further detention.  The
Department will not change the final rule based on these comments.  The comment
are contrary to the congressional goal, enacted into law, to ensure that aliens
ordered removed from **\*80287**  the United States are available for prompt removal

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80287)**

when travel documents are obtained.  As indicated in the government's response
to comments on the constitutionality of this rule and statutory interpretation,
section 241(a)(6) of the Act grants the Attorney General specific authority to
continue to detain an alien following the expiration of the removal period.  An
order of removal does not convert to a grant of admission or de facto admission
because a foreign government delays or refuses to accept the return of one of
its nationals.  Similarly, an alien found deportable and ordered removed does
not gain permission to remain in the United States simply because of the refusal
of another country to admit the alien.  Congress enacted the removal period at
section 241(a) of the Act to facilitate the removal of criminal aliens, an
objective of paramount importance.  Detention has proven to be an effective
enforcement tool in the removal of criminal aliens as nondetained aliens often
fail to appear for pending immigration proceedings or removal after issuance of
a final order.  It is within the discretion of the Service to determine the
likelihood of receipt of a travel document in the foreseeable future.  A policy
of automatic release pending the issuance of travel documents would thwart the
intention of Congress that the Attorney General be vested with the discretion to
detain certain aliens including those who pose a danger to the community or a
risk of flight pending their removal.  Such a policy could serve to encourage
foreign governments to further delay or refuse to accept the return of their
nationals if they expect the U.S. Government will release the alien.  See Mezei,
345 U.S. at 216; Barrera, 44 F.3d at 1448.

  Two commenters felt that the proposed rule improperly penalizes aliens who fail
to cooperate with the Service in seeking a travel document.  Although the
purposes of immigration detention are not punitive, we wish to emphasize that
cooperation in obtaining a travel document is required by law, and that failure
of an alien subject to a final removal order to cooperate with the Service in
obtaining a travel document is a felony punishable by imprisonment of four to
ten years.  See section 243(a)(1)(D) of the Act, 8 U.S.C. 1253(a)(1)(D) (Supp.
IV 1998).  An alien who fails or refuses to cooperate in obtaining a travel
document not only engages in criminal conduct, but also helps to bring about the
very condition he or she complains of--i.e., prolonged detention--by that
criminal conduct.  Moreover, the Act specifically provides for detention in the
event that an alien subject to a final removal order fails or refuses to
cooperate in obtaining a travel document.  See section 241(a)(1)(C) of the Act,
8 U.S.C. 1231(a)(1)(C) (Supp. IV 1998).  These provisions manifest a clear
congressional policy with regard to cooperation in obtaining travel documents.
The Department believes the rule as presently drafted is both consistent with
this congressional policy and reasonable in allowing for consideration of the
alien's cooperation and compliance with the law.  The pertinent provisions will
be retained without modification.

Criteria for Release

  The Department received several comments objecting to the criteria specified in
§ 241.4(e) because they differ from the statutory criteria.  Other commenters
found it confusing to require two separate findings regarding risk to the
community and opined that the focus of inquiry should be on prospective behavior

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

**(Cite as: 65 FR 80281, \*80287)**

in the community.  Some commenters found this section gave too much discretion
to the decision-maker whereas another felt there was too little discretion.  Th
criteria in this section are consistent with the Mariel Cuban parole regulation
at 8 CFR 212.12 and will assist the decision-maker in identifying and evaluatin
factors relevant to the exercise of discretion regarding continuation of
custody.  The criteria set out in § 241.4(e) provide essential guidance to the
decision-maker in assessing future risk to the community.  In making this
determination, both past and present behavior are relevant.  Restricting the
custody review inquiry to behavior subsequent to the alien's release from
incarceration or from the time of detention in Service custody would place
unacceptable limitations on the decision-maker's ability to fully review the
circumstances of an alien's case in making a custody decision.

One commenter suggested additional language for the end of § 241.4(e)(1)
(suggested change in italics): "\* \* \* immediate removal, while proper, is
otherwise not practicable or not in the public interest, or potentially
detrimental to the health or well being of the alien." The humanitarian concern
expressed by the commenter are encompassed within the rule's current language c
"not practicable or not in the public interest" and additional language is not
necessary.  The Service has the discretion to release a detainee or even to
delay removal for humanitarian reasons.

One commenter suggested that the criteria of § 241.4(e)(3) that "the detainee
is likely to remain nonviolent" be replaced with the detainee has expressed an
intent to remain nonviolent. The Department believes that the proposed rule
correctly captures the relevant inquiry.  An expression of intent to refrain
from violence, though potentially relevant to a release determination, is not i
itself necessarily determinative or even persuasive. Indeed, one of the aims of
the process is to assess the detainee's credibility regarding rehabilitation.
The language of the proposed rule will be retained, therefore, without
modification.


Factors for Consideration


Several comments expressed the view that the commission of disciplinary
infractions should not preclude a finding that the alien is not a risk to the
community.  Other commenters felt that their commission should be afforded
minimal weight in the risk assessment because of disparity in detention
standards and requirements, constant transfers, and language barriers.  There i
nothing in the rule that prohibits release in a case where the alien has been
involved in the commission of disciplinary infractions.  Disciplinary
infractions represent one of several factors that are to be considered and
afforded appropriate weight in making a recommendation or decision.  Some
infractions are more serious than others and will be weighed as warranted by th
circumstances in each case.  As a general matter, however, disciplinary
infractions are relevant to danger to the community, because they reflect the
alien's present ability to follow rules, respect the rights of others, and act
appropriately on his or her own if released into a less structured environment.
The Department received some comments stating that consideration of the
detainee's criminal conduct and other criminal history was too broad an inquiry

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80287)**

because it allows consideration of unverified charges not resulting in a criminal conviction.  However, under the immigration law, grounds of removability may include criminal conduct that does not result from a criminal conviction.  Because such conduct is sufficient to support a finding of removability from the United States, it may also be considered for detention purposes.  Consideration of criminal history is probative of the threat to the community posed by the alien's potential release.  It is relevant to consider the alien's entire criminal history although the weight given to each factor will vary according to the individual facts and circumstances of a **\*80288** particular case.  The rule adequately provides, without additional specificity, for consideration of the nature and severity of the convictions, factors in mitigation of a criminal sentence, the sentence imposed, state parole findings, probation, and other criminal history.  Moreover, to the extent that non conviction criminal history information may exist, the decision-maker can make clarifying inquiries with the alien or the alien's representative, as appropriate, and can give criminal history information whatever weight is appropriate in light of the information available.

Commenters suggested that the body of the rule as well as the supplemental information section should state that no negative inference will be made from non-participation in rehabilitation programs if such programs are not available in the facility where the alien is housed.  Some commenters wanted the body of the rule to add that (1) barriers to participation include long waiting lists, waiting periods for new detainees, and the unavailability of some programs to detainees, and (2) that program availability at state and local institutions prior to Service detention may be considered.

The Department understands the concerns reflected in these comments, but does not believe that a change in the regulatory text is necessary or appropriate to address them.  The relevance of nonparticipation in rehabilitative programs is proper subject of internal training.  It is not necessary, therefore, to reinforce this message through an alteration of regulatory text.  Moreover, detainees seeking release are free to submit materials indicating the impossibility or difficulty of enrolling in rehabilitative programs if they wish.

Two commenters felt that the rule should specify the nature of participation in rehabilitation programs, freedom from disciplinary infractions, and other indicia of commitment to good conduct required to secure the alien's release, particularly after commission of violent crimes.  In other words, these commenters invite the Department to specify criteria the satisfaction of which would require release from custody.

In general, the custody review determination involves highly individualized case reviews for which mandatory release pursuant to pre-established formulas would not be appropriate.  Rather, the Department prefers an approach based on the consideration of factors included in the rule instead of mandatory criteria. The regulation cannot cover every conceivable circumstance and provide enough flexibility to accommodate multiple issues considered in the exercise of discretion under section 241(a)(6) of the Act, 8 U.S.C. 1231(a)(6).  To avoid what the commenter terms "rubber stamp denials," the listed factors and other pertinent information will be evaluated in relation to the alien's character,

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80288)**

and ability to adjust in the community.  The Department declines to change the
rule based on this comment.

Similarly, the Department received numerous comments stating that the only
factors that should be considered are the enumerated ones and that no single
factor should be weighed so as to exclude all others.  The Department declines
to make any changes to the final rule based on these comments.  Maintaining
flexibility is essential to the exercise of discretion.  The decision-maker may
weigh the same factors differently depending on the circumstances of the
individual case.  Further, the list of factors for consideration provides a
guideline (not an exclusive list) for the decision-maker to utilize in reaching
a custody determination.  If other relevant circumstances are present in a
particular case, the decision-maker must be free to consider them.  Several
commenters suggested that favorable factors should be set out with more
specificity in the rule, including prospects for employment, community care
placement opportunities, ties to clergy or community organizations, and
sponsorship.  Such specificity is not needed in the final rule because the rule
already addresses sponsorship and provides for consideration of community ties
and other factors whether favorable or unfavorable.

Several commenters suggested that the body of the final rule state that there
is no presumption of dangerousness due to the existence of a criminal record.
The decision-maker's responsibility is to weigh the severity and circumstances
of the criminal conduct along with other material considerations, whether
favorable or unfavorable, in making a custody determination.  The Department
will not mandate a result either for release or detention based on the presence
or lack of a particular factor for consideration.  As discussed above, it is up
to the alien ordered removed to demonstrate a lack of danger to the community
and flight risk upon release.

Other commenters suggested that only immigration violations relevant to flight
risk should be considered and only willful failures to appear.  Failure to
appear for probation appointments, court hearings, and other mandated
proceedings is highly probative of flight risk.  As with any other factor, the
specific circumstances surrounding the failure to appear will determine how much
weight the decision-maker gives it.  It is unnecessary to amend the final rule
and address this with more specificity.

Two commenters wanted to add as a factor for consideration the length of time
the detainee has been in immigration custody.  The final rule does not exclude
this factor, if relevant, from the decision-maker's consideration, but an
explicit mention of this has not been included in the rule.

One commenter suggested that favorable factors such as ties to the United
States and availability of work or other programs should not be considered
because removable aliens may be deported from this country without regard to
such considerations.  The Department will not change the final rule based on
this comment.  The crux of this program is to make a custody determination based
on an analysis and weighing of factors that may permit the alien's release into
the community until such time as his or her removal can be effected.  Ties to
the community, work opportunities, and rehabilitative programs are relevant to
making a custody determination.

Several commenters suggested the addition of a factor to be weighed heavily in

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80288)**

favor of the alien: that the alien cannot be returned to his or her country of
origin.  Although nothing in the rule prevents a decision-maker from considering
such a circumstance in rendering a custody decision, the overriding concerns of
the rule are public safety and flight risk, and the likelihood of the alien's
successful reintegration into the community pending removal.  The Department
feels that the list of discretionary factors properly focuses on these issues,
but leaves decision-makers with broad discretion to consider other circumstances
as may be appropriate in each case.  Therefore, the text of the rule will not be
modified.

Sponsorship

  Several commenters believed that the sponsorship provision should be deleted or
modified.  The suggested language authorizes the district director or Executive
Associate Commissioner, in the exercise of discretion, to condition release on
the detainee's having a sponsor or participating in an approved halfway house or
mental health or community project, whether residential or not.  The language of
the rule is sufficiently broad to allow the decision- maker to consider a wide
range \*80289  of sponsorship possibilities.  Given that sponsorship is a
permissive rather than a mandatory condition of release, the Department will not
expand the language of § 241.4(j)(2).
  One commenter suggested that the rule should encourage employment authorization
and mandate a grant or denial decision within 30 days of application.  Such
specificity is not required in the final rule.  As with other provisions of the
final rule, each case will receive individual consideration.  The Service will
make decisions on work authorization as expeditiously as possible.  It was also
suggested that the rule should authorize the presence of the sponsor at the
panel interview.  The Department has no objection to the sponsor's being
selected as the alien's representative, subject to the security concerns of the
panel or institution.  If the alien desires the presence of his or her sponsor
in addition to the presence of counsel or other representative, the alien must
make advance arrangements with the panel and the facility.

Release or Order of Supervision

  One commenter asked whether the release of an inadmissible alien constitutes a
release on parole pursuant to section 212(d)(5) of the Act, 8 U.S.C. 1182(d)(5),
and 8 CFR 212.5(d)(2)(i) or under an order of supervision pursuant to section
241(a)(3) of the Act, 8 U.S.C. 1231(a)(3), and 8 CFR 241.5. Reference to the
parole statute and regulations is correct and will not be revised.  An alien who
has been denied admission to the United States continues to be an applicant for
admission and pending removal is subject to release in accordance with the
Attorney General's parole authority both before and after a final order of
exclusion or removal on grounds of inadmissibility.  See, e.g., Leng May Ma v.
Barber, 357 U.S. 185, 188 (1958); Palma v.  Verdeyen, 676 F.2d 100, 103 (4th
Cir. 1982); see also sections 101(a)(13) and 212(d)(5) of the Act, 8 U.S.C. 1101
(a)(13), 8 U.S.C. 1182(d)(5)(A); 8 CFR 212.12.  As in the Mariel Cuban program
at 8 CFR 212.12, the Attorney General may impose a reporting requirement or

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80289)**

other conditions of release in the case of an inadmissible alien who is detaine
pursuant to section 241(a)(6) of the Act and approved for parole.

Frequency and Timing of Reviews

 Numerous commenters objected to the change from review of custody status every
six months under the Pearson memoranda to annual reviews.  The Department has
fully considered this issue and will retain the annual review structure.  The
final rule is modeled after the Cuban Review Plan, which also operates on an
annual review schedule.  The Pearson reviews were structured on an interim basi
until more permanent procedures could be put in place.  The final rule will
allow sufficient time between reviews for interview scheduling and compiling of
the materials for review.  Further, interim reviews are not foreclosed by the
annually scheduled custody review.  Under § 241.4(k)(2)(iii), the HQPDU will
respond to the alien's written request for release based on a showing of a
material change in circumstances since the last annual review. One commenter
asked why there were no sanctions in the rule if a review is late.  The remedy
if a review is late is a full review as soon as possible. The Department must
preserve flexibility for redeployment of Service staff for national immigration
emergencies or other mandates requiring immediate attention.  Extreme weather
conditions, or other transportation problems may delay a panel's visit to a
particular facility.  A panel member's illness or other personal emergency, a
prison lock-down situation, or the alien's transfer to another facility are som
other reasons that interviews might be delayed.
 Several commenters objected to § 241.4(k)(3) of the rule allowing for
suspension of reviews for removal or good cause.  Other commenters urged that
this section provide for notice and a right of appeal.  The Department will
retain this section in the rule as written.  This section is essential for
administration of the program and in furtherance of removal where practicable.
Release under section 241(a)(6) of the Act is a privilege and can be revoked. A
provided in the rule, if further review is appropriate after suspension, it wil
be rescheduled.  Any administrative appeal and hearing would only delay the
review further and would be inappropriate in cases where prompt removal is
practicable.
 Several commenters suggested that transfer of detention authority from the
district director to the HQPDU should occur upon expiration of the removal
period.  The Department will retain the rule provisions regarding transfer as
written.  The rule provides for an orderly transfer of authority and fully sets
out the procedures for automatic, periodic review.
 One commenter noted that the rule is a tremendous improvement in providing for
meaningful and periodic reviews.  The balance of comments pertaining to §
241.4(k) concern requiring mandatory deadlines for conducting custody reviews,
writing decisions, and serving them on the alien.  The Department will not make
any changes to the final rule as a result of these comments.  As indicated in
previous responses, the Service must maintain flexibility for allocation of
resources and for working cooperatively with other federal agencies as well as
state and local authorities.  The Service is obligated to make every reasonable
effort to ensure that reviews are held timely and professionally.

    Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80289)**

Interim Reviews

 Two commenters suggested revision of § 241.4(k)(2)(iii) to allow for quarterly
interim reviews at the alien's request without restriction.  The Department
understands the commenters' concerns; however, implementing such a program woul
severely strain Service resources, which do not permit more frequent reviews
without cause.  The Service would scarcely have completed a review before it
would be time to begin another.  Frequent re-review of the same facts without
any change in circumstances in support of release would merely serve to
misdirect Service resources that otherwise could be more usefully employed and
would result in delay of reviews in other cases.  The Department disagrees with
the comment that circumstances cannot change because the alien is detained. For
example, an appropriate sponsor might be located, the alien might receive an
employment offer, remain incident free, or become eligible for or successfully
complete rehabilitative programs that might influence the decision-maker to
approve release.

Notice and File Access

 Some commenters requested that the notification of custody review be extended
to 45 or 60 days prior to the review.  The Department declines to extend this
notification period.  If the alien requires additional time to prepare for a
custody review, it may be granted in accordance with the provisions of the fina
rule.  The Department agrees with the commenter who suggests that the alien be
given the address of the HQPDU.  That information will be supplied to the alien
with written notification of the Headquarters custody review.
 Some commenters felt that § 241.4(h)(4) should specifically advise the alien i
the district director is retaining jurisdiction over the case for the additiona
three-month period, rather than referring the case to the HQPDU at the
expiration of the 90-day removal period.  The structure of the final rule
permits the district director flexibility in determining what options are
available to him or her during the **\*80290** initial period when the Service has
assumed physical custody over the alien.  During this additional three- month
period, the district director may be able to execute the removal order, may
order the alien's release pending removal, or may refer the case to the HQPDU
for further review.  The rule's notice requirements advise the alien of the
results of the 90-day review while maintaining the district director's
flexibility to determine what further action the case requires.
 Numerous commenters requested full disclosure to the detainee and the
representative of the alien's A file and the file of the detention facility.
Others requested copies of all documents relied on by the Service at the custod
review.  Access to the alien A file will be provided to the detainee and the
representative in accordance with current Service policy and practice as
developed under the Cuban Review Plan, and subject to limited exceptions such a
the identities of confidential informants, law enforcement personnel, and
documents that cannot be released because the information therein would
adversely effect an ongoing investigation.
 Because access to the A file is provided, the Service will not provide copies

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80290)**

as a matter of course.  In any event, much of the information in the A file is
already in the detainee's possession as it was originally obtained from the
detainee or is a public record (such as conviction documents).  A FOIA request
can be made for additional items.  The detainee or representative must make
arrangements for access to files of the detention facility from the custodian of
those records in advance of when the party wishes to review them.  The Service
is not the custodian of files maintained by a non-Service detention facility and
has no authority to grant or deny access to such files.

   One commenter proposed language changes to the provisions concerning service of
notices and decisions to the alien and the representative of record.  The
Department will not change the wording of §§ 241.4(d)(2) or (d)(3).  Section
241.4(d)(3) adequately ensures that the representative of record will receive a
copy of any notice or decision.

   One commenter requested that the notice required by § 241.4(h)(2) for the
district director's 90-day review advise the alien of the criteria of § 241.4(e)
and the factors in § 241.4(f).  The Department will adopt this recommendation.
The notice of a district director or HQPDU custody review will advise the alien
of the criteria of § 241.4(e) (conclusions that must be drawn by the decision-
maker before approving a release) and factors in § 241.4(f) to assist the alien
in preparing for the review.  A notice of custody review, whether by the
district director or the HQPDU, will briefly advise the alien of the review
procedures and display the correct address for submission of any documents.  For
a more detailed explanation of review procedures, the detainee may consult the
final rule.

   The Department will not accept the recommendation of a commenter to amend the
language of § 241.4(h)(2) so that the alien's request for additional time to
submit documentation to the district director extends the time for conducting
the custody review only until the additional information has been received.  The
custody review will be conducted as promptly as scheduling permits.


Withdrawal of Release Approval/Revocation

   One commenter objected to § 241.4(l)(2) (Determination by the Service).  Other
commenters recommended limiting § 241.4(j)(4) (Withdrawal of release approval)
to cases where removal is practicable or there is a material change in the
detainee's conduct, indicating he poses a risk to the community.  Commenters
also requested written notice of withdrawal of release approval and provisions
for a hearing process.  Upon revocation, commenters suggested that the next
review be conducted within 3 months.  Depending on the circumstances of a
particular case, revocation or withdrawal of release authorization under section
241(a)(6) of the Act, 8 U.S.C. 1231(a)(6), may be appropriate for any of the
reasons listed in section 241.4(l)(2) of the rule, including the alien's
violation of a condition of release.  Cf. section 243 of the Act, 8 U.S.C.
1253(b) (authorizing criminal sanctions for violation of release conditions).
Section 241.4(l)(1) of the rule provides that, upon revocation, the alien will
be provided notice of the reasons for the revocation.  In addition, the rule is
being modified to provide that the alien will be afforded an initial informal
interview promptly after his return to Service custody to provide the alien an

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80290)**

opportunity to respond to the reasons for the revocation.  The rule currently
provides at § 241.4(l)(3) for a full custody review, including an interview, to
be conducted within three months of the revocation of release.  The rule is
being modified to clarify that the custody review will include a final
evaluation of any contested facts relevant to the revocation and a determination
whether the facts as determined warrant revocation and further denial of
release.

Recordkeeping, Reporting, and Ombudsman

  Several commenters stated that the district director should forward all
documents submitted by the alien to the HQPDU.  The Department agrees with this
recommendation.  The alien's submissions will be included in the HQPDU custody
review file.
  Several commenters endorsed a recommendation that the Service compile
statistics on nationality, length and place of detention, and dates of review,
and that these statistics be made available for independent review.  The Service
will maintain statistics on the detained post-order population.  Such statistics
may be available through authorized pre-existing procedures.  The Department
declines to appoint a separate ombudsman to oversee the implementation of the
program and keep statistics.  The Service has a Headquarters managerial position
in the Detention and Removals Branch that fulfills the functions of an
ombudsman.

Courts

  Some commenters wanted the rule to permit federal court stays.  See 8 CFR 241.
(Administrative stay of removal).  This rule concerns the delegation and
exercise of powers by the Attorney General, not the courts.  Thus, the rule will
not be modified to account for judicial stays.

Executive Orders

  One commenter predicted that the rule will prolong litigation with a
corresponding increase in costs if promulgated.  The commenter also noted the
Government's litigation and detention costs.  These comments concern policy
determinations made by Congress, which sets immigration policy and passes
legislation allocating expenditures within the federal budget.  This is not an
executive or judicial function.
  This commenter also stated that the rule affects the relationship between the
states and the federal government by nullifying prior determinations (to
release) by state court judges, probation officers, prison authorities, and
parole administrators.  The commenter stated that the rule requires a federalism
summary impact statement.  The Department disagrees with the need for an impact
statement.  States have no authority to regulate immigration. This function is
solely within the province of the federal government.  This rule concerns civil
immigration, not criminal law.  The statutes and policies being **\*80291**
implemented by state courts, probation and parole departments, and penal

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80291)**

authorities' release determinations are based on different goals and
responsibilities than those that govern a release or detention decision
affecting an alien under a final order of removal.  For example, release from a
term of imprisonment is mandated when an individual has been sentenced for
commission of a criminal offense and that sentence has been served.  There is no
authority to detain the individual longer under that criminal sentence. Also, a
particular sentence may be mandated by statute irrespective of the risk that the
criminal poses to the community upon release.  This is exemplified in "truth-in
sentencing" jurisdictions.  There have also been various instances where a court
order mandates the release of criminals because of prison overcrowding.  Thus,
the Department believes that no impact study is required.

Venue for Panel Reviews

 Two commenters stated that panel reviews should be conducted at district
processing centers to allow attorney representatives and family to attend.  The
Department cannot implement this suggestion.  The rule already permits the
attendance of the attorney representative.  Panel interviews will be conducted
at the facility where the alien is detained.  Moving detainees for interviews
would involve significant additional expenditures and security concerns that
would detract from the expeditious and efficient operation of the program.

Transition Provisions

 The Department will retain the transition provisions as written.  Two
commenters requested that transitional cases receive an interview irrespective
of whether the last review was a records review or included an interview and
that the reviews should be held more frequently than specified in the rule. The
transition provisions of the rule more closely mirror the permanent procedures
than do the commenters' suggestions, which in timing resemble the interim
Pearson provisions.  The provisions allow the Service to give full consideration
to cases that have not yet received any review and advance equal treatment of
all cases more expeditiously than the commenters' proposal.

Vera Institute of Justice Study

 A commenter noted that the proposed rule did not mention the Vera Institute of
Justice study recommending alternatives to detention for aliens ordered removed.
The Service recently received the final report of the Vera Institute Appearance
Assistance Program, and is currently reviewing it.  The Service agrees that
there is potential for use of the processes and information from the study in
the area of detention of aliens with final removal orders. The Service intends
to establish additional pilot projects in several districts in the next year.
The projects may include contract or governmental personnel and will test
various levels of supervision.  Supervised release of post-order detainees will
be examined in some of the test sites.  These projects may involve halfway
houses or other support and rehabilitation programs to prepare detainees for
release or for future consideration.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80291)**

 Several commenters suggested deletion of the language in the supplementary
information addressing foreign and domestic affairs, availability of resources,
public policy, and humanitarian concerns.  The Attorney General must be able to
take these factors into account and assess their impact on individual and
institutional decision making.  INS v.  Aguirre-Aguirre, 526 U.S. 415, 424-25
(1999).

Who Is Covered Under This Final Rule?

 This rule establishes a permanent review procedure applying to aliens who are
detained following expiration of the 90-day removal period.  It also applies to
aliens released under the provisions of the final rule upon a finding that they
do not constitute a risk to the community or a flight risk.  The Attorney
General is authorized to detain these aliens beyond the removal period
consistent with section 241(a)(6) of the Act, 8 U.S.C. 1231(a)(6).  This
permanent review procedure governs all post-order custody reviews inclusive of
aliens who are the subjects of a final order of removal, deportation, or
exclusion, with the exception of inadmissible Mariel Cubans whose parole under
section 212(d)(5) of the Act, 8 U.S.C. 1182(d)(5), is governed by the provision
of 8 CFR 212.12.  Mariel Cuban custody reviews will continue to be conducted
pursuant to those provisions.

What Are the Proposed Procedures for Post-Order Custody Reviews?

 Under the final rule, the district director maintains the responsibility for
the initial custody review when the alien's immediate removal is proper but not
practicable at the expiration of the removal period.  For the initial post-
order custody review at the expiration of the removal period (the 90-day custody
review), the district director will conduct a records review.  In most cases, i
will be unnecessary for the district director to undertake a personal interview
because the alien's immigration proceedings have recently concluded, and his or
her records are therefore up-to-date.  The district director has the discretion
to conduct a personal or telephonic interview if he or she finds that it will
assist him or her in making a custody determination.  Further, the alien will b
provided with the opportunity to present any relevant written information the
alien desires in support of his or her release into the community.
 After the 90-day custody review, the district director will notify the alien i
writing that he or she is to be released from custody, or that the alien will b
continued in detention pending removal or further review of his or her custody
status.
 Where the district director has notified the alien that he or she will continu
to be detained pending removal, the district director's authority to reconsider
an alien's custody status may be extended for an additional period of up to
three months after expiration of the removal period.  The additional three-mont
period will allow the district director to continue efforts to obtain the
necessary travel documents to effect the alien's removal before the detention
authority is transferred to Service Headquarters.
 During the additional three-month period, the alien may submit a written

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00193-SHR   Document 8   Filed 02/27/2001   Page 63 of 154

request to the district director for further review of his or her custody status. The district director shall consider information that the alien submits in support of his or her release from detention demonstrating a material change in circumstances. The district director will provide a written response as appropriate to the alien's submission of such new information and may, in the exercise of discretion, conduct any further review of the alien's custody status that he or she deems appropriate. The district director retains the authority to release the alien during this period as well.

If the alien has not been removed or released from detention, detention authority transfers to the newly designated Service component, the HQPDU, under the authority of the Executive Associate Commissioner, Field Operations (Executive Associate Commissioner), either at the end of the 90-day removal period or at the expiration of the three-month extension period. Under either circumstance, the HQPDU will ordinarily commence a custody review within 30 days of the transfer of detention authority or as soon as possible thereafter should **80292** unforeseen or emergent circumstances arise. The alien will receive written notice of the custody review approximately 30 days prior to the scheduled review. The HQPDU will conduct all further custody determinations as long as the alien remains in custody pending removal. Subsequent custody reviews will be conducted at annual intervals (or more frequently in the sole discretion of the HQPDU).

When the detention authority transfers to the HQPDU, that unit will conduct a records review for each alien previously ordered detained by the district director. If the records review does not result in a release decision, the alien will be given the opportunity for a panel interview. The two-member panel will be chosen from professional staff of the Service. The interview will be conducted in person and a translator will be provided if the Service official determines that a translator's assistance is appropriate. As under the Mariel Cuban Review Plan, the interviewing panel will make a custody recommendation to the HQPDU. Upon receipt of the panel's recommendation, the HQPDU shall determine whether to detain the alien or grant release consistent with the delegation of discretionary authority. The decision of the HQPDU will be final and will not be subject to further administrative review.

The HQPDU is not bound by the panel's recommendation. The HQPDU retains full statutory authority for custody determinations under sections 241(a)(6), 8 U.S.C. 1231(a)(6), and (for inadmissible aliens) 212(d)(5) of the Act, 8 U.S.C. 1182(d)(5). The panel's recommendation is designed to serve as an important guide to the exercise of discretion for the HQPDU, but the decision-maker must be free to assess all of the circumstances in arriving at a final custody determination. The decision-maker must also take into consideration changes in foreign and domestic affairs, the availability of fiscal resources, public policy and humanitarian concerns, and other factors that could weigh for or against the decision in an individual case.

The subsequent HQPDU periodic review, to be conducted within one year of a decision declining to grant release under these procedures or as soon as practicable thereafter in case of unforeseen circumstances or an emergent situation, will address whether the alien can be released into the community if the alien has not been removed since the last review. The HQPDU may conduct a

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80292)**

custody review at more frequent intervals at its sole discretion and consider written submissions demonstrating any material change in circumstances that supports the alien's release during the interval between reviews. Material change does not include mere disagreement with the decision denying release. The HQPDU will give a written response to the alien's submission of new information as appropriate under the rule. Written submissions, whether to the district director or the HQPDU, must be in English or they may not be given consideration.

 The alien may be assisted by a person of his or her choice in preparing or submitting information in response to the notice of custody review. The Service has followed the guidelines set forth in 8 CFR 212.12(d)(4)(ii) (regarding representation of an alien before a Mariel Cuban parole panel) rather than the more formal rules regarding attorney representatives at 8 CFR 292.1. Both 8 CFR 212.12 and this final rule allow the alien to be accompanied by a person of his or her choice at the panel interview (subject to the discretion of the institution and panel). It may be difficult for the detained alien to secure the services of a licensed attorney for each annual review, or counsel may change between reviews. Further, giving the alien discretion in selecting who will assist him or her in preparation of materials for submission to the district director and who will accompany him or her to the panel proceeding promotes two important Service objectives. These objectives are to make this process as flexible and nonadversarial as possible and to promote the alien's level of comfort with the proceedings. The alien's representative will be required to complete a Form G-28, Notice of Entry of Appearance as Attorney or Representative, at the time of the interview or prior to reviewing the detainee's records. Attached to any notice of a records review or interview, the Service will provide a list of free or low cost attorneys and representatives who are located near the alien's place of confinement.

 Although the Service will forward a copy of all notices and decisions relating to the custody review to counsel or other representative of record through regular mail, the alien bears primary responsibility for ensuring that the individual providing assistance to him or her is aware of any notices, decisions, or other documentation relating to the custody review. Experience with the Cuban Review Plan has demonstrated that an alien may have several representatives successively, or may be assisted by an attorney, other person, or organization whose representation is not known to the Service.

 Any person assisting the alien should not answer for the alien but should assist the alien in the latter's presentation of information supporting a release decision. Whether the alien's case is before the district director for review or the panel for an interview, the purpose of the review process is to collect information. Because the decision-maker must evaluate the suitability of the alien for release, it is important for the alien to address the district director or panel directly and be able to speak freely. The district director and panel need to hear from the alien rather than his or her representative.

 Both the Executive Associate Commissioner through the HQPDU and the district director have the authority to withdraw approval for release and to revoke release or parole in the exercise of discretion. Reasons for withdrawal of approval for release or revocation include the Service's ability to obtain a

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80292)**

travel document and remove the alien, the alien's adverse conduct while awaiting
release, the decision-maker's belief that the alien's actions while in the
community pose a threat to public safety, or any other circumstance that
indicates that release would no longer be appropriate.  If the decision-maker
withdraws release approval or revokes the alien's release or parole, the alien
will receive written notification specifying the reasons for the withdrawal of
approval for release or revocation of post-order release or parole.  The alien
will be afforded an initial informal interview promptly after his or her return
to Service custody to afford the alien an opportunity to respond to the reasons
stated in the notice.  A full custody review, including an interview, will be
conducted within three months of the revocation of release and will include a
final evaluation of any contested facts relevant to the revocation, and a
determination whether the facts as determined warrant revocation and further
denial of release.
 This rule addresses Service procedures for conducting post-order custody
reviews.  It does not circumscribe the exercise of the Commissioner's authority
to direct otherwise, as appropriate.  Section 2.1 delegates the authority vested
with the Attorney General to the Commissioner.  Section 241(a)(3) of the Act
vests authority with the Attorney General to promulgate regulations governing
supervision of aliens beyond the removal period and section 241(c)(2) of the Act
vests authority with the Attorney General to grant stays of removal.  Therefore,
the Commissioner already has the authority to release certain aliens from
Service custody, **\*80293**  issue orders of supervision, and grant stays of
removal.  As directed by the Commissioner or Deputy Commissioner, Service
officials have authority to release certain aliens from Service custody, issue
orders of supervision, and grant stays of removal. Therefore, this rule also
amends 8 CFR 241.4, 241.5, and 241.6 to reflect the concurrent authority of the
Commissioner and other designated Service officials.

What Other Changes Does This Rule Make?

 This rule terminates the existing procedure of appeal to the Board of
Immigration Appeals (Board) under 8 CFR 236.1 for an alien who receives an
unfavorable custody decision from the district director.  See Matter of Saelee,
Interim Decision 3427 (BIA 2000).  Because these aliens have final orders of
removal, all legal issues involving removability (and any relief from removal,
if available) have been resolved through the Executive Office for Immigration
Review or through alternate procedures.  Custody determinations at this stage of
the process involve separate and distinct issues, and the Service has the
knowledge and expertise required to make these custody decisions.
 This rule for permanent procedures provides for an automatic multi-tiered
annual review process subsequent to the district director's 90-day review as
long as the alien remains in custody.  The detainee is assured a periodic and
thorough review that does not depend on the alien's request for a custody review
or the filing of an appeal, but is required at regular intervals by regulation.
This review process will ensure timely, scheduled reviews of each alien's
custody status.
 Accordingly, in order to implement a single comprehensive review process for

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80293)**

post-order custody cases, this rule removes all references to post-order
detention from 8 CFR 236.1. As revised, 8 CFR 236.1 would govern detention
issues only for aliens who have not yet received a final removal order.
  Any case pending before the Board on December 21, 2000 will be completed by th
Board. Should the alien decide to withdraw his or her appeal, the Service shal
continue to conduct custody reviews under the provisions of this rule.
  This rule also removes 8 CFR 212.13 and any references to that section in 8 CF
212.5 and 8 CFR 212.12. Section 212.13 established a single Departmental parol
review for all excludable Mariel Cubans who on December 21, 2000 were detained
by virtue of the Attorney General's authority under the Act and whose parole ha
been denied after the exhaustion of the review procedures of 8 CFR 212.12. The
Departmental Review Panels have completed the review of the cases of detainees
eligible for such review. Thus, there is no longer a need for 8 CFR 212.13.
This action will not otherwise affect the Cuban Review Plan set forth in 8 CFR
212.12.

What Must the Alien Demonstrate To Show His or Her Suitability for Release?

  The alien must be able to show to the satisfaction of the decision-maker that
he or she does not constitute a danger to public safety or a flight risk
pursuant to the criteria set forth in this rule.

If a Travel Document Can Be Obtained, How Is The Custody Review Process
Affected?

  Detention or release of aliens with a final order of removal is tied to the
Service's mission to enforce the immigration laws and protect the interests of
the United States, pending the aliens' eventual removal from the United States.
Accordingly, district directors will continue to make efforts to obtain travel
documents even after review authority has transferred to the HQPDU.
Headquarters Detention and Removals, Office of Field Operations will also assis
in the effort to secure travel documents.
  The ability to secure a travel document by itself supports a decision to
continue detention pending the removal of the alien and obviates the need for
further custody review because it means the alien can be deported promptly. Se
8 CFR 212.12(g)(1). Custody reviews may be pretermitted in the case of an alie
for whom travel documents are available. Pending litigation, an administrative
or judicial stay, or other barrier to removal does not entitle a removable alie
to be released within the United States pending resolution of the underlying
action or event. Aliens whose removal is withheld under 8 CFR 208.16 or
deferred under 8 CFR 208.17 may be considered for release.

Will There Be Special Release Conditions Under This Rule and Will Work
Authorization Be Granted?

  Release conditions and work authorization for aliens subject to a final order
of removal will continue to be governed by 8 CFR 241.5. The district director
or HQPDU may wish to impose conditions, in addition to those enumerated by

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
(Cite as: 65 FR 80281, *80293)

regulation, such as that the alien obey all laws, not associate with any person
involved in criminal activity, not associate with anyone convicted of a felony
without permission, not carry firearms or other dangerous weapons, and such
other conditions as the decision-maker deems appropriate. Under 8 CFR 241.5(c)
a grant of work authorization is discretionary but requires the decision-maker
to make an initial finding that the alien cannot be immediately removed because
no country will accept the alien or that the alien's removal is impracticable or
contrary to the public interest.

Sponsorship and evidence of financial support may be required as a precursor to
release under the rule. The Service has determined that appropriate sponsorship
is in the best interest of the alien and community when an alien is approved for
release pending removal. See, e.g., Fernandez-Roque v. Smith, 734 F.2d 576,
583 (11th Cir. 1984). Although the Service reserves the authority to impose
conditions of release, including appropriate sponsorship, this rule does not
compel the Government to tailor existing programs to the needs of individual
aliens or to create or fund additional programs if suitable sponsorship is not
located or available for an alien.

If an alien is detained in a facility that does not provide any rehabilitative
programs, no negative inference respecting release will be drawn against the
alien in making a custody determination based on the fact that the alien did not
participate in such programs. However, if the facility has such programs
available to the alien but the alien refuses to participate, that fact may be
considered by the decision-maker.

Effective Date of this Final Rule

The Department's implementation of this final rule effective upon publication
in the Federal Register is based upon the "good cause" exception found at 5
U.S.C. 553(d)(3). The Pearson reviews were intended for interim use only;
through this rule, the agency has now adopted permanent and more comprehensive
procedures for post-order detainees. Implementation upon publication affords
both the Government and detainees the benefits of the new procedures as soon as
possible. Delaying the effective date of this rule would be contrary to the
public interest.

Regulatory Flexibility Act

The Attorney General, in accordance with the Regulatory Flexibility Act, 5
U.S.C. 605(b), has reviewed this regulation and, by approving it, certifies
*80294 that this rule will not have a significant economic impact on a
substantial number of small entities. This rule would provide a more uniform
review process governing the detention of certain aliens who have received a
final administrative removal order but whose departure has not been effected
within the 90-day removal period. This rule does not affect small entities as
that term is defined in 5 U.S.C. 601(6).

Unfunded Mandates Reform Act of 1995

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80294)**

 This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or mor in any one year, and it will not significantly or uniquely affect small governments.  Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

Small Business Regulatory Enforcement Fairness Act of 1996

 This rule is not a major rule as defined by section 251 of the Small Business Regulatory Enforcement Act of 1996, 5 U.S.C. 804.  This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

Executive Order 12866

 This rule is considered by the Department, to be a "significant regulatory action" under Executive Order 12866, section 3(f), Regulatory Planning and Review.  Accordingly, this rule has been submitted to the Office of Management and Budget for review.

Executive Order 13132

 This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government.  Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implication to warrant the preparation of a federalism summary impact statement.

Executive Order 12988

 This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2 of Executive Order 12988, Civil Justice Reform.

List of Subjects

8 CFR Part 212

 Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

8 CFR Part 236

 Administrative practice and procedure, Aliens, Immigration.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80294)**

8 CFR Part 241

Administrative practice and procedure, Aliens, Immigration.
Accordingly, chapter I of title 8 of the Code of Federal Regulations is amende
as follows:

PART 212--DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAI
INADMISSIBLE ALIENS; PAROLE

1.   The authority citation for part 212 continues to read as follows:

Authority: 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1187, 1225, 1226, 1227, 1228
1252; 8 CFR part 2.

§ 212.5 [Amended]

2.   Section 212.5(f) is amended by revising the phrase "§§ 212.12 and 212.13"
to read "§ 212.12".

§ 212.12 [Amended]

3.   Section 212.12 is amended by:
a.   Revising the phrase "Except as provided in § 212.13, the authority" to rea
"The authority" in paragraph (b) introductory text; and by
b.   Removing the word "either" and removing the phrase "or § 212.13, whichever
is later" in paragraph (g)(2).

§ 212.13 [Removed]

4.   Remove section 212.13.

PART 236--APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS;
REMOVAL OF ALIENS ORDERED REMOVED

5.   The authority citation for part 236 continues to read as follows:

Authority: 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1362; sec. 303(b) of
Div. C of Pub. L. No. 104-208; 8 CFR part 2.

6.   Section 236.1 is amended by:
a.   Removing the last sentence in paragraph (d)(1);
b.   Revising paragraph (d)(2); and by
c.   Removing paragraph (d)(3)(iii), to read as follows:

§ 236.1 Apprehension, custody, and detention.

*  *  *  *  *
(d)  *  *  *

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80294)**

(2) Application to the district director. After expiration of the 7-day period in paragraph (d)(1) of this section, the respondent may request review by the district director of the conditions of his or her release.
\* \* \* \* \*

PART 241--APPREHENSION AND DETENTION OF ALIENS ORDERED REMOVED

7.  The authority citation for part 241 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1223, 1227, 1231, 1251, 1253, 1255, and 1330; 8 CFR part 2.

8.  Section 241.4 is revised to read as follows:

§ 241.4 Continued detention of inadmissible, criminal, and other aliens beyond the removal period.

(a) Scope. The authority to continue an alien in custody or grant release or parole under sections 241(a)(6) and 212(d)(5)(A) of the Act shall be exercised by the Commissioner or Deputy Commissioner, as follows: Except as otherwise directed by the Commissioner or his or her designee, the Executive Associate Commissioner Field Operations (Executive Associate Commissioner) or the district director may continue an alien in custody beyond the removal period described in section 241(a)(1) of the Act pursuant to the procedures described in this section.  Except as provided in paragraph (b)(2) of this section, the provisions of this section apply to custody determinations for the following groups of aliens:

(1) An alien ordered removed who is inadmissible under section 212 of the Act, including an excludable alien convicted of one or more aggravated felony offenses and subject to the provisions of section 501(b) of the Immigration Act of 1990, Public Law 101-649, 104 Stat. 4978, 5048 (codified at 8 U.S.C. 1226(e)(1) through (e)(3)(1994));

(2) An alien ordered removed who is removable under section 237(a)(1)(C) of the Act;

(3) An alien ordered removed who is removable under sections 237(a)(2) or 237(a)(4) of the Act, including deportable criminal aliens whose cases are governed by former section 242 of the Act prior to amendment by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Div. C of Public Law 104-208, 110 Stat. 3009-546; and

(4) An alien ordered removed who the decision-maker determines is unlikely to comply with the removal order or is a risk to the community.  **\*80295**

(b) Applicability to particular aliens.--(1) Motions to reopen. An alien who has filed a motion to reopen immigration proceedings for consideration of relief from removal, including withholding or deferral of removal pursuant to 8 CFR 208.16 or 208.17, shall remain subject to the provisions of this section unless the motion to reopen is granted.  Section 236 of the Act and 8 CFR 236.1 govern custody determinations for aliens who are in pending immigration proceedings before the Executive Office for Immigration Review.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80295)**

(2) Parole for certain Cuban nationals. The review procedures in this section do not apply to any inadmissible Mariel Cuban who is being detained by the Service pending an exclusion or removal proceeding, or following entry of a final exclusion or pending his or her return to Cuba or removal to another country. Instead, the determination whether to release on parole, or to revoke such parole, or to detain, shall in the case of a Mariel Cuban be governed by the procedures in 8 CFR 212.12.

(3) Individuals granted withholding or deferral of removal. Aliens granted withholding of removal under section 241(b)(3) of the Act or withholding or deferral of removal under the Convention Against Torture who are otherwise subject to detention are subject to the provisions of this part 241. Individuals subject to a termination of deferral hearing under 8 CFR 208.17(d) remain subject to the provisions of this part 241 throughout the termination process.

(c) Delegation of authority. The Attorney General's statutory authority to make custody determinations under sections 241(a)(6) and 212(d)(5)(A) of the Act when there is a final order of removal is delegated as follows:

(1) District directors. The initial custody determination described in paragraph (h) of this section and any further custody determination concluded in the three-month period immediately following expiration of the 90-day removal period, subject to the provisions of paragraph (c)(2) of this section, will be made by the district director having jurisdiction over the alien. The district director shall maintain appropriate files respecting each detained alien reviewed for possible release, and shall have authority to determine the order in which the cases shall be reviewed, and to coordinate activities associated with these reviews in his or her respective district.

(2) Headquarters Post-Order Detention Unit (HQPDU). For any alien the district director refers for further review after the 90-day removal period, or any alien who has not been released or removed by the expiration of the three-month period after the 90-day review, all further custody determinations will be made by the Executive Associate Commissioner, acting through the HQPDU.

(3) The HQPDU review plan. The Executive Associate Commissioner shall appoint a Director of the HQPDU. The Director of the HQPDU shall have authority to establish and maintain appropriate files respecting each detained alien to be reviewed for possible release, to determine the order in which the cases shall be reviewed, and to coordinate activities associated with these reviews.

(4) Additional delegation of authority. All references to the Executive Associate Commissioner and district director in this section shall be deemed to include any person or persons (including a committee) designated in writing by the district director or Executive Associate Commissioner to exercise powers under this section.

(d) Custody determinations. A copy of any decision by the district director or Executive Associate Commissioner to release or to detain an alien shall be provided to the detained alien. A decision to retain custody shall briefly set forth the reasons for the continued detention. A decision to release may contain such special conditions as are considered appropriate in the opinion of the Service. Notwithstanding any other provisions of this section, there is no appeal from the district director's or the Executive Associate Commissioner's decision.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00168-SHR   Document 6   Filed 03/27/2001   Page 72 of 154

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80295)**

(1) Showing by the alien. The district director or the Executive Associate
Commissioner may release an alien if the alien demonstrates to the satisfaction
of the Attorney General or her designee that his or her release will not pose a
danger to the community or to the safety of other persons or to property or a
significant risk of flight pending such alien's removal from the United States.
The district director or the Executive Associate Commissioner may also, in
accordance with the procedures and consideration of the factors set forth in
this section, continue in custody any alien described in paragraphs (a) and
(b)(1) of this section.

(2) Service of decision and other documents. All notices, decisions, or other
documents in connection with the custody reviews conducted under this section by
the district director or Executive Associate Commissioner shall be served on the
alien, in accordance with 8 CFR 103.5a, by the Service district office having
jurisdiction over the alien.  Release documentation (including employment
authorization if appropriate) shall be issued by the district office having
jurisdiction over the alien in accordance with the custody determination made by
the district director or by the Executive Associate Commissioner. Copies of all
such documents will be retained in the alien's record and forwarded to the
HQPDU.

(3) Alien's representative. The alien's representative is required to complete
Form G-28, Notice of Entry of Appearance as Attorney or Representative, at the
time of the interview or prior to reviewing the detainee's records.  The Service
will forward by regular mail a copy of any notice or decision that is being
served on the alien only to the attorney or representative of record. The alien
remains responsible for notification to any other individual providing
assistance to him or her.

(e) Criteria for release. Before making any recommendation or decision to
release a detainee, a majority of the Review Panel members, or the Director of
the HQPDU in the case of a record review, must conclude that:

(1) Travel documents for the alien are not available or, in the opinion of the
Service, immediate removal, while proper, is otherwise not practicable or not in
the public interest;

(2) The detainee is presently a non-violent person;

(3) The detainee is likely to remain nonviolent if released;

(4) The detainee is not likely to pose a threat to the community following
release;

(5) The detainee is not likely to violate the conditions of release; and

(6) The detainee does not pose a significant flight risk if released.

(f) Factors for consideration. The following factors should be weighed in
considering whether to recommend further detention or release of a detainee:

(1) The nature and number of disciplinary infractions or incident reports
received when incarcerated or while in Service custody;

(2) The detainee's criminal conduct and criminal convictions, including
consideration of the nature and severity of the alien's convictions, sentences
imposed and time actually served, probation and criminal parole history,
evidence of recidivism, and other criminal history;

(3) Any available psychiatric and psychological reports pertaining to the
detainee's mental health;

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80296)**

(4) Evidence of rehabilitation including institutional progress relating \*8029
to participation in work, educational, and vocational programs, where availabl
(5) Favorable factors, including ties to the United States such as the number
of close relatives residing here lawfully;
(6) Prior immigration violations and history;
(7) The likelihood that the alien is a significant flight risk or may abscond
to avoid removal, including history of escapes, failures to appear for
immigration or other proceedings, absence without leave from any halfway house
or sponsorship program, and other defaults; and
(8) Any other information that is probative of whether the alien is likely to-
(i) Adjust to life in a community,
(ii) Engage in future acts of violence,
(iii) Engage in future criminal activity,
(iv) Pose a danger to the safety of himself or herself or to other persons or
to property, or
(v) Violate the conditions of his or her release from immigration custody
pending removal from the United States.
(g) Travel documents and docket control for aliens continued in detention
beyond the removal period--(1) In general. The district director shall continue
to undertake appropriate steps to secure travel documents for the alien both
before and after the expiration of the removal period.  If the district direct
is unable to secure travel documents within the removal period, he or she shall
apply for assistance from Headquarters Detention and Deportation, Office of
Field Operations.  The district director shall promptly advise the HQPDU
Director when travel documents are obtained for an alien whose custody is
subject to review by the HQPDU.  The Service's determination that receipt of a
travel document is likely may by itself warrant continuation of detention
pending the removal of the alien from the United States.
(2) Availability of travel document. In making a custody determination, the
district director and the Director of the HQPDU shall consider the ability to
obtain a travel document for the alien.  If it is established at any stage of a
custody review that, in the judgment of the Service, travel documents can be
obtained, or such document is forthcoming, the alien will not be released unles
immediate removal is not practicable or in the public interest.
(3) Removal. The Service will not conduct a custody review under these
procedures when the Service notifies the alien that it is ready to execute an
order of removal.
(4) Alien's cooperation. Release will be denied if the alien fails or refuses
to cooperate in the process of obtaining a travel document.  See, e.g., section
241(a)(1)(C) of the Act.
(h) District director's custody review procedures. The district director's
custody determination will be developed in accordance with the following
procedures:
(1) Records review. The district director will conduct the initial custody
review.  For aliens described in paragraphs (a) and (b)(1) of this section, the
district director will conduct a records review prior to the expiration of the
90-day removal period.  This initial post-order custody review will consist of
review of the alien's records and any written information submitted in English

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00168-SHR   Document 6   Filed 02/27/2001   Page 74 of 154

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80296)**

to the district director by or on behalf of the alien.  However, the district
director may in his or her discretion schedule a personal or telephonic
interview with the alien as part of this custody determination.  The district
director may also consider any other relevant information relating to the alien
or his or her circumstances and custody status.

(2) Notice to alien. The district director will provide written notice to the
detainee approximately 30 days in advance of the pending records review so that
the alien may submit information in writing in support of his or her release.
The alien may be assisted by a person of his or her choice, subject to
reasonable security concerns at the institution and panel's discretion, in
preparing or submitting information in response to the district director's
notice.  Such assistance shall be at no expense to the Government.  If the alien
or his or her representative requests additional time to prepare materials
beyond the time when the district director expects to conduct the records
review, such a request will constitute a waiver of the requirement that the
review occur prior to the expiration of the removal period.

(3) Factors for consideration. The district director's review will include but
is not limited to consideration of the factors described in paragraph (f) of
this section.  Before making any decision to release a detainee, the district
director must be able to reach the conclusions set forth in paragraph (e) of
this section.

(4) District director's decision. The district director will notify the alien
in writing that he or she is to be released from custody, or that he or she will
be continued in detention pending removal or further review of his or her
custody status.

(5) District office staff. The district director may delegate the authority to
conduct the custody review, develop recommendations, or render the custody or
release decision to those persons directly responsible for detention within his
or her district.  This includes the deputy district director, the assistant
director for detention and deportation, the officer-in-charge of a detention
center, persons acting in such capacities, or such other persons as the district
director may designate from the professional staff of the Service.

(i) Determinations by the Executive Associate Commissioner. Determinations by
the Executive Associate Commissioner to release or retain custody of aliens
shall be developed in accordance with the following procedures.

(1) Review panels. The HQPDU Director shall designate a panel or panels to make
recommendations to the Executive Associate Commissioner.  A Review Panel shall,
except as otherwise provided, consist of two persons.  Members of a Review Panel
shall be selected from the professional staff of the Service.  All
recommendations by the two-member Review Panel shall be unanimous.  If the vote
of the two-member Review Panel is split, it shall adjourn its deliberations
concerning that particular detainee until a third Review Panel member is added.
The third member of any Review Panel shall be the Director of the HQPDU or his
or her designee.  A recommendation by a three-member Review Panel shall be by
majority vote.

(2) Records review. Initially, and at the beginning of each subsequent review,
the HQPDU Director or a Review Panel shall review the alien's records.  Upon
completion of this records review, the HQPDU Director or the Review Panel may

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80296)**

issue a written recommendation that the alien be released and reasons therefore
  (3) Personal interview. (i) If the HQPDU Director does not accept a panel's
recommendation to grant release after a records review, or if the alien is not
recommended for release, a Review Panel shall personally interview the detainee
The scheduling of such interviews shall be at the discretion of the HQPDU
Director.  The HQPDU Director will provide a translator if he or she determines
that such assistance is appropriate.
  (ii) The alien may be accompanied during the interview by a person of his or
her choice, subject to reasonable security concerns at the institution's and
panel's discretion, who is able to attend at the time of the scheduled
interview.  Such assistance shall be at no expense to the Government.  The alie
may submit to the Review Panel any information, in English, that he or she
**\*80297**  believes presents a basis for his or her release.
  (4) Alien's participation. Every alien shall respond to questions or provide
other information when requested to do so by Service officials for the purpose
of carrying out the provisions of this section.
  (5) Panel recommendation. Following completion of the interview and its
deliberations, the Review Panel shall issue a written recommendation that the
alien be released or remain in custody pending removal or further review.  This
written recommendation shall include a brief statement of the factors that the
Review Panel deems material to its recommendation.
  (6) Determination. The Executive Associate Commissioner shall consider the
recommendation and appropriate custody review materials and issue a custody
determination, in the exercise of discretion under the standards of this
section.  The Executive Associate Commissioner's review will include but is not
limited to consideration of the factors described in paragraph (f) of this
section.  Before making any decision to release a detainee, the Executive
Associate Commissioner must be able to reach the conclusions set forth in
paragraph (e) of this section.  The Executive Associate Commissioner is not
bound by the panel's recommendation.
  (j) Conditions of release.--(1) In general. The district director or Executive
Associate Commissioner shall impose such conditions or special conditions on
release as the Service considers appropriate in an individual case or cases,
including but not limited to the conditions of release noted in 8 CFR 212.5(c)
and § 241.5. An alien released under this section must abide by the release
conditions specified by the Service in relation to his or her release or
sponsorship.
  (2) Sponsorship. The district director or Executive Associate Commissioner may
in the exercise of discretion, condition release on placement with a close
relative who agrees to act as a sponsor, such as a parent, spouse, child, or
sibling who is a lawful permanent resident or a citizen of the United States, o
may condition release on the alien's placement or participation in an approved
halfway house, mental health project, or community project when, in the opinion
of the Service, such condition is warranted.  No detainee may be released until
sponsorship, housing, or other placement has been found for the detainee, if
ordered, including but not limited to, evidence of financial support.
  (3) Employment authorization. The district director and Executive Associate
Commissioner may, in the exercise of discretion, grant employment authorization

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80297)**

under the same conditions set forth in § 241.5(c) for aliens released under an order of supervision.

(4) Withdrawal of release approval. The district director or Executive Associate Commissioner may, in the exercise of discretion, withdraw approval for release of any detained alien prior to release when, in the decision-maker's opinion, the conduct of the detainee, or any other circumstance, indicates that release would no longer be appropriate.

(k) Timing of reviews. The timing of reviews shall be in accordance with the following guidelines:

(1) District director. (i) Prior to the expiration of the 90-day removal period, the district director shall conduct a custody review for an alien described in paragraphs (a) and (b)(1) of this section where the alien's removal, while proper, cannot be accomplished during the 90-day period because no country currently will accept the alien, or removal of the alien prior to expiration of the removal period is impracticable or contrary to the public interest.  As provided in paragraph (h)(4) of this section, the district director will notify the alien in writing that he or she is to be released from custody, or that he or she will be continued in detention pending removal or further review of his or her custody status.

(ii) When release is denied pending the alien's removal, the district director in his or her discretion may retain responsibility for custody determinations for up to three months after expiration of the 90-day removal period, during which time the district director may conduct such additional review of the case as he or she deems appropriate.  The district director may release the alien if he or she is not removed within the three-month period following the expiration of the 90-day removal period, in accordance with paragraphs (e), (f), and (j) of this section, or the district director may refer the alien to the HQPDU for further custody review.

(2) HQPDU reviews. (i) District director referral for further review. When the district director refers a case to the HQPDU for further review, as provided in paragraph (c)(2) of this section, authority over the custody determination transfers to the Executive Associate Commissioner, according to procedures established by the HQPDU.  The Service will provide the alien with approximately 30 days notice of this further review, which will ordinarily be conducted by the expiration of the removal period or as soon thereafter as practicable.

(ii) District director retains jurisdiction. When the district director has advised the alien at the 90-day review as provided in paragraph (h)(4) of this section that he or she will remain in custody pending removal or further custody review, and the alien is not removed within three months of the district director's decision, authority over the custody determination transfers from the district director to the Executive Associate Commissioner. The initial HQPDU review will ordinarily be conducted at the expiration of the three-month period after the 90-day review or as soon thereafter as practicable.  The Service will provide the alien with approximately 30 days notice of that review.

(iii) Continued detention cases. A subsequent review shall ordinarily be commenced for any detainee within approximately one year of a decision by the Executive Associate Commissioner declining to grant release.  Not more than once every three months in the interim between annual reviews, the alien may submit

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80297)**

written request to the HQPDU for release consideration based on a proper showin
of a material change in circumstances since the last annual review.  The HQPDU
shall respond to the alien's request in writing within approximately 90 days.

(iv) Review scheduling. Reviews will be conducted within the time periods
specified in paragraphs (k)(1)(i), (k)(2)(i), (k)(2)(ii), and (k)(2)(iii) of
this section or as soon as possible thereafter, allowing for any unforeseen
circumstances or emergent situation.

(v) Discretionary reviews. The HQPDU Director, in his or her discretion, may
schedule a review of a detainee at shorter intervals when he or she deems such
review to be warranted.

(3) Postponement of review. In the case of an alien who is in the custody of
the Service, the district director or the HQPDU Director may, in his or her
discretion, suspend or postpone the custody review process if such detainee's
prompt removal is practicable and proper, or for other good cause.  The decisio
and reasons for the delay shall be documented in the alien's custody review fil
or A file, as appropriate.  Reasonable care will be exercised to ensure that th
alien's case is reviewed once the reason for delay is remedied or if the alien
is not removed from the United States as anticipated at the time review was
suspended or postponed.

(4) Transition provisions. (i) The provisions of this section apply to cases
that have already received the 90-day **\*80298**  review.  If the alien's last
review under the procedures set out in the Executive Associate Commissioner
memoranda entitled Detention Procedures for Aliens Whose Immediate Repatriation
is Not Possible or Practicable, February 3, 1999; Supplemental Detention
Procedures, April 30, 1999; Interim Changes and Instructions for Conduct of
Post-order Custody Reviews, August 6, 1999; Review of Long-term Detainees,
October 22, 1999, was a records review and the alien remains in custody, the
HQPDU will conduct a custody review within six months of that review (Memoranda
available at http://www.ins.usdoj.gov).  If the alien's last review included an
interview, the HQPDU review will be scheduled one year from the last review.
These reviews will be conducted pursuant to the procedures in paragraph (i) of
this section, within the time periods specified in this paragraph or as soon as
possible thereafter, allowing for resource limitations, unforeseen
circumstances, or an emergent situation.

(ii) Any case pending before the Board on December 21, 2000 will be completed
by the Board.  If the Board affirms the district director's decision to continu
the alien in detention, the next scheduled custody review will be conducted one
year after the Board's decision in accordance with the procedures in paragraph
(i) of this section.

(l) Revocation of release--(1) Violation of conditions of release. Any alien
described in paragraph (a) or (b)(1) of this section who has been released unde
an order of supervision or other conditions of release who violates the
conditions of release may be returned to custody.  Any such alien who violates
the conditions of an order of supervision is subject to the penalties described
in section 243(b) of the Act.  Upon revocation, the alien will be notified of
the reasons for revocation of his or her release or parole.  The alien will be
afforded an initial informal interview promptly after his or her return to
Service custody to afford the alien an opportunity to respond to the reasons fo

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80298)**

revocation stated in the notification.

(2) Determination by the Service. The Executive Associate Commissioner shall have authority, in the exercise of discretion, to revoke release and return to Service custody an alien previously approved for release under the procedures in this section.  A district director may also revoke release of an alien when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner.  Release may be revoked in the exercise of discretion when, in the opinion of the revoking official:

(i) The purposes of release have been served;

(ii) The alien violates any condition of release;

(iii) It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or

(iv) The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

(3) Timing of review when release is revoked. If the alien is not released from custody following the informal interview provided for in paragraph (l)(1) of this section, the HQPDU Director shall schedule the review process in the case of an alien whose previous release or parole from immigration custody pursuant to a decision of either the district director or the Executive Associate Commissioner under the procedures in this section has been or is subject to being revoked.  The normal review process will commence with notification to the alien of a records review and scheduling of an interview, which will ordinarily be expected to occur within approximately three months after release is revoked. That custody review will include a final evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release. Thereafter, custody reviews will be conducted annually under the provisions of paragraphs (i), (j), and (k) of this section.

9.  Section 241.5 is amended by revising paragraph (a) introductory text to read as follows:

§ 241.5 Conditions of release after removal period.

(a) Order of supervision. An alien released pursuant to § 241.4 shall be released pursuant to an order of supervision.  The Commissioner, Deputy Commissioner, Executive Associate Commissioner Field Operations, regional director, district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer-in-charge may issue Form I- 220B, Order of Supervision.  The order shall specify conditions of supervision including, but not limited to, the following:
\* \* \* \* \*

10. Section 241.6 is revised to read as follows:

§ 241.6 Administrative stay of removal.

(a) Any request of an alien under a final order of deportation or removal for

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

65 FR 80281-01
**(Cite as: 65 FR 80281, \*80298)**

stay of deportation or removal shall be filed on Form I-246, Stay of Removal, with the district director having jurisdiction over the place where the alien i at the time of filing.  The Commissioner, Deputy Commissioner, Executive Associate Commissioner Field Operations, regional director, or district director, in his or her discretion and in consideration of factors listed in 8 CFR 212.5 and section 241(c) of the Act, may grant a stay of removal or deportation for such time and under such conditions as he or she may deem appropriate.  Neither the request nor the failure to receive notice of disposition of the request shall delay removal or relieve the alien from strict compliance with any outstanding notice to surrender for deportation or removal.

 (b) Denial by the Commissioner, Deputy Commissioner, Executive Associate Commissioner Field Operations, regional director, or district director of a request for a stay is not appealable, but such denial shall not preclude an immigration judge or the Board from granting a stay in connection with a previously filed motion to reopen or a motion to reconsider as provided in 8 CF part 3.

 (c) The Service shall take all reasonable steps to comply with a stay granted by an immigration judge or the Board.  However, such a stay shall cease to have effect if granted (or communicated) after the alien has been placed aboard an aircraft or other conveyance for removal and the normal boarding has been completed.

 Dated: December 15, 2000.

Janet Reno,

Attorney General.

[FR Doc. 00-32432 Filed 12-18-00; 2:38 pm]

BILLING CODE 4410-10-P

65 FR 80281-01, 2000 WL 1860526 (F.R.)
END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

**Attachment B**

2001 WL 87442

--- F.3d ----

**(Cite as: 2001 WL 87442 (6th Cir.(Ky.)))**

**H**

United States Court of Appeals,
Sixth Circuit.

Mario ROSALES-GARCIA, Petitioner-Appellant,
v.
J.T. HOLLAND, Warden, Respondent-Appellee.

No. 99-5683.

Submitted Aug. 4, 2000.
Jan. 31, 2001.

Cuban citizen filed petition for writ of habeas corpus, alleging that his indefinite detention by Immigration and Naturalization Service (INS) following revocation of his immigration parole and pending Cuba's acceptance of his return violated his constitutional rights. The United States District Court for the Eastern District of Kentucky, Karl S. Forester, J., denied petition, and alien appealed. The Court of Appeals, Moore, Circuit Judge, held that: (1) court had habeas jurisdiction over case; (2) petition was not mooted by virtue of fact that alien was notified by INS that he was releasable; and (3) indefinite incarceration violated alien's Fifth Amendment liberty interest in freedom from indefinite incarceration.

Reversed and remanded.

Rice, J., sitting by designation, dissented and filed opinion.

[1] Federal Courts ☞542

170Bk542

Court of appeals has obligation to address predicate question of its jurisdiction, even when it is not contested, before turning to merits of appeals.

[2] Habeas Corpus ☞521
197k521

Court of Appeals had habeas jurisdiction over Cuban citizen's challenge of Immigration and Naturalization Service's (INS) authority to detain him indefinitely following revocation of his immigration parole and pending Cuba's acceptance of his return, as petition did not seek review of decision or action by Attorney General to commence proceedings, adjudicate cases, or execute removal orders. Immigration and Nationality Act, § 242(g), as amended, 8 U.S.C.A. §

1252(g); § 236(e), as amended, 8 U.S.C.(1994 Ed.) § 1226(e); 28 U.S.C.A. § 2241; 8 C.F.R. § 212.12.

[3] Federal Courts ☞12.1
170Bk12.1

Federal court only possesses jurisdiction over actual cases and controversies that will affect rights of litigants. U.S.C.A. Const. Art. 3, § 2, cl. 1.

[4] Federal Courts ☞12.1
170Bk12.1

Case is deemed "moot" if relief sought would make no difference to legal interests of parties.

[5] Federal Courts ☞12.1
170Bk12.1

[5] Federal Courts ☞723.1
170Bk723.1

Case or controversy justiciability requirement must be satisfied at all stages of review, not just upon initiation of legal action. U.S.C.A. Const. Art. 3, § 2, cl. 1.

[6] Habeas Corpus ☞235
197k235

Cuban citizen's petition for habeas relief challenging authority of Immigration and Naturalization Service (INS) to detain him indefinitely following revocation of his immigration parole and pending Cuba's acceptance of his return was not rendered moot by virtue of fact that he was notified by INS that he was releasable, where suitable placement had not been found, INS retained discretion to withdraw parole, and controversy was capable of repetition yet evading review. Immigration and Nationality Act, § 242(g), as amended, 8 U.S.C.A. § 1252(g); § 236(e), as amended, 8 U.S.C.(1994 Ed.) § 1226(e); 28 U.S.C.A. § 2241; 8 C.F.R. § 212.12.

[7] Federal Courts ☞12.1
170Bk12.1

For claim to fall under exception to mootness doctrine for controversies capable of repetition yet evading review, complaining party must show that (1) duration of dispute is too short to be litigated fully prior to cessation or expiration of action, and (2)

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

2001 WL 87442
**(Cite as: 2001 WL 87442 (6th Cir.(Ky.)))**

there is reasonable expectation that it will be subjected to same action again.

[8] Habeas Corpus ☞842
197k842

District court's dismissal of habeas corpus petition is reviewed de novo on appeal.

[9] Aliens ☞53.9
24k53.9

Section of Immigration and Nationality Act (INA) of 1990 authorizing Attorney General to take into custody alien who has been convicted of aggravated felony pending determination of alien's excludability authorizes Attorney General to continue to detain indefinitely excludable alien whose deportation cannot be expeditiously accomplished. Immigration and Nationality Act, § 236(e), as amended, 8 U.S.C.(1994 Ed.) § 1226(e).

[10] Aliens ☞4
24k4

Excludable alien accused of committing crime is entitled to constitutional protections of Fifth and Sixth Amendments. U.S.C.A. Const.Amends. 5, 6.

[10] Constitutional Law ☞252
92k252

Excludable alien accused of committing crime is entitled to constitutional protections of Fifth and Sixth Amendments. U.S.C.A. Const.Amends. 5, 6.

[11] Aliens ☞53
24k53

Congress may not authorize immigration officials to treat excludable aliens with complete impunity.

[12] Constitutional Law ☞274.3
92k274.3

Cuban citizen being detained indefinitely by Immigration and Naturalization Service (INS) following revocation of his immigration parole and pending Cuba's acceptance of his return had Fifth Amendment liberty interest in freedom from indefinite incarceration. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 236(e), as amended, 8 U.S.C.(1994 Ed.) § 1226(e).

[13] Constitutional Law ☞255(1)
92k255(1)

Deprivation of fundamental liberty interest comports with due process only if it is narrowly tailored to serve compelling government interest. U.S.C.A. Const.Amend. 5.

[14] Constitutional Law ☞255(1)
92k255(1)

If detention is intended as legitimate regulation, rather than punishment, for due process purposes, court must determine (1) whether there is alternative, non-punitive purpose which may rationally be assigned to detention, and (2) whether detention appears excessive in relation to alternative purpose assigned to it. U.S.C.A. Const.Amend. 5.

[15] Constitutional Law ☞255(1)
92k255(1)

Due Process Clause does not grant person absolute right to be free from detention, even when convicted of no crime. U.S.C.A. Const.Amend. 5.

[16] Aliens ☞53.9
24k53.9

Immigration and Naturalization Service's (INS) detention of excludable alien following revocation of his immigration parole and pending Cuba's acceptance of his return was rationally related to government's non-punitive purpose of protecting public safety, for purposes of determining whether detention deprived alien of his liberty in violation of Fifth Amendment Due Process Clause. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 236(e), as amended, 8 U.S.C.(1994 Ed.) § 1226(e).

[16] Constitutional Law ☞274.3
92k274.3

Immigration and Naturalization Service's (INS) detention of excludable alien following revocation of his immigration parole and pending Cuba's acceptance of his return was rationally related to government's non-punitive purpose of protecting public safety, for purposes of determining whether detention deprived alien of his liberty in violation of Fifth Amendment Due Process Clause. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 236(e), as amended, 8 U.S.C.(1994 Ed.) § 1226(e).

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

[17] Aliens ☞53.9
24k53.9

In order to detain excludable alien pending his deportation, government has burden of demonstrating that: (1) alien's home nation and United States are engaged in diplomatic discussions which encompass specific repatriation agreement whose details are currently being negotiated; and (2) alien is among those whose repatriation agreement contemplates. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 236(e), as amended, 8 U.S.C.(1994 Ed.) § 1226(e).

[18] Aliens ☞53.9
24k53.9

Fact that Cuban Review Plan called for yearly consideration of detainee's parole status did not affect nature of his detention as "indefinite," for purposes of determining whether detention deprived alien of his liberty in violation of Fifth Amendment Due Process Clause. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 236(e), as amended, 8 U.S.C.(1994 Ed.) § 1226(e); C.F.R. § 212.12.

[18] Constitutional Law ☞274.3
92k274.3

Fact that Cuban Review Plan called for yearly consideration of detainee's parole status did not affect nature of his detention as "indefinite," for purposes of determining whether detention deprived alien of his liberty in violation of Fifth Amendment Due Process Clause. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 236(e), as amended, 8 U.S.C.(1994 Ed.) § 1226(e); C.F.R. § 212.12.

[19] Aliens ☞53.9
24k53.9

Immigration and Naturalization Service's (INS) indefinite detention of Cuban citizen following revocation of his immigration parole and pending Cuba's acceptance of his return was excessive in relation to purpose of protecting community from danger and enforcing immigration order that was unenforceable, and thus violated Cuban citizen's Fifth Amendment liberty interest in freedom from indefinite incarceration. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 236(e), as amended, 8 U.S.C.(1994 Ed.) § 1226(e).

[19] Constitutional Law ☞274.3

92k274.3

Immigration and Naturalization Service's (INS) indefinite detention of Cuban citizen following revocation of his immigration parole and pending Cuba's acceptance of his return was excessive in relation to purpose of protecting community from danger and enforcing immigration order that was unenforceable, and thus violated Cuban citizen's Fifth Amendment liberty interest in freedom from indefinite incarceration. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 236(e), as amended, 8 U.S.C.(1994 Ed.) § 1226(e).

Mario Rosales-Garcia (briefed), Lexington, KY, pro se.

Emily A. Radford (briefed), Allen W. Hausman (briefed), Senior Litigation Counsel, U.S. Dept. of Justice, Immigration Litigation, Civil Division, Washington, DC, for Respondent-Appellee.

Before: MOORE and CLAY, Circuit Judges; RICE, District Judge. [FN*]

OPINION

MOORE, Circuit Judge.

*1 This case presents the difficult and complex question whether an excludable alien has a liberty interest recognized by the Fifth Amendment's Due Process Clause when the Immigration and Naturalization Service ("INS") seeks to detain him in custody, perhaps indefinitely, without charging him with a crime or affording him a trial but simply on the ground that it cannot effect his deportation. On July 9, 1998, Petitioner-Appellant Mario Rosales-Garcia ("Rosales") applied for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 in the United States District Court for the Eastern District of Kentucky. He sought relief from the Attorney General's decision on March 24, 1997 denying him parole from his detention at the Federal Medical Center in Lexington, Kentucky, or in the alternative, an emergency hearing before the Cuban Review Panel and the INS. Rosales is a Cuban citizen who arrived in this country during the Mariel boatlift in 1980. Because he has been declared excludable by the INS he would ordinarily be deported to his home country; however, the United States is unable to effect his deportation because Cuba refuses to accept his return. Thus, Rosales, after completing a federal prison sentence, has been taken into INS custody pending an agency determination that he is eligible for parole or that Cuba will allow

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

him to enter. Rosales, appearing pro se, asserts that both his substantive and procedural due process rights under the Constitution are being violated by the Attorney General and the INS. The district court dismissed his petition with prejudice, and Rosales promptly appealed to this court. We REVERSE the district court's judgment, order Rosales's release, and REMAND to the district court for proceedings in accordance with this opinion.

I. Background
A. Facts and Procedure

Rosales left Cuba, his birthplace, and arrived in this country around May 6, 1980 as part of the Mariel boatlift, so known because over 120,000 undocumented Cubans departed from the Mariel Harbor en route to the United States. Although Rosales was initially detained by immigration authorities, he was released into the custody of his aunt on May 20, 1980, pursuant to the Attorney General's authority to parole illegal aliens for humanitarian or other reasons under 8 U.S.C. § 1182(d)(5)(A) (1994). [FN1] J.A. at 97-110 (Request for Asylum, Passport). Rosales was subsequently arrested multiple times [FN2] and was convicted of several of the offenses including: possession of marijuana and resisting arrest in October 1981, J.A. at 146-47; grand theft in September 1981, for which he received two years' probation in March 1983, J.A. at 174; burglary and grand larceny in October 1983, for which he received two six-month sentences to be served concurrently, J.A. at 152-53, 175; and escape from a penal institution in February 1984, J.A. at 177, where he had been serving time for his previous convictions. On January 9, 1986, Rosales received a sentence of 366 days for the escape charge after he pleaded guilty. J.A. at 155, 181.

\*2 Rosales's immigration parole was revoked on July 10, 1986 by the INS, pursuant to its authority under 8 U.S.C. § 1185(d)(5)(A) and 8 C.F.R. § 212.5(d)(2), for the escape and grand larceny charges. J.A. at 111-13. In a separate proceeding before an immigration judge in Atlanta, Georgia, on June 26, 1987, Rosales was denied asylum and deemed excludable [FN3] from this country because he lacked a visa or other documentation entitling him to admission and because he had been convicted of state crimes in Florida. J.A. at 115. Rosales remained in immigration custody until he was considered for immigration parole a second time on April 5, 1988. J.A. at 120. He was released on May 20, 1988 to the custody of his uncle in Miami. J.A. at 122-25.

Rosales was not deported at that time, however, because Cuba refused to take him back.

On March 18, 1993, Rosales pleaded guilty to one count of conspiracy to possess with the intent to distribute cocaine in the United States District Court for the Eastern District of Wisconsin; he was sentenced to 63 months in federal prison, followed by five years of supervised release. J.A. at 159-61. While Rosales was serving his sentence, the INS lodged a detainer against him, directing prison officials to release him to INS custody for deportation proceedings at the completion of his sentence. J.A. at 126-27. On March 24, 1997, prior to his release, Rosales's immigration parole was again revoked pursuant to the regulations governing parole of Mariel Cubans at 8 C.F.R. § 212.12 (the "Cuban Review Plan"). [FN4] See 8 C.F.R. § 212.12(a). When Rosales was released from prison on May 18, 1997, the INS promptly detained him and took him into custody, pursuant to its authority under 8 U.S.C. § 1226(e) (1994). [FN5] On November 5, 1997, the Associate Commissioner for Enforcement for the INS reconsidered and then denied Rosales immigration parole. J.A. at 133. The INS rendered its decision on December 12, 1997 and served it on Rosales on February 11, 1998. According to its report, the Cuban Review Panel determined that Rosales had demonstrated "a propensity to engage in recidivist criminal behavior" as reflected by his criminal record and that his responses to questions at his parole interview were "non-credible." J.A. at 133. The Panel stated that "it is not clearly evident" that releasing Rosales on parole was in the public interest; that he would not pose a threat to the community; or that he would not violate the conditions of immigration parole. [FN6] J.A. at 133. Rosales has remained in custody since that determination, where he continues to receive periodic consideration for parole under the Cuban Review Plan. [FN7] See 8 C.F.R. § 212.12(g)(2).

Rosales filed his habeas petition with the district court on July 9, 1998. J.A. at 5. In his petition, Rosales asserted that his due process rights under the Fifth and Fourteenth Amendments were violated because he was denied his right to be represented by counsel at the Cuban Review Panel hearing on his parole status; to review the information used against him at that proceeding; and the right to confront and cross-examine witnesses. Rosales also alleged that the Cuban Review Panel improperly assessed his prior convictions when it calculated his "score" in its assessment of his candidacy for parole, in violation of

the regulations governing the Review Panel, at 8 C.F.R. §§ 212.12-13. Finally, Rosales asserted that the decision by the INS was an abuse of discretion, arbitrary and capricious, and that it violated Supreme Court precedent. Rosales sought immediate release on parole, or in the alternative, an emergency hearing at which he would be afforded procedural due process rights.

*3 On October 1, 1998, the district court dismissed the habeas petition sua sponte, concluding that "the petitioner is not being held in violation of the U.S. Constitution or any U.S. law, rule or regulation; thus, the petitioner is not entitled to habeas relief." J.A. at 66, 70. Rosales then filed a motion to alter or amend the judgment on October 21, 1998, stating that he meant to assert his due process rights, not under the Constitution, but under 8 U.S.C. §§ 1101, 1105(a) and 5 U.S.C. §§ 551-701 as well as Supreme Court precedents. J.A. at 13. The district court, construing pro se petitions leniently, vacated its earlier decision to dismiss and granted Rosales's motion for reconsideration on December 1, 1998, allowing the case to proceed. J.A. at 71-73.

The government filed a response to Rosales's petition on February 4, 1999, arguing that this case is identical to those that have been rejected by other circuits, including the Sixth Circuit in an unpublished opinion, Gonzalez v. Luttrell, No. 96-5098, 1996 WL 627717 (6th Cir. Oct.29, 1996). The government noted that Rosales had received all the procedure due under the Cuban Review Plan and that his parole had been appropriately denied by the Attorney General. Rosales responded to the government by again asserting his right to be free from indefinite detention and to be afforded procedural due process rights at his parole hearings. J.A. at 58-65. Rosales also sought the appointment of counsel through a motion to the district court, but that request was denied on February 23, 1999. J.A. at 75.

The district court dismissed Rosales's amended petition with prejudice on May 3, 1999. The district court, addressing Rosales's statutory claims first, concluded that Congress had granted total discretionary authority to the Attorney General over immigration matters at 8 U.S.C. §§ 1103(a)(1) [FN8] and 1182(d)(5)(A). After surveying the recent amendments to the immigration laws and noting Congress's intent to provide the Attorney General with more discretion to detain aliens, the district court concluded that "the Attorney General may continue to detain the instant petitioner in conformity with federal

law." J.A. at 88-89 (D.Ct.Op.)

The district court also concluded that Rosales had failed to state a cognizable constitutional claim. The court determined that the Sixth Amendment is not applicable to Rosales's petition "because 'immigration proceedings and detention do not constitute criminal proceedings or punishment.' " J.A. at 89 (internal citations omitted). The court next found that the Fifth Amendment does not "provide excludable aliens with procedural due process rights with regard to admission or parole." J.A. at 89. Thus, the court concluded that Rosales was not due any of the procedures which he sought, namely the right to counsel, to review the information used against him, or to confront and cross- examine people who provided information at his parole hearing. Although the district court noted that "the law is less clear about the extent to which any substantive due process rights are enjoyed by excludable aliens," the court denied Rosales the benefit of the protection of the substantive component of the Fifth Amendment as well. J.A. at 90. The district court observed that Rosales "has no fundamental right to be free to roam the United States and a fundamental right is the first component of a substantive due process claim." J.A. at 91. The court also found that Rosales's continued detention was "neither arbitrary, conscience-shocking nor oppressive in the constitutional sense." J.A. at 91. Rosales then filed a prompt notice of appeal to this court. J.A. at 95.

*4 In his four-page pro se brief to this court, Rosales does not challenge the Attorney General's right to exclude him. Rather, Rosales argues that he should be granted procedural due process rights during his parole revocation hearing and that his substantive due process rights are being violated by the indefinite nature of his detention. In response to the district court's assertion that an excludable alien is not free to "roam" this country, Rosales asserts that he "is not asking for permission to 'roam' the United States." Instead, he claims that he would return to Cuba and that "[i]f he was not part of this 'Catch 22', where he is not allowed to return to his country, he [would] gladly do so." Appellant's Br. at 3.

B. Relations With Cuba

A brief background on the United States' relationship with Cuba is essential to our analysis. Most of the 125,000 Cuban refugees who came to this country in 1980 in the Mariel boatlift were found excludable because they arrived here without proper entry

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

documents or because they had committed crimes in Cuba. However, a large percentage of these Cubans, including Rosales, were paroled, pursuant to the Attorney General's authority under 8 U.S.C. § 1182(d)(5). According to the affidavit of Michael E. Ranneberger, the Coordinator of the Office of Cuban Affairs in the State Department, who has been responsible for negotiations with Cuba since 1995, "[f]or almost two decades, the United States has been discussing with Cuban authorities the issue of return of excludable Cubans." J.A. at 56. The United States reached a limited agreement with Cuba to repatriate Mariel Cubans in December 1984. Under the terms of this agreement, Cuba consented to the return of 2,746 excludable aliens from the Mariel Boatlift, at the rate of 100 per month, whom the INS was able to identify at the time the agreement was reached. J.A. at 56 (Ranneberger Decl.); 81 (D.Ct.Op.). Rosales was not among those named in the 1984 Agreement because he was not declared excludable until 1987. Cuba suspended the agreement in May 1985, but agreed to reinstate the agreement in November 1987. See Gisbert v. U.S. Attorney Gen., 988 F.2d 1417, 1440 (5th Cir.1993). As of January 1999, 1400 Cubans had been returned to Cuba. J.A. at 56 (Ranneberger Decl.).

Further talks between the two countries took place on September 9, 1994 and May 2, 1995. J.A. at 57 (Ranneberger Decl.). The September 1994 agreement stated that the United States and Cuba "agreed to continue to discuss the return of Cuban nationals excludable from the United States." J.A. at 57. Ranneberger noted that discussions between the two countries continued periodically, and while he cannot offer details from these sensitive discussions, he says that he "can confirm that the return of Cuban nationals ... remains under discussion between the two governments." J.A. at 57.

The United States is currently detaining approximately 1,750 Mariel Cubans in U.S. prison facilities who are neither eligible for parole nor deportable because Cuba will not accept them. See Chi Thon Ngo v. INS, 192 F.3d 390, 395 (3d Cir.1999). According to the government, the United States' position has been and currently is that Cuba is required to take back all of its nationals who are denied admission to the United States. Appellee's Br. at 19.

## II. Jurisdiction

\*5 [1] The government challenged the district court's jurisdiction to hear Rosales's 28 U.S.C. § 2241 habeas petition based on 8 U.S.C. §§ 1252(g) [FN9] and 1231(h) [FN10], as well as § 1226(e) [FN11] and conflicting case law. The district court determined that, in light of this court's decision in Mansour v. INS, 123 F.3d 423, 426 (6th Cir.1997), and the absence of further clarification from this court or the Supreme Court, it had jurisdiction to hear the petition. [FN12] The government appears to have conceded this court's jurisdiction to hear the instant appeal. Appellee's Br. at 2 (stating that the court of appeals' jurisdiction arises under 28 U.S.C. §§ 1291 and 2253). However, it is our obligation to address the predicate question of our jurisdiction, even when it is not contested, before turning to the merits of these appeals. See Arizonans for Official English v. Arizona, 520 U.S. 43, 73, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997).

The Supreme Court's recent decision in Reno v. American-Arab Anti- Discrimination Committee ("AADC"), 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999), makes clear that the district court was correct to assert jurisdiction over Rosales's habeas petition; it also establishes the propriety of our jurisdiction to hear Rosales's claim. In AADC, the Supreme Court addressed the scope of 8 U.S.C. § 1252(g) and its ostensibly sweeping jurisdiction-stripping language. [FN13] Forced to reconcile the incongruity of several provisions of the IIRIRA which simultaneously grant and deny the right of judicial review to certain aliens who were in deportation proceedings before April 1, 1997, the Supreme Court determined that § 1252(g) must have a "narrow[ ]" meaning. [FN14] See AADC, 525 U.S. at 482, 119 S.Ct. 936. Rejecting the idea that § 1252(g) "covers the universe of deportation claims--that it is a sort of 'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review,' " the Supreme Court restricted § 1252(g) to three discrete actions that the Attorney General may take: the decision to "commence proceedings, adjudicate cases, or execute removal orders." Id. The Court noted that "[t]here are of course many other decisions or actions that may be part of the deportation process...." Id.

[2] In Zhislin v. Reno, 195 F.3d 810 (6th Cir.1999), we applied the Supreme Court's reasoning in AADC and concluded that § 1252(g) did not preclude our review of an alien's petition for habeas corpus challenging the INS's authority to detain him indefinitely. See Zhislin, 195 F.3d at 814. Like Zhislin, Rosales does not seek to review the Attorney

Case 1:01-cv-00100-SHR   Document 6   Filed 03/27/2001   Page 87 of 154

General's decision to commence or adjudicate a case, nor does he dispute the removal order entered against him. Instead, Rosales challenges "the right of the Attorney General to detain him indefinitely when it appears that circumstances beyond anyone's control will prevent the deportation order from ever being executed." Id. Such a challenge is clearly outside the purview of § 1252(g) and we may therefore consider the claim. See Zhislin, 195 F.3d at 814; Carrera-Valdez v. Perryman, 211 F.3d 1046, 1047 (7th Cir.2000) (upholding district court's jurisdiction over Mariel Cuban's petition for release from indefinite detention); Ho v. Greene, 204 F.3d 1045, 1051 (10th Cir.2000); Ma v. Reno, 208 F.3d 815, 818 n. 3 (9th Cir.2000), cert. granted, --- U.S. ----, 121 S.Ct. 297, 148 L.Ed.2d 239 (Oct. 10, 2000); Chi Thon Ngo v. INS, 192 F.3d 390, 393 (3d Cir.1999); Zadvydas v. Underdown, 185 F.3d 279, 285-86 (5th Cir.1999), cert. granted, --- U.S. ----, 121 S.Ct. 297, 148 L.Ed.2d 239 (Oct. 10, 2000).

### III. Mootness

**\*6** After this appeal was submitted to this panel, the government informed the panel that on July 19, 2000, the INS determined that Rosales is releasable under the custody review procedures of 8 C.F.R. § 212.12. In its Notice of Releasability, the INS conditioned Rosales's release on efforts to find him a suitable sponsorship or placement, namely a halfway house, as required by the Cuban Review Plan at 8 C.F.R. § 212.12(f) ("No detainee may be released on parole until suitable sponsorship or placement has been found for the detainee."). The Notice further stated that Rosales's release from custody is conditioned on his maintaining proper behavior while sponsorship and placement efforts are undertaken and that "[f]ailure to maintain good behavior could result in [ ] continued detention." Because the INS has not provided any further information indicating that such a sponsorship or placement has been found or that Rosales has been released on parole, we must assume that he is still in custody at the Federal Medical Center in Lexington, Kentucky.

The government argues that Picrin-Peron v. Rison, 930 F.2d 773, 776 (9th Cir.1991), stands for the proposition that the INS's notice of releasability moots Rosales's appeal. In Picrin-Peron, the Ninth Circuit considered a detainee's appeal from the denial of his habeas corpus petition after the detainee had been released on parole for one year. Pursuant to the court's request, an INS official authored an affidavit for the court declaring that "absent Picrin's

reinvolvement with the criminal justice system, a change in the Cuban government enabling him to return to Cuba, or the willingness of a third country to accept him, he will be paroled for another year." Picrin- Peron, 930 F.2d at 776. Based on this sworn statement, the Ninth Circuit dismissed Picrin's petition as moot, concluding that the court could offer the detainee no further relief. See id.

**[3][4][5][6]** According to Article III of the Constitution, this court only possesses jurisdiction over actual cases and controversies that will the affect the rights of the litigants. See McPherson v. Michigan High Sch. Athletic Ass'n, Inc., 119 F.3d 453, 458 (6th Cir.1997) (en banc ). A case is deemed moot if the relief sought would make no difference to the legal interests of the parties. See id. We are obligated to consider whether the "case or controversy" justiciability requirement has been met in this case because it must be satisfied at all stages of review, not just upon initiation of a legal action. See id. Rosales's petition seeks either release from custody or a hearing before the Cuban Review Panel with certain procedural protections that he believes were denied to him in error. As a preliminary step in our analysis, we note that Rosales appears to remain in federal custody, as his parole is conditioned on the INS's ability to find him a suitable halfway house as well as on his continued good behavior. We also note that, according to 8 C.F.R. § 212.12(e), "[t]he Associate Commissioner for Enforcement may, in his or her discretion, withdraw approval for parole of any detainee prior to release when, in his or her opinion, the conduct of the detainee, or any other circumstance, indicates that parole would no longer be appropriate." Should the INS decide, in its discretion, to withdraw his parole or should it be unable to find him a suitable placement, Rosales will therefore continue to be detained in federal custody. Thus, this case is not like Picrin-Peron, in which petitioner had already been released from detention and the INS verified in a sworn affidavit that he would continue to be granted yearly parole absent his involvement in any criminal activity. Moreover, if Rosales is not released, the same procedures that he asserts are constitutionally defective will continue to be used against him. Based on these circumstances, we conclude that Rosales's petition for relief is not rendered moot by virtue of the fact that he has been notified that he is releasable. This case clearly represents a substantial ongoing controversy between the parties, for which this court can offer relief.

**\*7 [7]** Moreover, we believe that, should Rosales be

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

physically released, this case may also be adjudicated under the well-established exception to the mootness doctrine for controversies capable of repetition yet evading review. See Grider v. Abramson, 180 F.3d 739, 746 (6th Cir.1999); Pinette v. Capitol Square Review & Advisory Bd., 30 F.3d 675, 677 (6th Cir.1994); aff'd, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). Two criteria must be satisfied for a claim to fall under this exception to the mootness doctrine. First, the complaining party must show that the duration of the dispute is too short to be litigated fully prior to the cessation or expiration of the action. Second, the complaining party must show that there is a reasonable expectation that it will be subjected to the same action again. See Suster v. Marshall, 149 F.3d 523, 527 (6th Cir.1998). The Cuban Review Plan confers on the Cuban Review Panel and the Associate Commissioner for Enforcement substantial discretion to withdraw parole approval to release and to revoke a detainee's parole once he is out of custody. See 8 C.F.R. § 212.12(e), (h). [FN15] While the Plan provides yearly review for detainees who have been refused parole, see id. at § 212.12(g)(2), the Cuban Review Plan Director may schedule a review of the detainee's status "at any time when the Director deems such a review to be warranted." See id. at § 212.12(g)(3). Due to the discretionary nature of these regulations, the Associate Commissioner for Enforcement or the Cuban Review Panel may grant parole, withdraw parole approval or revoke Rosales's parole repeatedly within a time period too short to effect appellate review of a habeas corpus petition. We have every reason to believe that future review of another habeas petition filed by Rosales will take at least as long as the instant case in arriving at this court. Moreover, should the INS and its officials engage in repeated denials, revocations or withdrawals of parole, the regulations make clear that Rosales will face the same detention and hearing procedures that he challenges in his current petition. Because Rosales's situation is capable of repetition yet evading review, we conclude that his appeal is not moot.

### IV. Standard of Review

[8] This court reviews a district court's dismissal of a habeas corpus petition de novo. See Rogers v. Howes, 144 F.3d 990, 992 (6th Cir.1998).

### V. Analysis

This circuit has not ruled definitely on the constitutionality of indefinite detention of excludable aliens. [FN16] In its brief to this court, the government frames the question before us as whether Rosales has a protected statutory or constitutional entitlement to immigration parole. The larger question, however, is whether the executive branch of the government has the authority under the United States Constitution to detain a person indefinitely without charging him with a crime or affording him a trial. We hold that indefinite detention of Mario Rosales-Garcia cannot be justified by reference to the government's plenary power over immigration matters and that it violates Rosales's substantive due process rights under the Due Process Clause of the Fifth Amendment to the Constitution.

### A. Statutory Authority to Detain Indefinitely

*8 Our first point of analysis is Rosales's statutory claim that the Attorney General and the INS violated their governing statutes and regulations by denying him parole and detaining him indefinitely. See Reno v. Flores, 507 U.S. 292, 300, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (noting reviewing court's obligation to construe statutes to avoid constitutional problems unless such construction is plainly contrary to Congress's intent). The government argues that we are bound by former 8 U.S.C. § 1226(e) (1994), which, according to the government, authorizes the Attorney General to continue to detain Rosales indefinitely. According to IIRIRA, its permanent provisions apply only to removal proceedings commenced after April 1, 1997, IIRIRA's effective date. See IIRIRA § 309(c)(1). We agree with the government that we must apply former § 1226(e) to the instant case because Rosales was declared excludable in 1987 and his immigration parole was last revoked on March 24, 1997, prior to the Act's effective date. [FN17] Cf. INS v. Aguirre-Aguirre, 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (counseling that courts of appeals must apply Chevron deference to agency's interpretations of immigration statute).

According to former § 1226(e), pending a determination of excludability, the Attorney General must take into custody any alien convicted of an aggravated felony [FN18] upon release of the alien. See § 1226(e)(1) (1994); see also 8 U.S.C. § 1182(d)(5)(A) (1994) (giving the Attorney General the right to return into custody an excludable alien when "the purposes of such parole shall ... have been served"); § 1227(a) (1994) (authorizing Attorney General immediately to deport any alien who is excludable unless she decides, in her discretion, "that immediate deportation is not practicable or proper").

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Under the former statute, the Attorney General may not release the alien from custody unless she determines that the alien may not be deported because the alien's home country denies or unduly delays acceptance of the alien's return. See § 1226(e)(2) (incorporating 8 U.S.C. § 1253(g) (1994)). If this determination is made, the Attorney General may release the alien only after a review in which the severity of the felony committed by the alien is considered and the review concludes that the alien will not pose a danger to the safety of other persons or to property. See § 1226(e)(3). Many circuits, including the Second, Third, Fifth, Seventh, Ninth, and Tenth Circuits have found former § 1226(e) to authorize the Attorney General to detain indefinitely an excludable alien who has been convicted of an aggravated offense. See Ho v. Greene, 204 F.3d 1045, 1055 (10th Cir.2000) (Attorney General has authority to continue indefinitely to detain excludable alien whose deportation cannot be accomplished expeditiously because the "statute is framed not as a grant of authority to detain the alien, but as a limitation on the Attorney General's power to release the alien from detention"); Carrera-Valdez v. Perryman, 211 F.3d 1046, 1048 (7th Cir.2000); Chi Thon Ngo v. INS, 192 F.3d 390, 394 (3d Cir.1999) (statute permits prolonged detention of excludable aggravated felons); Gisbert v. U.S. Attorney Gen., 988 F.2d 1437, 1446 (5th Cir.1993) ( "[W]e do not regard section 1226(e) as a limitation on the Attorney General's authority to detain excludable aliens, either before or after final determination of excludability, pending their removal from this country."); Alvarez-Mendez v. Stock, 941 F.2d 956, 962 (9th Cir.1991) ("The only logical interpretation of section 1226(e) is that it ... provides that where deportation of an alien found excludable cannot be immediate, the Attorney General may release [the alien] only if doing so will not endanger society.").

*9 [9] Former § 1226(e) is not ambiguous concerning the Attorney General's discretion to detain indefinitely an excludable alien whose deportation cannot be expeditiously accomplished. The statute explicitly states that the Attorney General "shall" not release an alien from custody unless she determines that the alien will not pose a danger to the safety of other persons or to property. The statute does not contain any language limiting the length of time the Attorney General may detain an alien pending a determination that the alien no longer poses a threat to society. Nor does the statute carve an exception to this language for aliens whose home countries refuse to accept their return. We therefore conclude, in

accordance with the other circuits that have analyzed this issue, that the statute clearly authorizes the Attorney General to detain an excludable alien indefinitely. Because we cannot construe the statute to avoid constitutional inquiry, we must now address the constitutionality of Rosales's detention.

B. The Immigration Statute and the Plenary Power Doctrine

In this case, we are confronted with two principles deeply embedded in our jurisprudence that conflict with each other: the political branches' almost complete authority over immigration matters and a person's inalienable right to liberty absent charges or conviction of a crime. Rosales's petition for habeas corpus relief does not contest the government's almost complete control over matters of immigration policy. Under Art. I, § 8, cl. 4 of the Constitution [FN19] and the plenary power doctrine, [FN20] the executive and legislative branches have coordinate authority to establish and enforce policies for admission to and exclusion from this country, while the judiciary accords those branches almost total deference. See Mathews v. Diaz, 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) ("[T]he responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government"); United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542, 70 S.Ct. 309, 94 L.Ed. 317 (1950) (authority over immigration matters stems not just from legislative power "but is inherent in the executive power to control the foreign affairs of the nation."); Fong Yue Ting v. United States, 149 U.S. 698, 711, 13 S.Ct. 1016, 37 L.Ed. 905 (1893) (it is the "right to exclude or to expel all aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace, being an inherent and inalienable right of every sovereign and independent nation, essential to its safety, its independence, and its welfare...."). Under this doctrine, the Attorney General is charged with the administration and enforcement of all laws relating to the immigration and naturalization of aliens, and she does so with virtually no interference from the courts. [FN21] The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953); see also Diaz, 426 U.S. at 82, 96 S.Ct. 1883 (noting "narrow standard of review of decisions made by the Congress

2001 WL 87442
**(Cite as: 2001 WL 87442, \*9 (6th Cir.(Ky.)))**

or the President in the area of immigration and naturalization").

\*10 Nor does Rosales contest the government's right to designate him an excludable alien and attempt to remove him from this country. The principle that there is no constitutional right to enter this country, see Knauff, 338 U.S. at 542, 70 S.Ct. 309, is not under review in this case. The Supreme Court has made clear that an attempt to enter this country is considered a request for a privilege rather than an assertion of right, because "the power to admit or exclude aliens is a sovereign prerogative." See Landon v. Plasencia, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). According to the Supreme Court, such a privilege can only be exercised according to the procedures established by Congress and implemented by the appropriate executive officials. See Knauff, 338 U.S. at 542-44, 70 S.Ct. 309.

Finally, Rosales does not challenge the government's application of the "entry fiction" to his case. Under the former version of the immigration act the government had two mechanisms for returning non-citizens to their country of origin: "exclusion" was the procedure used to refuse an alien entry at the border of this country; "deportation" was the procedure used to remove an alien who has already entered the country but is here illegally. See Plasencia, 459 U.S. at 25-26, 103 S.Ct. 321. Although exclusion proceedings usually occurred at the port of entry, the Supreme Court developed what has become known as the "entry fiction" to govern the rights of those aliens who are deemed excludable but who have nonetheless been allowed to enter physically the United States for humanitarian, administrative, or other reasons, under 8 U.S.C. § 1182(d)(5)(A). Under the entry fiction, an alien deemed to have entered this country illegally is treated as if detained or "excluded" at the border despite his physical presence in the United States. See Gisbert, 988 F.2d at 1440 (explaining distinction between excludable and deportable aliens). Excludable aliens have no rights with regard to their entry or exclusion from this country and they are treated differently from those who have "passed through our gates." Mezei, 345 U.S. at 212, 73 S.Ct. 625; but see Plasencia, 459 U.S. at 32-34, 103 S.Ct. 321 (resident alien detained at border upon return to country is validly subject to exclusion proceeding but may invoke procedural due process protections during proceedings); Kwong Hai Chew v. Colding, 344 U.S. 590, 597-600, 73 S.Ct. 472, 97 L.Ed. 576 (1953) (resident alien returning to U.S. after five-

month absence is subject to exclusion hearing but is entitled to procedural due process protections). According to the Supreme Court, they are due only the procedures authorized by Congress for their removal proceedings and nothing more. See Mezei, 345 U.S. at 212, 73 S.Ct. 625 (citing Knauff, 338 U.S. at 544, 70 S.Ct. 309); compare Zadvydas, 185 F.3d at 295-97 (extending entry fiction to deportable aliens who have received final order of deportation and stripping them of due process right to be free from indefinite detention) and Ho, 204 F.3d at 1059-60 (same) with Ma, 208 F.3d at 825-26 n. 23 (rejecting INS's argument that aliens ordered deportable are on same constitutional footing as excludable aliens seeking entry).

\*11 Rosales does, however, challenge the government's authority to detain him indefinitely after he has completed his federal prison sentence and has neither been charged with nor convicted of another crime. It is to this challenge that we now turn our attention.

### C. Constitutional Authority to Detain Indefinitely

[10] The Fifth Amendment to the Constitution restricts the government from depriving all persons of the right to life, liberty, or property without due process of law. See U.S. CONST. amend. V. The Supreme Court has consistently held that aliens physically present in this country are not wholly without constitutional protection. Indeed, the Supreme Court has accorded aliens a panoply of Fifth, Sixth, and Fourteenth Amendment rights. Should an excludable alien be accused of committing a crime, he would be entitled to the constitutional protections of the Fifth and Sixth Amendments. See Wong Wing v. United States, 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896) ("[I]t must be concluded that all persons within the territory of the United States are entitled to the protection guaranteed by [the fifth and sixth] amendments, and that even aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law."). Thus, in Wong Wing v. United States, the Court struck down a federal statute imposing a maximum of one year of hard labor on a Chinese alien upon a determination of his deportability, finding it a violation of the alien's due process right to be free from punishment without trial. In Yick Wo v. Hopkins, another early immigration case, the Supreme Court announced that the Fourteenth

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00168-SHR   Document 6   Filed 03/27/2001   Page 91 of 154

Amendment's protections extend to aliens as well:

> The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says: "Nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws.

Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (finding imprisonment of Chinese immigrants under state statute unconstitutional because it violated Equal Protection Clause of Fourteenth Amendment); see also Flores, 507 U.S. at 315-16, 113 S.Ct. 1439 (O'Connor, J., concurring) (emphasizing that juvenile aliens have a constitutionally protected liberty interest, rooted in the Due Process Clause, in freedom from institutional confinement); Diaz, 426 U.S. at 77, 96 S.Ct. 1883 (noting that there are millions of aliens in this country and that "[t]he Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these [aliens] from deprivation of life, liberty, or property without due process of law" whether they are here unlawfully or not).

*12 As the Supreme Court has evaluated whether to extend entitlements or rights to aliens in addition to those protected by the Fifth, Sixth, and Fourteenth Amendments, the Court has demonstrated a willingness to draw lines between the rights due to citizens and those due to aliens. See Diaz, 426 U.S. at 80, 96 S.Ct. 1883 (noting that "Congress regularly makes rules that would be unacceptable if applied to citizens"). The Court has also expressed its willingness to distinguish among different classifications of aliens. However, it has never held that aliens are utterly beyond the purview of the Constitution. Thus, in Diaz, the Court held that Congress may constitutionally condition an alien's receipt of federal medical insurance benefits (Medicare Part B) on the legality of his entry and the length of his residence in this country. See Diaz, 426 U.S. at 82-83, 96 S.Ct. 1883. However, in Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), the Court held that state statutes conditioning welfare benefits on a residency requirement or denying welfare benefits to resident aliens violated the Fourteenth Amendment's Equal Protection Clause. The Supreme Court has also determined that the exclusion of the children of

illegal aliens from a public school system pursuant to a state statute violated the Equal Protection Clause of the Fourteenth Amendment. Rejecting the government's argument that illegal aliens are not "persons" within the purview of the Constitution, the Court stated that "[w]hatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term. Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." Plyler v. Doe, 457 U.S. 202, 210, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

The government, relying on the Supreme Court's decision in Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), asks this court to conclude, despite a long line of Supreme Court decisions extending to aliens basic Fifth, Sixth, and Fourteenth Amendment protections, that excludable aliens have no cognizable Fifth Amendment liberty interest under the Constitution in freedom from indefinite incarceration. In Mezei, the Supreme Court reviewed the case of an excludable alien who was being detained indefinitely on Ellis Island because this country deemed him a security threat and the alien's home country, as well as other nations, refused to allow him to return. [FN22] When the case reached the Supreme Court in 1953, Mezei had been detained on Ellis Island for close to two years. Addressing the question whether the potentially indefinite detention of an excludable alien without a hearing violated the Constitution, the Supreme Court observed that "[c]ourts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." Mezei, 345 U.S. at 210, 73 S.Ct. 625. The Court then deferred to the executive's authority to "impose additional restrictions on aliens entering or leaving the United States during periods of international tension and strife." Id. Noting the existence of a presidentially-declared state of emergency, the Supreme Court found that the Attorney General's authority to act derived from the Passport Act of 1918, which permitted the executive to "shut out aliens whose 'entry would be prejudicial to the interest of the United States' " during periods of national emergency. [FN23] Id. at 210-11, 73 S.Ct. 625 (citing regulations at 8 C.F.R. § 175.53 promulgated in accordance with the amendments to the Passport Act). The Supreme Court decided that "the times being what they are" it would not question the Attorney General's discretion to detain Mezei at

Ellis Island in deference to his assessment that Mezei presented a security threat. Id. at 216, 73 S.Ct. 625. Deeming this case "[a]n exclusion proceeding grounded on danger to the national security," id., the Court refused to substitute its judgment for the legislative will. Thus, it found no statutory or constitutional impediment to Mezei's detention or denial of a hearing. See id. at 215, 73 S.Ct. 625.

*13 The government would have this court accept the premise that the entry fiction completely forecloses any need for this court to examine whether an excludable alien, faced with the prospect of indefinite detention imposed by an executive agency, possesses a Fifth Amendment interest in liberty from physical constraint. We do not disagree that the entry fiction is an important doctrinal principle that the Supreme Court has employed to uphold this country's immigration laws and regulations, most notably our sovereign right to determine who may enter our borders, and our concomitant policy not to let other nations determine whom we must accept or reject by virtue of their refusal to repatriate their own citizens. However, crucial to our understanding and application of the Mezei decision are the circumstances in which the case was decided: the opinion was authored in the midst of the Korean War, as our nation labored under a fear of Communist infiltration [FN24] and in a state of affairs defined as a national emergency. [FN25] Courts have always allowed the executive an extraordinary amount of leniency during wartime or when the national security is truly at stake. [FN26] Such incomparable exigencies are clearly not present in the instant case. We are not operating in a declared state of emergency nor has there been any suggestion to this court that Rosales poses a threat to our national security.

[11][12] Moreover, while the government argues for absolute judicial deference to its plenary power over immigration policies, it is clear to this court that Congress may not authorize immigration officials to treat excludable aliens with complete impunity. For example, the INS may not, consistent with the Constitution, execute an excludable alien should it be unable to effect his prompt deportation. It is also evident that Congress cannot authorize the infliction of physical torture upon an excludable alien while he is detained in federal prison. See Gisbert, 988 F.2d at 1442; Lynch v. Cannatella, 810 F.2d 1363, 1374 (5th Cir.1987) (excludable aliens "are entitled under the due process clauses of the fifth and fourteenth amendments to be free of gross physical abuse at the hands of state or federal officials"). Consequently, we

emphatically reject the government's premise that excludable aliens are completely foreign to the Fifth Amendment of the Constitution. [FN27] We therefore find ourselves asked to draw a line of constitutional dimension between the act of torturing an excludable alien and the act of imprisoning such an alien indefinitely. We do not believe that the Constitution authorizes us to draw such a line. While it is true that aliens are not entitled to enjoy all the advantages of citizenship, see Diaz, 426 U.S. at 78, 96 S.Ct. 1883, we emphasize that aliens--even excludable aliens--are "persons" entitled to the Constitution's most basic protections and strictures. We conclude that if Rosales is indeed being detained indefinitely, discussed infra, his Fifth Amendment interest in liberty is necessarily implicated.

### D. Rosales's Fifth Amendment Right to Liberty

*14 The right to be free from bodily restraint, the right at issue in this case, is not a new liberty interest, but is at the heart of those interests protected by the Due Process Clause of the Fifth Amendment and available to all persons within our shores. [FN28] Rosales asserts that his continuing confinement without trial violates his substantive due process rights under the Fifth Amendment to the Constitution. He also argues that his procedural due process rights have been violated because he was not afforded certain procedural protections during his parole revocation hearing with the Cuban Review Panel. In response, the government urges that "it is undisputed that an alien who has been denied admission to the United States has no liberty interest that would entitle him to be at-large within our borders even temporarily." Appellee's Br. at 25. According to the government, once an alien has been found excludable his detention is a mere continuation of the exclusion that has been authorized by Congress. Because detention serves only to effectuate the exclusion order, there can be no limit on its length, other than a statutory limit, which Congress has not chosen to provide. See 8 U.S.C. § 1226(e) (1994).

The Due Process Clause is comprised of two components, one substantive and the other procedural. Substantive due process precludes "the government from engaging in conduct that 'shocks the conscience' or interferes with rights 'implicit in the concept of ordered liberty.' " See United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (citing Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952); Palko v. Connecticut, 302 U.S. 319, 325-26, 58 S.Ct.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

149, 82 L.Ed. 288 (1937)). Indeed, "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." Foucha v. Louisiana, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992).

[13][14] We construe Rosales's petition for habeas corpus relief to challenge his detention as impermissible punishment in the absence of a trial. The deprivation of a fundamental liberty interest comports with due process only if it is narrowly tailored to serve a compelling government interest. See Flores, 507 U.S. at 302, 113 S.Ct. 1439. According to Salerno, in order to determine whether Rosales's detention constitutes an impermissible restriction on liberty or permissible regulation, this court must analyze whether the detention is imposed for the purpose of punishment or whether it may be considered merely incidental to another legitimate government purpose. See Salerno, 481 U.S. at 747, 107 S.Ct. 2095. Unless Congress expressly provides that the purpose of the legislation is punitive, this court must determine whether there is an alternative purpose for the restriction. See id. Because the Supreme Court has found that deportation proceedings for resident aliens are civil actions that are not intended as punishment for unlawful entry into this country, we must conclude, for the purposes of this case, that Congress did not intend to punish excludable aliens by detaining them prior to removal from this country. See AADC, 525 U.S. at 491, 119 S.Ct. 936 ("While the consequences of deportation may assuredly be grave, they are not imposed as a punishment."); INS v. Lopez-Mendoza, 468 U.S. 1032, 1039, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) ("The purpose of deportation is not to punish past transgressions but rather to put an end to a continuing violation of the immigration laws."). If the detention is intended as legitimate regulation, as in this case, we must then determine (1) whether there is an alternative, non-punitive purpose which may rationally be assigned to the detention, and (2) whether the detention "appears excessive in relation to the alternative purpose assigned [to it]." Salerno, 481 U.S. at 747, 107 S.Ct. 2095 (internal citation omitted).

*15 Bound by this analytical framework, we first consider whether the government has articulated an alternative purpose, other than punishment, that is rationally related to Rosales's detention. The government has identified its interests in detaining Rosales as the need to protect society from a person

who poses a danger to the safety of other persons or to property pursuant to 8 U.S.C. § 1226(e) (1994). [FN29] As we note infra, we do not dispute that Rosales's detention is rationally related to this alternative purpose. Our analysis focuses on the second prong of the Salerno test: evaluating whether Rosales's detention appears excessive in relation to the alternative purpose such that it violates his Fifth Amendment interest in liberty. In order to evaluate the question of excessiveness, we must balance the government's stated purpose against the likelihood of Rosales's deportation.

[15] The Due Process Clause clearly does not grant a person an absolute right to be free from detention, even when convicted of no crime. See Salerno, 481 U.S. at 748, 107 S.Ct. 2095; see also Schall v. Martin, 467 U.S. 253, 281, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) (permitting pretrial detention of juvenile delinquents considered dangerous); Bell v. Wolfish, 441 U.S. 520, 535-40, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (allowing pretrial detention of arrestee if court finds there is risk of flight); Carlson v. Landon, 342 U.S. 524, 537-42, 72 S.Ct. 525, 96 L.Ed. 547 (1952) (allowing detention of Communist aliens pending deportation because they posed threat to nation's public interest). In Salerno, the Supreme Court upheld the Bail Reform Act against a challenge asserting that pretrial detention of prisoners amounted to a deprivation of the prisoners' liberty in violation of the Fifth Amendment. Noting that Congress's stated goal in enacting the Bail Reform Act was to protect the community from dangerous persons likely to commit crime prior to trial, the Court held that "preventing danger to the community is a legitimate regulatory goal" and the Act was rationally related to that goal. Salerno, 481 U.S. at 747, 107 S.Ct. 2095; see also Martin, 467 U.S. at 264, 104 S.Ct. 2403 ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted."). However, the Court explicitly acknowledged that length of detention could contribute to a finding of excessiveness when it observed that, at some point, "detention in a particular case might become excessively prolonged, and therefore punitive, in relation to Congress' regulatory goal." See Salerno, 481 U.S. at 747 n. 4, 107 S.Ct. 2095. In its conclusion that the Bail Reform Act did not cross that point, the Court emphasized that the Act "limits the circumstances under which detention may be sought to the most serious of crimes." Id. at 747, 107 S.Ct. 2095. Among the factors contributing to its conclusion, the Court noted that the government must demonstrate probable cause

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

that the arrestee committed the charged crime; the government must prove by clear and convincing evidence that the arrestee presents an identified and articulable threat to an individual or the community; the arrestee is entitled to a prompt detention hearing at which he may be represented by counsel and has the right to testify, present evidence and cross-examine witnesses; and the Speedy Trial Act strictly limits the amount of time an arrestee may be detained prior to trial. See id. at 747-51, 107 S.Ct. 2095. Thus, the Salerno Court, carefully delineating the contours of permissible detention, held that a finding of dangerousness alone is not enough to justify civil pretrial detention without assurances that the detention is of finite and limited duration.

*16 [16] Just as the Supreme Court concluded in Salerno, we recognize that Rosales's detention is rationally related to the government's non-punitive purpose of protecting public safety. Our concern is whether Rosales's detention, rationally related though it may be to the government's purpose, is unconstitutionally excessive when compared with the indefinite nature of his confinement. Detention to effectuate deportation is arguably analogous to detention prior to criminal trial. Although Rosales has never committed a crime of violence, he has compiled a fairly long and progressively more serious criminal record. The government's interest in detaining Rosales to protect the community from harm is perhaps similar to the government's interest in detaining a violent arrestee prior to trial who presents a safety risk to the community should he be released. As the Supreme Court held in Salerno, "the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest." Salerno, 481 U.S. at 748, 107 S.Ct. 2095. However, in this case, there are no protections similar to those in Salerno for aliens who are detained while the government attempts to effect their deportation. Cf. Foucha, 504 U.S. at 82, 112 S.Ct. 1780 (indefinite civil commitment of mentally ill persons is unconstitutional because, unlike in Salerno, the detention is not limited in duration); Martin, 467 U.S. at 269-70, 104 S.Ct. 2403 (pretrial detention of juveniles is constitutional because it is "strictly limited in time" and juveniles receive an array of procedural protections during detention such that juvenile may not be detained more than seventeen days). As the government has repeatedly emphasized, there are no limits on the length that the Attorney General may, under 8 U.S.C. § 1226(e) (1994), detain an excludable alien released from prison once the Attorney General concludes that

the alien presents a danger to persons or property.

Moreover, we note that in this case, unlike in Salerno, Rosales has served his prison sentence for the crime with which he was charged and to which he pleaded guilty. The district court judge set the length of Rosales's sentence pursuant to the United States Sentencing Guidelines, and Rosales paid his debt to society in due course. Should Rosales commit another crime upon his release, there is no reason why he could not be charged, prosecuted, and convicted for that crime. His sentence would undoubtedly reflect his recidivist tendency. Cf. Foucha, 504 U.S. at 82, 112 S.Ct. 1780 (noting that society's "normal means of dealing with persistent criminal conduct" is sufficient arsenal against threat that mentally ill person may commit future crime if he is not indefinitely committed). Were Rosales a citizen, he would be entitled to be free once he served his sentence absent any new charges of criminal conduct, even if authorities believed him still to be a dangerous person capable of inflicting future harm on society.

*17 Because Congress has bestowed on the executive the authority to determine whether an alien released from prison still presents a threat to society, however, such an alien may be detained after serving his sentence and prior to his deportation. This court does not dispute Congress's authority to grant the executive that power. However, we note that in one of its earliest immigration cases, the Supreme Court delineated between detention as a means to ensure deportation and detention as a method of punishment. In Wong Wing, the Supreme Court stated that "[w]e think it clear that detention or temporary confinement, as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens, would be valid." Wong Wing, 163 U.S. at 235, 16 S.Ct. 977. Implicit in the Supreme Court's opinion is the idea that the strength of the government's interest in protecting the community and enforcing its immigration laws must be considered in relation to the possibility that the government may actually achieve its goal to effect Rosales's deportation. With this admonition in mind, we turn to an evaluation of the likelihood of Rosales's return to Cuba in order to determine whether his civil detention is excessive in relation to the government's purpose in detaining him.

The government argues that Cuba's unwillingness to accept the return of its citizens does not affect Rosales's statutory or constitutional rights. Appellee's Br. at 18. We disagree. The government submitted an affidavit by Michael Ranneberger, the Coordinator of

the Office of Cuban Affairs in the State Department, detailing this country's negotiations with Cuba for the return of Mariel Cubans. Ranneberger's testimony reveals clearly that little progress on repatriation has been made in over fifteen years of talks. Ranneberger could only assert that the issue of repatriating Mariel Cubans "remains under discussion." J.A. at 57. No evidence was presented to this court that any agreement between the two nations was likely or even possible in the near future. Moreover, no evidence was presented that Rosales is among those Mariel Cubans who may be returned even if such an agreement were to be executed.

[17] Because the government has offered this court no credible proof that there is any possibility that Cuba may accept Rosales's return any time in the foreseeable future, we are constrained to conclude that Rosales faces indefinite detention. [FN30] While other circuits have found that excludable aliens cannot demonstrate that they are being detained indefinitely because of the possibility that their home country will one day invite them back, see Zadvydas, 185 F.3d at 294 (holding that detention is not indefinite until there is a showing that "deportation is impossible, not merely problematical, difficult, and distant"); Chi Thon Ngo, 192 F.3d at 398 (concluding that "[i]t is extremely unlikely that the [Vietnamese] petitioner's detention will be permanent" because "[d]iplomatic efforts with Vietnam are underway, albeit at a speed approximating the flow of cold molasses"), we decline to impose such a standard on Rosales. We will not require an alien to demonstrate that there is no conceivable possibility that his home country will ever accept his return in order to prove that his or her detention is indefinite in nature. Due to the vicissitudes of national politics and the potential for change in international relations, no alien could ever surmount such a standard, as the government need only point to ongoing talks, as it has in this case, or the potential for renewed relations to defeat the alien's claim that his home nation has no interest in repatriating him. Instead, this court will require the government to demonstrate (1) that the alien's home nation and this government are engaged in diplomatic discussions which encompass a specific repatriation agreement whose details are currently being negotiated; and (2) that the alien is among those whose repatriation the agreement contemplates. We believe that, because the government has superior access to information on our diplomatic negotiations with other nations, the burden appropriately rests on the government to demonstrate adequately to this court that there is a genuine likelihood that the alien

is among those whom the home country will agree to take back. [FN31]

*18 [18] Moreover, we conclude that the fact that Rosales receives periodic review of his parole status does not affect the nature of his detention as indefinite. The district court determined that because the Cuban Review Plan calls for yearly consideration of a detainee's status, Rosales cannot characterize his detention as indefinite. J.A. at 92. According to the district court, "[h]is detention is not indefinite but is for only one year at a time; at the end of each year he has an opportunity to plead his case anew." J.A. at 92. Other courts have held similarly. See Chi Thon Ngo, 192 F.3d at 398 (finding prolonged detention permissible provided the appropriate provisions for parole are available); Barrera-Echavarria v. Rison, 44 F.3d 1441, 1450 (9th Cir.1995) (en banc) (Mariel Cuban's detention is more like "a series of one-year periods of detention followed by an opportunity to plead his case anew"); cf. Zadvydas, 185 F.3d at 291 (noting that because a resident alien has the opportunity to be paroled by showing that he is no longer either a threat to the community or a flight risk, and because his case is reviewed periodically, his detention cannot be considered indefinite). However, as Rosales noted himself in his pro se brief to this court, even monthly review of his status would not change the fact that he will not be released until Cuba agrees to accept him, a prospect we have already discounted, or the Cuban Review Panel determines that his behavior comports with its guidelines such that it may offer him parole. As we discussed earlier, because of the broad discretion bestowed upon the INS to grant and revoke parole, Rosales can never be certain of receiving such parole, no matter how well he behaves himself in detention.

[19] Bearing in mind our obligation to weigh the government's stated interest in protecting the community from danger against the likelihood that the government will be able to effectuate Rosales's deportation, we conclude that Rosales's confinement can only be considered excessive in relation to the purpose of protecting the community from danger and enforcing an immigration order that is, at present, unenforceable. [FN32] We believe that this case no longer implicates the government's plenary power to control the scope of our nation's immigration laws, namely its ability to enforce final orders of exclusion and deportation. Judicial deference to the political branches' authority over immigration matters has always been premised on the paramount importance of our nation's self-determination and our national

prerogative to control who enters our borders and on what conditions. See Aguirre-Aguirre, 526 U.S. at 425, 119 S.Ct. 1439 (noting that judicial deference "is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations") (internal citation omitted). Such deference becomes less compelling, however, when it directly conflicts with other constitutional interests. Cf. INS v. Chadha, 462 U.S. 919, 941, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) ("Congress has plenary authority in all cases in which it has substantive legislative jurisdiction, so long as the exercise of that authority does not offend some other constitutional restriction.") (internal citation omitted). When there is no practical possibility that the alien will be returned home, as in this case, then Rosales's prolonged detention can no longer be considered an ancillary administrative element of the INS's removal procedures and judicial deference loses its rationale altogether. We agree with the Tenth Circuit that when an alien's home country refuses to accept him, it appears that "detention is [ ] used as an alternative to exclusion rather than a step in the process of returning petitioner to his native Cuba." [FN33] Rodriguez-Fernandez v. Wilkinson, 654 F.2d 1382, 1386 (10th Cir.1981); cf. Chi Thon Ngo, 192 F.3d at 398 ("It is [ ] unrealistic to believe that these INS detainees are not actually being 'punished' in some sense for their past conduct."). We conclude, therefore, that Rosales's detention has crossed the line from permissible regulatory confinement to impermissible punishment without trial. [FN34] We order Rosales's release within thirty days of the issuance of the mandate, following a hearing before the district court, upon such conditions as the district court may impose consistent with this opinion.

## VI. Conclusion

**\*19** The district court held that the prospect of indefinitely detaining Rosales was not "arbitrary, conscience-shocking nor oppressive in the constitutional sense." With all due respect, this court must disagree. We conclude that the district court improperly denied Rosales's petition for habeas corpus. We therefore REVERSE the district court's judgment and REMAND for proceedings in accordance with this opinion.

MOORE, J., delivered the opinion of the court, in which CLAY, J., joined.

RICE, D.J. (pp. ---- - ----), delivered a separate dissenting opinion.

WALTER HERBERT RICE, District Judge, dissenting.

Petitioner Mario Rosales-Garcia ("Rosales"), a citizen of Cuba, is an excludable alien who came to the United States as part of the Mariel boatlift. Since his arrival, Rosales has been granted immigration parole by the Immigration and Naturalization Service ("INS"). [FN1] On each occasion, the INS revoked his parole after his conviction on various criminal charges. He is now being detained by the INS, pending an agency determination either (1) that he is eligible for immigration parole once again or (2) that Cuba will accept his return. The majority frames the issue before the court as "whether the executive branch of the government has the authority under the United States Constitution to detain a person indefinitely without charging him with a crime or affording him a trial." With respect to Rosales, the majority answers this question in the negative, concluding that his indefinite detention "cannot be justified by reference to the government's plenary power over immigration matters and that it violates [his] substantive due process rights under the Due Process Clause of the Fifth Amendment to the Constitution."

In reaching the foregoing conclusion, the majority does not dispute three key points. First, the executive and legislative branches of the government have almost complete control over matters involving immigration and the exclusion of aliens, with virtually no interference from the judiciary. See, e.g., Mathews v. Diaz, 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953). Second, the government has the right to designate Rosales as excludable alien and to attempt to remove him. Rosales has no constitutional right to enter this country, and any attempt to do so is a request for a privilege. This privilege must be exercised in accordance with procedures established by Congress and implemented by the executive branch. See, e.g., United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542-544, 70 S.Ct. 309, 94 L.Ed. 317 (1950). Third, the "entry fiction" applies to this case. The entry fiction treats an excludable alien "as one standing on the threshold of entry, and therefore not entitled to the constitutional protections provided to those within the territorial jurisdiction of the United States." Ma v. Reno, 208 F.3d 815, 823 (9th Cir.), cert. granted, --- U.S. ----,

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

121 S.Ct. 297, 148 L.Ed.2d 239 (Oct. 10, 2000). The majority acknowledges that, under the entry fiction, individuals such as Rosales are "treated as detained or 'excluded' at the border despite [their] physical presence in the United States." Indeed, the majority notes that such individuals "have no rights with regard to their entry or exclusion from this country and they are treated differently from those who have 'passed through our gates.' "

**\*20** After recognizing the foregoing principles, the majority examines the "constitutional authority to detain indefinitely." [FN2] In so doing, the court properly notes that even excludable aliens are not completely without constitutional protection. Given that aliens have been extended certain Fifth, Sixth and Fourteenth Amendment rights, the majority concludes that excludable aliens such as Rosales possess a Fifth Amendment liberty interest in freedom from indefinite detention by the INS. After also recognizing that Congress may not authorize immigration officials to treat excludable aliens with "complete impunity" by executing or torturing them, the majority reasons:

.... We therefore find ourselves asked to draw a line of constitutional dimension between the act of torturing an excludable alien and the act of imprisoning such an alien indefinitely. We do not believe that the Constitution authorizes us to draw such a line. While it is true that aliens are not entitled to enjoy all the advantages of citizenship, see Diaz, 426 U.S. at 78, 96 S.Ct. 1883, we emphasize that aliens--even excludable aliens-- are "persons" entitled to the Constitution's most basic protections and strictures. We conclude that if Rosales is indeed being detained indefinitely, [as] discussed infra, his Fifth Amendment interest in liberty is necessarily implicated.

After finding that excludable aliens possess a liberty interest in freedom from indefinite bodily restraint, the majority concludes that Rosales's continued detention violates substantive due process. In reaching this conclusion, the majority relies upon the analytical framework set forth in United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). In Salerno, the Supreme Court explained that whether a restriction on liberty (in the form of pretrial detention) violates substantive due process turns upon whether the detention is punishment without a trial or whether it is regulatory in nature. Id. at 746-747, 107 S.Ct. 2095. Absent evidence that Congress intended to punish excludable aliens by detaining them indefinitely, [FN3] the punitive/ regulatory distinction itself turns on (1) whether the

detention is rationally related to some alternative (i.e., non-punitive) purpose, and (2) whether the detention appears excessive in relation to the alternative purpose that Congress sought to achieve. Id. at 747, 107 S.Ct. 2095.

Applying the foregoing test, the majority notes that the United States has identified as its "alternative purpose" in detaining Rosales "the need to protect society from a person who poses a danger to the safety of other persons or to property...." The court then recognizes that Rosales's detention is "rationally related" to the government's "alternative" purpose of public safety. Nevertheless, the majority concludes that his indefinite detention is "excessive" in relation to the government's alternative (i.e., non-punitive) purpose, given (1) the probability that he never will return to Cuba and (2) the fact that he "can never be certain of receiving [immigration] parole, no matter how well he behaves himself in detention." As a result, the court concludes that his "detention has crossed the line from permissive regulatory confinement to impermissible punishment without trial...." Consequently, the majority orders his immediate release.

**\*21** Having reviewed the majority's analysis, I disagree with it in two primary respects. First, I do not believe that the indefinite detention of an excludable alien such as Rosales implicates any protected liberty interest in freedom from bodily restraint. Second, assuming, arguendo, that a Fifth Amendment liberty interest is implicated, I do not believe that Rosales's detention, which includes annual review for parole eligibility, is excessive in relation to the government's non-punitive purpose. Consequently, under Salerno, his detention is regulatory in nature rather than punitive, and it does not violate substantive due process, even if a protected liberty interest is at stake.

Concerning the first issue, the existence of a liberty interest, I do not dispute that excludable aliens possess some Fifth Amendment rights. It is true that neither the Attorney General nor the INS may shoot or torture Rosales without running afoul of his substantive due process rights. See, e.g., Gisbert v. U.S. Attorney General, 988 F.2d 1437, 1442 (5th Cir.1993), amended 997 F.2d 1122 (5th Cir.1993) (recognizing that excludable aliens have a substantive due process right to be free from "gross physical abuse"). The majority's ruling turns upon its inability to "draw a line of constitutional dimension between the act of torturing an excludable alien and the act of

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

imprisoning such an alien indefinitely." The court concludes that the Constitution does not authorize the judiciary "to draw such a line."

Upon review, however, I cannot agree that drawing a line between torturing an excludable alien and indefinitely detaining him to ensure exclusion from this country violates the Constitution. The government's indefinite detention of an excludable alien simply is not equivalent, for Fifth Amendment purposes, to torturing him or to killing him. It has been generally accepted that "[e]xcluded aliens may be able to challenge, under a constitutional theory, governmental action outside of the immigration context." [FN4] Fernandez-Roque v. Smith, 734 F.2d 576, 582 n. 8 (11th Cir.1984) (emphasis added) (citing United States v. Henry, 604 F.2d 908, 914 (5th Cir.1979)); see also Zadvydas v. Underdown, 185 F.3d 279, 295 (5th Cir.1999), cert. granted, --- U.S. ----, 121 S.Ct. 297, 148 L.Ed.2d 239 (Oct. 10, 2000) (recognizing that excludable aliens may have substantive due process rights, but only with respect to matters that are unrelated to the government's plenary power over immigration). However, this principle does not "limit the government's conduct in the immigration field where it possesses plenary authority." Fernandez-Roque, 734 F.2d at 582 n. 8 (citing Jean v. Nelson, 727 F.2d 957 (11th Cir.1984) (en banc), aff'd 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985)). In Lynch v. Cannatella, 810 F.2d 1363, 1373 (5th Cir.1987), the court articulated a clear rationale for drawing "a line of constitutional dimension" between torturing an excludable alien and detaining him indefinitely:

\*22 The basis for limiting the constitutional protection afforded excludable aliens has been the overriding concern that the United States, as a sovereign, maintain[s] its right to self-determination. "As the history of its immigration policy makes clear, this nation has long maintained as a fundamental aspect of its right to self-determination the prerogative to determine whether, and in what numbers, outsiders without any cognizable connection to this society shall be permitted to join it." Courts ordinarily should abstain from placing limits on government discretion in these circumstances because the sovereign interest in self-determination weighs so much more heavily in this scheme than does the alien's interest in entering the country. That interest, however, plays virtually no role in determining whether the Constitution affords any protection to excludable aliens while they are being detained by state officials and awaiting

deportation. Counsel has not suggested and we cannot conceive of any national interests that would justify the malicious infliction of cruel treatment on a person in United States territory simply because that person is an excludable alien. We therefore hold that, whatever due process rights excludable aliens may be denied by virtue of their status, they are entitled under the due process clauses of the fifth and fourteenth amendments to be free of gross physical abuse at the hands of state or federal officials.

Id. at 1373-74 (footnotes omitted); see also Gisbert, 988 F.2d at 1442 ("Lynch plainly recognizes that excludable aliens may legally be denied other due process rights, including the right to be free of detention."). [FN5]

In the present case, the government is not endeavoring to deprive Rosales of life or property, nor is it seeking to deprive him of liberty, except to the extent necessary to exclude him from this country, which the majority concedes the INS has an absolute right to do. It is in this context that Rosales has no liberty interest protected by the Fifth Amendment. [FN6] See Fernandez- Roque, 734 F.2d at 582 (footnote omitted) ("[W]e are compelled to conclude that [immigration] parole is part of the admissions process. As such, its denial or revocation does not rise to the level of a constitutional infringement. Because the Cubans lack a constitutional liberty interest, we need not reach the question of whether the Attorney General's plan satisfies due process."); Ma, 208 F.3d at 824 (quoting Barrera-Echavarria v. Rison, 44 F.3d 1441, 1450 (9th Cir.1995) (citations omitted) ("Noncitizens who are outside United States territories enjoy very limited protections under the United States Constitution. Because excludable aliens are deemed under the entry doctrine not to be present on United States territory, a holding that they have no substantive right to be free from immigration detention reasonably follows.").

While it would indeed shock the conscience to permit the INS to shoot or to torture a person seeking entry into the United States, it is not conscience shocking to allow the INS to enforce its immigration policies by indefinitely detaining such a person at the border when he will not or cannot go elsewhere. [FN7] The Supreme Court has long held that "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." Landon v. Plasencia, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

2001 WL 87442
**(Cite as: 2001 WL 87442, \*22 (6th Cir.(Ky.)))**

21 (1982). "In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." Mathews, 426 U.S. at 79-80, 96 S.Ct. 1883. Indeed, "[c]ourts have long recognized that the governmental power to exclude or expel aliens may restrict aliens' constitutional rights when the two come into direct conflict." Zadvydas, 185 F.3d at 289

**\*23** Consistent with the foregoing principles, the federal circuit courts routinely have rejected constitutional arguments that are similar, if not identical, to the one advanced by Rosales in the present case. Most recently, the Seventh Circuit rejected a substantive due process challenge to indefinite confinement in Carrera-Valdez v. Perryman, 211 F.3d 1046 (7th Cir.2000), [FN8] reasoning as follows:

> Almost fifty years ago, the Supreme Court held that an excludable alien may be detained indefinitely when his country of origin will not accept his return. Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). Several Justices in more recent years have expressed unease with that decision, but it is conclusive in the courts of appeals. It is therefore not surprising that at least five appellate courts have rejected constitutional challenges, similar to Carrera's, brought by others who arrived on the Mariel boatlift. See Guzman v. Tippy, 130 F.3d 64 (2d Cir.1997); Palma v. Verdeyen, 676 F.2d 100 (4th Cir.1982); Gisbert v. U.S. Attorney General, 988 F.2d 1437, amended, 997 F.2d 1122 (5th Cir.1993); Barrera-Echavarria v. Rison, 44 F.3d 1441 (9th Cir.1995) (en banc ); Garcia-Mir v. Meese, 788 F.2d 1446 (11th Cir.1986). See also Chi Thon Ngo v. INS, 192 F.3d 390 (3d Cir.1999). The only arguably contrary decision, Rodriguez-Fernandez v. Wilkinson, 654 F.2d 1382 (10th Cir.1981), has not garnered adherents and is of doubtful vitality in its own circuit. Duy Dac Ho v. Greene, 204 F.3d 1045 (10th Cir.2000). Given Shaughnessy there is little point in elaborate discussion by an inferior court. Carrera is not constitutionally entitled to release.

Id. at 1048. [FN9]

In finding that excludable aliens have no constitutional right to be free from indefinite immigration detention, the federal courts have relied largely upon Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956

(1953), in which the Supreme Court held that an excludable alien may be detained indefinitely, without violating the Constitution, when his country of origin will not accept his return. [FN10] In Mezei, the Court reasoned as follows:

> ... Aliens seeking entry from contiguous lands obviously can be turned back at the border without more. While the Government might keep entrants by sea aboard the vessel pending determination of their admissibility, resulting hardships to the alien and inconvenience to the carrier persuaded Congress to adopt a more generous course. By statute, it authorized, in cases such as this, aliens' temporary removal from ship to shore. But such temporary harborage, an act of legislative grace, bestows no additional rights.... And this Court has long considered such temporary arrangements as not affecting an alien's status; he is treated as if stopped at the border.
> Thus we do not think that respondent's continued exclusion deprives him of any statutory or constitutional right....
>
> **\*24** Id. at 215 (citations and footnotes omitted).

The majority reasons that Mezei is distinguishable because it was decided in the midst of the Korean War and it involved an individual whom the executive branch had classified as a national security threat. The majority suggests that the Mezei Court found no constitutional violation flowing from the alien's indefinite detention precisely because of the national security concerns at issue. Given that such "incomparable exigencies" do not exist in the present case, the majority reasons that Mezei is distinguishable.

Having reviewed Mezei, I cannot agree with the majority's reading of the opinion. In Mezei, the Supreme Court cited the Korean War and national security concerns as the impetus behind the Attorney General's decision to exclude an alien, pursuant to the Passport Act of 1918, which permitted the executive branch "to shut out aliens whose 'entry would be prejudicial to the interests of the United States.' " Mezei, 345 U.S. at 210, 73 S.Ct. 625; see also id. at 216, 73 S.Ct. 625 (characterizing the alien's continued detention as "[a]n exclusion proceeding grounded on danger to the national security"). "[T]imes being what they [were]," the Court also recognized that Congress had declined to authorize the release of excludable aliens such as Mezei. Id. at 216, 73 S.Ct. 625. The Mezei Court then noted that it lacked the authority to substitute its judgment for that of Congress with respect to the legislative

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

determination that individuals such as Mezei were to be excluded and not released. Id. ("Whatever our individual estimate of [the policy mandating Mezei's exclusion and indefinite detention] and the fears on which it rests, respondent's right to enter the United States depends on the congressional will, and courts cannot substitute their judgment for the legislative mandate.").

Although national security concerns may have prompted the Attorney General to exclude and to detain Mezei under legislation passed by Congress, the Supreme Court did not rely on national security concerns to support its determination that he lacked a substantive due process right to be free from indefinite detention. [FN11] Rather, the Supreme Court's constitutional analysis turned on the more fundamental fact that Mezei, an excludable alien, had no constitutional rights at all. Id. at 215, 73 S.Ct. 625 (reasoning that Mezei's continued exclusion on Ellis Island did not deprive him of any constitutional rights because he was "treated as if stopped at the border [,]" despite his physical presence in the United States). While Congress had provided for resident aliens to be released on bond pending deportation, the Mezei Court noted that no similar statutory authority existed for the release of excludable aliens. The Supreme Court also recognized that Congress's failure to provide for the release of individuals such as Mezei likely stemmed from fears associated with the Korean War. Id. at 216, 73 S.Ct. 625. Although it questioned that congressional policy "and the fears on which it rest[ed]," the Supreme Court upheld Mezei's indefinite detention because, as an excludable alien, he had no constitutional rights and his right to enter the United States depended solely "on the congressional will[.]" Id. at 215-216, 73 S.Ct. 625.

**\*25** Contrary to the majority's assertion herein, the Mezei Court did not cite the Korean War and national security concerns as the impetus behind its determination that Mezei's confinement violated no constitutionally protected right. In other words, the Court did not suggest that Mezei would have had a constitutionally protected liberty interest in freedom from bodily restraint but for the conflict in Korea. To the contrary, the Court found no due process violation because Mezei, an alien seeking initial entry, had no constitutional right to enter the United States at all. Id. at 215, 73 S.Ct. 625 ("While the Government might keep entrants by sea aboard the vessel pending determination of their admissibility, resulting hardships ... persuaded Congress to adopt a more generous course.... But such temporary harborage, an

act of legislative grace, bestows no additional rights.... Thus, we do not think that respondent's continued exclusion deprives him of any statutory or constitutional right."). Absent a constitutional right to enter this country, Mezei simply had no liberty interest in being free from indefinite detention to effect his exclusion. The "exigencies" associated with the Korean War were not crucial to the Court's resolution of this constitutional issue. [FN12] Rather, those national security concerns merely explained why the Attorney General had exercised his statutory authority to exclude and to detain Mezei. Notably, a number of other circuit courts have also read Mezei as standing for the proposition that an excludable alien has no liberty interest in freedom from indefinite immigration detention. See, e.g., Carrera-Valdez, 211 F.3d at 1048 ("Almost fifty years ago, the Supreme Court held that an excludable alien may be detained indefinitely when his country of origin will not accept his return.... Given [Mezei ] there is little point in elaborate discussion by an inferior court. Carrera is not constitutionally entitled to release."); Ma, 208 F.3d at 823 ("While the Court held that Mezei could be detained indefinitely on Ellis Island, because no country would take him back, it rested its holding on the fact that Mezei's exclusion did not violate the immigration statute, and that as an alien who had not yet entered the country he had no other rights."); Fernandez-Roque, 734 F.2d at 582.

The majority also asserts that the government's reading of Mezei is contrary to "a long line of Supreme Court decisions extending to aliens basic Fifth, Sixth, and Fourteenth Amendment protections...." Most of the decisions upon which the majority relies, however, involved aliens who had entered the United States, either legally or otherwise. See, e.g., Reno v. Flores, 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); Mathews v. Diaz, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); Wong Wing v. United States, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896); Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

**\*26** When considering the constitutional protection to which an alien is entitled, the Supreme Court has long distinguished between aliens who have entered the United States, even if their presence here is illegal, and aliens who have not yet entered this country. See, e.g., Yick Wo, 118 U.S. at 369, 6 S.Ct. 1064 (recognizing that the protections of the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Fourteenth Amendment extend "to all persons within the territorial jurisdiction" of a state); Johnson v. Eisentrager, 339 U.S. 763, 770-771, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (noting that "presence" in the United States gives an alien certain rights, and acknowledging that the Supreme Court has "extended to the person and property of resident aliens important constitutional guaranties"); Plyler, 457 U.S. at 212, 102 S.Ct. 2382 (recognizing that the Fifth, Sixth and Fourteenth Amendments have a "territorial theme," as the protections provided by those Amendments apply " 'to all persons within the territory of the United States,' including aliens unlawfully present"); United States v. Verdugo-Urquidez, 494 U.S. 259, 270-271, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (recognizing that various constitutional protections have been afforded to aliens who are present in the United States, whereas aliens who are not voluntarily within this nation's borders have not been granted the same protections). [FN13]

Without question, aliens who are present in the United States do enjoy significant constitutional protections. In Rosales's case, however, the entry fiction treats him as if he remains detained at the border and not present in the United States. See, e.g., Ma, 208 F.3d at 824 (quoting Barrera- Echavarria, 44 F.3d at 1450) (recognizing that " 'excludable aliens are deemed under the entry doctrine not to be present on United States territory' "). The majority does not dispute the applicability of the entry fiction herein. Consequently, the "long line" of Supreme Court precedent cited by the majority does not controvert the government's reading of Mezei, which involved an excludable alien who, under the entry fiction, remained detained at this nation's border and, like Rosales, was not present in the United States. [FN14]

In short, Rosales's substantive due process claim is a victim of the entry fiction. As noted above, that doctrine treats an excludable alien "as one standing on the threshold of entry, and therefore not entitled to the constitutional protections provided to those within the territorial jurisdiction of the United States." Ma, 208 F.3d at 823. Although Rosales may have a Fifth Amendment liberty interest in not being shot or tortured, he simply has no protected liberty interest in freedom from being detained indefinitely at this country's border. [FN15] This is so because he has no constitutional right to enter the United States, [FN16] and the Attorney General has an absolute right to effect his exclusion. [FN17] "[A] constitutionally protected [liberty] interest cannot arise from relief that the executive exercises unfettered discretion to

award." Tefel v. Reno, 180 F.3d 1286, 1300 (11th Cir.1999). Adopting the majority's reasoning would mean that "[a] foreign leader could eventually compel us to grant physical admission via parole to any aliens he wished by the simple expedient of sending them here and then refusing to take them back." Jean, 727 F.2d at 975. As a practical matter, such a rule would bestow upon foreign leaders the power to dictate U.S. immigration policy. Cf. Gisbert, 988 F.2d at 1447 ("Accepting petitioners' arguments here would allow one country to export its unwanted nationals and force them upon another country by the simple tactic of refusing to accept their return.... The United States cannot be forced to violate its national sovereignty in order to parole these aliens within its borders merely because Cuba is dragging its feet in repatriating them."); Barrera-Echavarria, 44 F.3d at 1448 ("A judicial decision requiring that excludable aliens be released into American society when neither their countries of origin nor any third country will admit them might encourage the sort of intransigence Cuba has exhibited in the negotiations over the Mariel refugees.").

*27 Even assuming, arguendo, that a Fifth Amendment liberty interest is implicated, Rosales's detention, which includes annual review for parole eligibility, is not excessive in relation to the government's concern about protecting society from a criminal alien who previously has committed felony offenses while on immigration parole. In Alvarez-Mendez v. Stock, 941 F.2d 956 (9th Cir.1991), the court reached a similar conclusion with respect to a detained Mariel Cuban, applying the balancing-of-interests approach set forth in Salerno, 481 U.S. at 747, 107 S.Ct. 2095, and adopted by the majority herein. In relevant part, the Alvarez-Mendez court reasoned as follows:

A detainee may not be punished prior to an adjudication of guilt in accordance with due process of law. White v. Roper, 901 F.2d 1501, 1504 (9th Cir.1990). Not all detention, however, is punishment. Bell v. Wolfish, 441 U.S. 520, 539 n. 20, 99 S.Ct. 1861, 1874 n. 20, 60 L.Ed.2d 447 (1979). In the absence of express intent to punish, the most significant factors in identifying punishment are "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." United States v. Salerno, 481 U.S. 739, 747, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987) (quotations omitted).

In denying Alvarez-Mendez reparole, the Associate Commissioner cited Alvarez-Mendez's criminal arrests and convictions, and concluded on the basis of these crimes that it was unlikely that Alvarez Mendez would "remain non-violent or honor the conditions of parole if released." Protecting society from a potentially dangerous alien is a rational, non-punitive purpose for Alvarez Mendez's detention. Because such protection requires separating Alvarez Mendez from society, and because immediate removal from the country is not possible, detention is not an excessive means of accomplishing such protection.

Id. at 962.

The Fifth Circuit subsequently cited Alvarez-Mendez with approval in Gisbert, 988 F.2d at 1442, concluding that the continued detention of Mariel Cubans "is not punishment" and is not excessive in relation to the government's rational purpose of protecting society from potentially dangerous aliens. This is particularly true in the present case, given that Rosales continues to receive annual consideration for immigration parole, despite the fact that he has twice committed serious offenses while on such parole. Cf. Barrera-Echavarria, 44 F.3d at 1450 ("When viewed in this light, as a series of one-year periods of detention followed by an opportunity to plead his case anew, we have no difficulty concluding that Barrera's detention is constitutional under Mezei."); Chi Thon Ngo v. I.N.S., 192 F.3d 390, 398 (3rd Cir.1999) ("We therefore hold that excludable aliens with criminal records as specified in the Immigration Act may be detained for lengthy periods when removal is beyond the control of the INS, provided that appropriate provisions for parole are available."); Id. at 399 ("So long as petitioner will receive searching periodic reviews, the prospect of indefinite detention without hope for parole will be eliminated. In these circumstances, due process will be satisfied."); Zadvydas, 185 F.3d at 297 n. 19 (noting that "the detention of certain classes of persons to protect society at large is not wholly alien to our constitutional order and has been allowed in special situations when, as here, there are procedures to insure that detention must be periodically reviewed").

*28 In opposition to the foregoing conclusion, the majority reasons that "the strength of the government's interest in protecting the community and enforcing its immigration laws must be considered in relation to the possibility that the government may actually achieve its goal to effect

Rosales's deportation." Given that Rosales is unlikely ever to be returned to Cuba, the court concludes that the strength of the government's interest diminishes to the point that it is outweighed by Rosales's liberty interest in freedom from bodily restraint. Specifically, the majority states that "Rosales's confinement can only be considered excessive in relation to the purpose of protecting the community from danger and enforcing an immigration order that is, at present, unenforceable."

By detaining Rosales, however, the government is enforcing immigration law and the order excluding Rosales from this country. Under the entry fiction, the applicability of which the majority does not dispute, Rosales is being detained at the border because he has no legal right to enter this country. He continues to have no legal right to enter this country, regardless of how long he remains waiting at the border. Therefore, by refusing to release Rosales into the United States, the Attorney General is unquestionably enforcing immigration policy, which includes not only deporting him but also excluding him. The fact that Cuba will not accept his return does not alter the fact that the government is enforcing both its immigration law and Rosales's order of exclusion simply by ensuring his exclusion from U.S. territory. Indeed, the only way that U.S. immigration policy and the order of exclusion would be rendered "unenforceable" is if this court orders an excludable alien such as Rosales to be released into the general population. Finally, the fact that Cuba will not accept Rosales's return does not alter the fact that the government is ensuring public safety by detaining Rosales, a person who has committed felony offenses in the United States, subject to annual review for purposes of determining his eligibility for immigration parole. [FN18]

Based on the reasoning and citation of authority set forth above, I conclude that Rosales lacks a liberty interest in freedom from continued detention by the INS. Even assuming, arguendo, that he does possess such an interest, I find that it is outweighed by the government's regulatory interest in enforcing immigration laws and providing for public safety. Consequently, Rosales's indefinite confinement does not violate substantive due process.

In conclusion, I pause briefly to note my agreement with the district court's determination that Rosales's procedural due process rights have not been violated. Although the majority fails to reach this issue, given its finding of a substantive due process violation, the Supreme Court has recognized that "[w]hatever the

procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." Knauff, 338 U.S. at 544, 70 S.Ct. 309; see also Mezei, 345 U.S. at 212, 73 S.Ct. 625. Consequently, the district court properly examined the Attorney General's Cuban Review Plan, found at 8 C.F.R. § 212.12, to identify the procedural rights at issue. See, e.g., Garcia-Arena v. Luttrell, 238 F.3d 420, 2000 WL 1827855 at *2 (6th Cir. Dec.8, 2000) (unpublished) (recognizing that excludable aliens are entitled to only the procedural rights provided by 8 C.F.R. § 212.12).

**\*29** The crux of Rosales's argument on appeal does not appear to be that the INS violated the procedure set forth in 8 C.F.R. § 212.12 when it declined to grant him immigration parole. Rather, Rosales appears to argue that the INS violated procedural due process rights emanating from the Constitution. [FN19] Stated differently, Rosales suggests that the immigration parole procedure contained in 8 C.F.R. § 212.12 is itself deficient because it does not afford him certain due process rights guaranteed by the Constitution. [FN20] However, in Betancourt v. Chandler, 230 F.3d 1357, 2000 WL 1359634 at *2 (6th Cir. Sept.14, 2000) (unpublished), a panel of this court recently recognized that excludable aliens are entitled to only those procedural rights provided by 8 C.F.R. § 212.12, not the Constitution. Absent a violation of § 212.12, which Rosales has not demonstrated, he has no procedural due process claim.

For the reasons set forth above, I respectfully dissent.

FN* The Honorable Walter Herbert Rice, Chief United States District Judge for the Southern District of Ohio, sitting by designation.

FN1. The statute read in pertinent part: "The Attorney General may ... in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A) (1994) (amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") § 602(a), Pub.L. 104-208, 110 Stat. 3009 (1996)).

FN2. Rosales was first arrested in 1980 for aggravated battery. That charge was dismissed. J.A. at 145. He was arrested for other offenses, including possession of marijuana, burglary, and loitering, but apparently he was not convicted of those offenses. J.A. at 147-54.

FN3. Before the enactment of IIRIRA, aliens ineligible for admission into the United States were designated "excludable" aliens. See 8 U.S.C. § 1182(a) (1994). Excludable aliens who were granted "parole" by the Attorney General could then enter the country. If an excludable alien's parole was revoked, exclusion proceedings would be brought to deport him. See 8 U.S.C. § 1182(d)(5)(A) (1994). These aliens are now referred to as "inadmissible" aliens. See 8 U.S.C. § 1182(a). Aliens who had gained admission into the United States but were here illegally were designated "deportable" aliens. See 8 U.S.C. § 1251 (1994). They could be removed from this country by deportation proceedings. See 8 U.S.C. § 1252 (1994). Proceedings to remove both inadmissible and deportable aliens are now referred to as "removal" proceedings. See 8 U.S.C. § 1229a. Inadmissible aliens are removable under 8 U.S.C. § 1227(a)(1)(A). Under the prior statutory scheme, Rosales was an "excludable" alien.

FN4. Because of the lack of an agreement with Cuba for the return of Mariel Cubans, the Attorney General adopted the Cuban Review Plan, at 8 C.F.R. §§ 212.12-.13, in 1987 to govern the grant and revocation of parole to all Cubans who arrived in the United States between April 15, 1980 and October 20, 1980. Under the Plan, the authority to grant parole for detained Mariel Cubans rests with the INS Commissioner, who may act through an Associate Commissioner for Enforcement. See id. § 212.12(b)(1). The Associate Commissioner must appoint a Review Plan Director who designates two- or three-person panels (the "Cuban Review Panel") to make

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

parole recommendations to the Associate Commissioner. The regulations provide for the annual review of a detainee's status. See id. at § 212.12(g)(2). Before making a recommendation that a detainee be granted parole, the Cuban Review Panel members "must conclude that: [1] The detainee is presently a nonviolent person; [2] The detainee is likely to remain nonviolent; [3] The detainee is not likely to pose a threat to the community following his release; and [4] The detainee is not likely to violate the conditions of his parole." Id. § 212.12(d)(2). Each panel must weigh the following factors when making its decisions: "[1] The nature and number of disciplinary infractions or incident reports received while in custody; [2] The detainee's past history of criminal behavior; [3] Any psychiatric and psychological reports pertaining to the detainee's mental health; [4] Institutional progress relating to participation in work, educational and vocational programs; [5] His ties to the United States, such as the number of close relatives residing lawfully here; [6] The likelihood that he may abscond, such as from any sponsorship program; and [7] Any other information which is probative of whether the detainee is likely to ... engage in future acts of violence, ... future criminal activity, or is likely to violate the conditions of his parole." See id. § 212.12(d)(3).

FN5. The statute provided, in pertinent part, that "the Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien" from criminal confinement. 8 U.S.C. § 1226(e) (1994). The parties do not dispute that Rosales's conviction for conspiracy to possess with intent to distribute cocaine was an "aggravated felony" under the statute.

FN6. The Review Panel worksheet also reveals that Rosales has demonstrated "good conduct" while in custody and that he has participated in English as a Second Language classes, a drug rehabilitation program, industrial training, automotive training, and has received his GED equivalency. J.A. at 137.

FN7. As of July 19, 2000, Rosales had been determined to be releasable by the INS pending placement in a suitable halfway house. The effect of this determination is discussed infra.

FN8. This statute provides that "[t]he Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: Provided, however, That determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1).

FN9. This section provides: "Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Chapter." 8 U.S.C. § 1252(g).

FN10. This section provides: "Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." 8 U.S.C. § 1231(h).

FN11. This section provides: "The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." 8 U.S.C. § 1226(e).

FN12. In Mansour, this court noted that because habeas relief was available to aliens seeking review of final deportation orders, the statute denying any court's jurisdiction to review those orders was constitutional. However, this court left undecided the scope of habeas review available to such aliens. See Mansour, 123 F.3d at 426 n. 3 ("[W]e need not address the scope of review that is available on a petition for a writ of habeas

corpus.").

FN13. We do not believe that either 8 U.S.C. § 1226(e) or § 1231(h) limits our jurisdiction over this appeal because these newly enacted provisions under IIRIRA do not govern this case. See IIRIRA § 309(c)(1).

FN14. IIRIRA provides that the revised rules governing removal proceedings, as well as judicial review of those proceedings, do not apply to aliens who were already in exclusion or deportation proceedings prior to the Act's effective date on April 1, 1997. See IIRIRA § 309(c)(1). However, IIRIRA § 306(c)(1) makes § 1252(g) applicable to cases "arising from all past, pending, or future exclusion, deportation, or removal proceedings" under the Act. IIRIRA § 306(c)(1) (emphasis added). Section 1252(g) purports to strip courts of their jurisdiction over most actions by the Attorney General relating to immigration actions "[e]xcept as provided in this section." However, according to § 309(c)(1), none of the other provisions in § 1252 apply to cases pending before April 1, 1997. In order to avoid reading § 309(c)(1) into a nullity, the Supreme Court crafted an extremely narrow reading of § 1252(g). See Mustata v. U.S. Dep't of Justice, 179 F.3d 1017, 1020 n. 3 (6th Cir.1999) (explaining the conflict between the provisions in greater depth).

FN15. The Associate Commissioner may revoke parole in the exercise of her discretion when "(1) The purposes of parole have been served; (2) The Mariel Cuban violates any condition of parole; (3) It is appropriate to enforce an order of exclusion or to commence proceedings against a Mariel Cuban; or (4) The period of parole has expired without being renewed." 8 C.F.R. § 212.12(h).

FN16. This court has authored several unpublished decisions including Betancourt v. Chandler, No. 99-5797, 2000 WL 1359634, at *2 (6th Cir. Sept.14, 2000) (rejecting claim that Attorney General lacks authority to detain excludable alien indefinitely); Laetividad v. INS, No. 99-5245, 1999 WL 1282432, at * 1 (6th Cir. Dec.27, 1999); Fernandez- Santana v. Chandler, No. 98-6453, 1999 WL 1281781, at *1 (6th Cir. Dec.27, 1999); and Gonzalez v. Luttrell, No. 96-5098, 1996 WL 627717, at *1 (6th Cir. Oct.29, 1996), that affirm the

district court's dismissal or denial of an excludable alien's habeas corpus petition. However, because these cases are unpublished, they are not binding on this court. See 6th Cir.R. 28(g); Salamalekis v. Comm'r of Soc. Sec., 221 F.3d 828, 833 (6th Cir.2000) (unpublished decisions are not binding precedent).

FN17. 8 U.S.C. § 1226 (1994) was repealed and reenacted by Congress in IIRIRA § 303 (codified at 8 U.S.C. § 1226). The amended version of the statute is inapplicable to this case.

FN18. See 8 U.S.C. § 1101(a)(43) (1994) (defining aggravated felonies).

FN19. The Constitution imbues the legislature with the power to "establish an uniform Rule of Naturalization." U.S. CONST. Art. I, § 8, cl. 4.

FN20. The plenary power doctrine, articulated in Harisiades v. Shaughnessy, 342 U.S. 580, 588-89, 72 S.Ct. 512, 96 L.Ed. 586 (1952), states that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." See also Zadvydas, 185 F.3d at 289 ("The power of the national government to act in the immigration sphere is thus essentially plenary.").

FN21. See 8 U.S.C. §§ 1103, 1182. Section 1103(a)(1) states that the "Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens" and that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling."

FN22. Mezei was born in Gibraltar and lived in the United States from 1923 to 1948. See Mezei, 345 U.S. at 208, 73 S.Ct. 625. In 1948, he went to Romania to visit his dying mother. He was denied entry to Romania, and remained in Hungary for 19 months before returning to the United States with a quota immigration visa issued by this country. On February 9, 1950 he was

deemed excludable by an immigration officer at Ellis Island on the ground that his entry would prejudice the public interest because he was a security threat.

FN23. The Passport Act was amended in 1941 by an act of Congress pursuant to a national emergency declared by the President on May 27, 1941 and which continued in effect in 1953. The amendments to the Act gave the Attorney General authority to exclude aliens whose "entry would be prejudicial to the United States." See Knauff, 338 U.S. at 540-41, 70 S.Ct. 309 (citing Act of June 21, 1941, c. 210, 55 Stat. 252, amending § 1 of the Act of May 22, 1918, c. 81, 40 Stat. 559, codified at 22 U.S.C. § 223 (repealed 1952)).

FN24. The Supreme Court in Mezei specifically noted that Mezei's stateless condition was due to the fact that he "left the United States and remained behind the Iron Curtain for 19 months." Mezei, 345 U.S. at 214, 73 S.Ct. 625. In his dissent, Justice Jackson criticized the majority for succumbing to the government's fear of Communist "infiltration." He stated: "[M]y apprehensions about the security of our form of government are about equally aroused by those who refuse to recognize the dangers of Communism and those who will not see danger in anything else." Id. at 227, 73 S.Ct. 625 (Jackson, J., dissenting). He concluded by observing that it is "inconceivable" that a "measure of simple justice and fair dealing," namely a "fair hearing with fair notice of the charges," would "menace the security of this country. No one can make me believe that we are that far gone." Id. at 228, 73 S.Ct. 625.

FN25. Moreover, Mezei has been severely criticized for establishing a "preposterous" level of deference to Congress's authorization of due process procedures for aliens. See Henry Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv. L.Rev. 1362, 1392 (1953).

FN26. Indeed, prior to those Supreme Court cases in the 1950s allowing indefinite detention, courts refused to permit the indefinite detention of aliens. As one court

held:
The right to arrest and hold or imprison an alien is nothing but a necessary incident of the right to exclude or deport. There is no power in this court or in any other tribunal in this country to hold indefinitely any sane citizen or alien in imprisonment, except as a punishment for crime. Slavery was abolished by the Thirteenth Amendment. It is elementary that deportation or exclusion proceedings are not punishment for crime.... [Petitioner] is entitled to be deported, or to have his freedom.
Bonder v. Johnson, 5 F.2d 238, 239 (D.Mass.1925); see also Caranica v. Nagle, 28 F.2d 955, 957 (9th Cir.1928) (holding that government must release alien if government fails to execute order of deportation "within a reasonable time").

FN27. Other circuits have noted that excludable aliens possess some form of due process rights. See, e.g., Chi Thon Ngo, 192 F.3d at 396 ("Even an excludable alien is a 'person' for purposes of the Fifth Amendment and is thus entitled to substantive due process."); Zadvydas, 185 F.3d at 294 ("Excludable aliens are persons, entitled to some due process, and other, constitutional protections."); Lynch, 810 F.2d at 1366 (holding that "even excludable aliens are entitled to the protection of the due process clause while they are physically in the United States").

FN28. We note that the Supreme Court decided Mezei before deciding a line of cases that expanded upon its conceptions of substantive due process, as well as cases that developed a framework for analyzing whether civil or regulatory confinement rises to the level of criminal "punishment" and thus violates a detainee's substantive due process rights.

FN29. Other courts have identified additional purposes for detention including: the government's ability to enforce deportation or exclusion orders; and preventing an alien's flight prior to deportation. See Hermanowski v. Farquharson, 39 F.Supp.2d 148, 159 (D.R.I.1999); Phan v. Reno, 56 F.Supp.2d 1149, 1155-56 (W.D.Wash.1999); Vo v. Greene, 63 F.Supp.2d 1278, 1285 (D.Colo.1999). However, because the government

identified only safety to persons and property as its rationale for Rosales's detention, we confine ourselves to evaluating this interest.

FN30. Rosales has thus far been detained in immigration custody for over three years.

FN31. Although the dissent states that excludable aliens "will not or cannot go elsewhere," see infra p. 47 (emphasis added), we think it important to note that it has never been suggested to this court that Rosales has had the opportunity to be released to any third country. The dissent further states, see infra note 17, that "Rosales's habeas petition does not suggest that he or his relatives, who are living in Florida, have arranged for him to leave the United States. Instead, he wants to be released into this country." We seriously question how an alien who is in prison and unrepresented by counsel could ever "arrange" to leave this country, much less whether there is any evidence in the record that any other country will accept Rosales.

FN32. Several district courts have reached the same constitutional conclusion with regard to deportable aliens. See Kay v. Reno, 94 F.Supp.2d 546, 553 (M.D.Pa.2000); Le v. Greene, 84 F.Supp.2d 1168, 1175 (D.Colo.2000); Vo v. Greene, 63 F.Supp.2d 1278, 1285 (D.Colo.1999); Tam v. INS, 14 F.Supp.2d 1184, 1192 (E.D.Cal.1998) ("At some point, indefinite detention of a deportable alien caused by an unenforceable INS order must intersect with the Constitution"); Hermanowski v. Farquharson, 39 F.Supp.2d 148, 162 (D.R.I.1999) (detention for over twenty-eight months with the promise of continued imprisonment for the rest of his life even though alien's country has refused to allow deportation constitutes governmental conduct that "shocks the conscience" in violation of the Fifth Amendment).

FN33. Although the dissent claims that our reasoning will undermine this nation's ability to enforce its immigration laws by encouraging foreign nations to send their undesirable citizens to our shores, see infra p. 57, we believe the dissent's contention is belied by common sense. By virtue of the fact that a nation has cast out certain of its citizens--as in the Mariel boatlift--we can reasonably conclude that such a nation is unlikely to be influenced by the possibility that one day its citizens might be paroled into this country, rather than spending their remaining days locked up in American detention centers.

FN34. Because we find that petitioner's substantive due process rights were violated, we do not reach his procedural due process claims.

FN1. Immigration parole adopts the fiction that Rosales has never entered this country. See Vargas v. Swan, 854 F.2d 1028, 1029 (7th Cir.1988). Despite his parole and physical presence within the United States, the INS treats Rosales as though he has not been admitted into this country, and, legally, he remains at "the threshold of initial entry." Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953). Therefore, he "stands on a different footing" than an alien who has already passed through this nation's gates. Id.

FN2. Before examining the constitutional issue, the majority resolves several other issues. First, the majority concludes that the district court possessed jurisdiction to hear Rosales's claim and that this court has jurisdiction to hear his appeal. Second, the majority finds that Rosales's appeal has not been rendered moot by virtue of the INS issuing a Notice of Releasability. Third, the majority concludes that the Attorney General and the INS do possess the statutory authority to detain Rosales indefinitely. I agree with each of these conclusions for the reasons set forth by the majority.

FN3. The majority finds no evidence that Congress intended to punish Rosales and other excludable aliens by detaining them indefinitely. I agree with this aspect of the majority's reasoning.

FN4. But see Ma, 208 F.3d at 824 (stating that "it is 'not settled' that excludable aliens have any constitutional rights at all"); Kwong Hai Chew v. Colding, 344 U.S. 590, 596 n. 5, 73 S.Ct. 472, 97 L.Ed. 576 (1953) (quoting Bridges v. Wixon, 326 U.S. 135, 161, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945)

(Murphy, J., concurring) (" 'The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores.' ")).

FN5. In Gisbert, the Fifth Circuit expressly rejected the position taken by the majority herein that the indefinite detention of Mariel Cubans constitutes punishment without a trial in violation of their substantive due process rights. Gisbert, 988 F.2d at 1441-42.

FN6. When engaging in a substantive due process analysis, a court must begin with "a careful description of the asserted right." Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). In the present case, Rosales does not dispute the Attorney General's power to exclude him or to detain him for a reasonable time to effect his return to Cuba. Rather, he claims that, because Cuba refuses to accept him, his detention is indefinite, and possibly permanent, thus constituting punishment without a trial. Rosales contends, and the majority agrees, that he has a liberty interest in being free from this type of detention. If his habeas petition is granted, however, he will be awarded the very right that the government lawfully denied to him as a result of his exclusion, namely the right to be at large in the United States. Although Rosales characterizes his request as one to be released from incarceration, the relief that he seeks is indistinguishable from a request to be admitted into this country until his return to Cuba can be arranged. As set forth more fully, supra, Rosales has no constitutional right to be released into this country, and the government has an absolute right to ensure his exclusion.

FN7. As noted, supra, the majority does not question the applicability of the "entry fiction," which treats Rosales as if he is being detained at the border, despite his physical presence in the United States. Although the entry fiction may appear to be draconian in operation, it has a humanitarian purpose. The entry fiction is a compassionate response to the hardships that surely would have befallen Rosales if INS representatives had prevented him and other Mariel Cubans from bringing their boats ashore, as the government unquestionably had the right to do. In other words, the United States lawfully could have forced Rosales and the other Mariel Cubans to remain at sea, where they almost certainly would have died from drowning, dehydration or starvation. Instead, the government allowed Rosales and the others to come ashore, under the entry fiction, which treats the Mariel Cubans as if they are still at sea, and outside of U.S. territory, for immigration purposes.

FN8. The facts of Carrera-Valdez are similar to those of the present case. The petitioner in Carrera-Valdez was a Mariel Cuban who was declared excludable following his arrival in this country. Like Rosales, the petitioner in Carrera-Valdez was released several times on immigration parole only to be taken into custody after committing crimes here. He sought a writ of habeas corpus ordering his release until he could be returned to Cuba. Carrera-Valdez, 211 F.3d at 1047.

FN9. The majority cites Carrera-Valdez and Gisbert for the proposition that the Attorney General has the statutory authority to detain an excludable alien indefinitely, while failing to acknowledge that those cases also stand for the proposition that an excludable alien has no constitutional right to be free from indefinite detention.

FN10. Although the alien in Mezei had lived in the United States for approximately 25 years, he left this country in 1948, without authorization or reentry papers, and resided in Hungary for 19 months. Mezei, 345 U.S. at 208, 214, 73 S.Ct. 625. In light of those facts, the Supreme Court had "no difficulty in holding respondent an entrant alien or 'assimilated to [that] status' for constitutional purposes." Id. at 214, 73 S.Ct. 625 (quoting Kwong Hai Chew v. Colding, 344 U.S. 590, 599, 73 S.Ct. 472, 97 L.Ed. 576 (1953)).

FN11. In fact, as noted above, the Supreme Court appeared to question whether Mezei was even a true national security risk. Mezei, 345 U.S. at 216, 73 S.Ct. 625 ("Whatever our individual estimate of [the policy mandating Mezei's exclusion and indefinite detention] and the fears on which it rests, respondent's right to enter the United States depends on the congressional will, and courts cannot substitute their judgment for the legislative mandate.").

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

FN12. It is noteworthy that the Supreme Court did not even require the Attorney General to divulge the evidence upon which he based his determination that Mezei constituted a threat to national security. Mezei, 345 U.S. at 212, 73 S.Ct. 625. The Court's refusal to "retry the determination of the Attorney General" by requiring such evidence to be revealed would be peculiar if the absence of a substantive due process right turned upon exigencies attributable to the Korean War. In other words, if the Supreme Court believed that Mezei lacked a substantive due process right to be free from indefinite detention only because of exigencies created by the Korean War, it seems likely that the Court would have required the Attorney General to present some evidence showing that those exigencies actually existed. The Court did not do so, however, for at least two reasons. First, Mezei's confinement was an act of exclusion, and the decision of the Attorney General to exclude an alien is "final and conclusive[.]" Id. Second, Mezei's continued exclusion on Ellis Island did not deprive him of any constitutional right, not because of national security concerns and the Korean War, but because he was treated as if detained outside of U.S. territory and, therefore, he had no substantive due process rights. Id. at 215, 73 S.Ct. 625; see also Ethan A. Klingsberg, Note, Penetrating the Entry Doctrine: Excludable Aliens' Constitutional Rights in Immigration Processes, 98 Yale L.J. 639, 643-644 (1989) (recognizing that Mezei rests upon the "principle that an alien arrives at the border without an interest in the right to enter" and, as a result, lacks a liberty interest in freedom from immigration detention). Consequently, the Attorney General's national security concerns were not critical to the Mezei Court's substantive due process analysis, despite the majority's assertion to the contrary.

FN13. In Verdugo-Urquidez, the Supreme Court reviewed several of the cases cited by the majority herein. According to the Verdugo- Urquidez Court, those cases stand for the proposition that aliens enjoy constitutional protections once they enter the United States: Verdugo-Urquidez also relies on a series of cases in which we have held that aliens enjoy certain constitutional rights. See, e.g., Plyler v. Doe, 457 U.S. 202, 211-212, 102 S.Ct. 2382, 2391-92, 72 L.Ed.2d 786 (1982) (illegal aliens protected by Equal Protection Clause); Kwong Hai Chew v. Colding, 344 U.S. 590, 596, 73 S.Ct. 472, 477, 97 L.Ed. 576 (1953) (resident alien is a "person" within the meaning of the Fifth Amendment); Bridges v. Wixon, 326 U.S. 135, 148, 65 S.Ct. 1443, 1449, 89 L.Ed. 2103 (1945) (resident aliens have First Amendment rights); Russian Volunteer Fleet v. United States, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931) (Just Compensation Clause of Fifth Amendment); Wong Wing v. United States, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896) (resident aliens entitled to Fifth and Sixth Amendment rights); Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886) (Fourteenth Amendment protects resident aliens). These cases, however, establish only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country. See, e.g., Plyler, supra, 457 U.S., at 212, 102 S.Ct., at 2392 (The provisions of the Fourteenth Amendment " 'are universal in their application, to all persons within the territorial jurisdiction ...' ") (quoting Yick Wo, supra, 118 U.S., at 369, 6 S.Ct., at 1070); Kwong Hai Chew, supra, 344 U.S., at 596, n. 5, 73 S.Ct., at 477, n. 5 ("The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders") (quoting Bridges, supra, 326 U.S., at 161, 65 S.Ct., at 1455 (concurring opinion) (emphasis added)). Respondent is an alien who has had no previous significant voluntary connection with the United States, so these cases avail him not. Verdugo-Urquidez, 494 U.S. at 270-71.

FN14. Despite the fact that the Fifth, Sixth and Fourteenth Amendments have a "territorial theme" and, therefore, apply " 'to

all persons within the territory of the United States,' " Plyler, 457 U.S. at 212, 102 S.Ct. 2382, some courts have held that excludable aliens may rely upon the Constitution to challenge "governmental action outside of the immigration context." Fernandez-Roque v. Smith, 734 F.2d 576, 582 n. 8 (11th Cir.1984); see also Gisbert, 988 F.2d at 1442 (recognizing that excludable aliens have a substantive due process right to be free from "gross physical abuse"); but see Ma, 208 F.3d at 824 ("[I]t is not settled that excludable aliens have any constitutional rights at all [.]"). Even if excludable aliens may challenge governmental conduct outside of the immigration context, however, the act of detaining an alien to effect his exclusion from the United States constitutes governmental action within the immigration context. As a result, excludable aliens such as Rosales have no substantive due process right to be free from immigration detention. See, e.g., Ma, 208 F.3d at 824; Carrera-Valdez, 211 F.3d at 1048.

FN15. Preventing the INS from killing or torturing Rosales does not infringe upon the government's plenary power to exclude aliens at our borders. Consequently, as noted, supra, some courts have recognized that excludable aliens have a protected liberty interest in not being physically abused. Preventing the INS from indefinitely detaining Rosales in order to ensure his exclusion, however, would interfere with the government's fundamental sovereign authority to control its borders.

FN16. "It is beyond dispute that aliens have no constitutional right to be admitted into this county." Fernandez-Roque, 734 F.2d at 581 (quoting Landon, 459 U.S. at 32, 103 S.Ct. 321); see also Jean, 727 F.2d at 972 ("[E]xcludable aliens cannot challenge either admission or parole decisions under a claim of constitutional right."). Immigration "[p]arole is an act of extraordinary sovereign generosity, since it grants temporary admission into our society to an alien who would probably be turned away at the border if he sought to enter by land, rather than coming by sea or air." Id.

FN17. This is not to say that the Attorney General could detain Rosales indefinitely if some other country were willing to accept him. Under those circumstances, which do not exist here, his continued detention likely would violate the Constitution. In other words, the United States lawfully may detain Rosales in order to regulate its border and prevent him from entering, but it cannot constitutionally prevent him from vacating the border and going elsewhere. Notably, however, Rosales's habeas petition does not suggest that he or his relatives, who are living in Florida, have arranged for him to leave the United States. Instead, he wants to be released into this country.

FN18. The majority appears to find a substantive due process violation in part because Rosales cannot be "certain" of receiving immigration parole, regardless of how well he behaves while he is detained. Given that Rosales has no right to enter this country at all, however, the fact that he cannot be "certain" of being paroled into the United States does not give rise to a substantive due process violation.

FN19. As the majority properly notes, Rosales alleged in his habeas petition that he was deprived of his Fifth and Fourteenth Amendment rights (1) to be represented by counsel at the parole hearing, (2) to review the information used against him at that proceeding, and (3) to confront and cross-examine witnesses. Rosales also alleged that the INS had miscalculated his parole candidacy score. In particular, he alleged that the INS had improperly enhanced his score to account for prior criminal offenses, not in violation of 8 C.F.R. § 212.12, but rather in violation of the Federal Rules of Evidence, Title 28 of the United States Code and the United States Sentencing Guidelines. J.A. at 6-7. Rosales did allege in his habeas petition, however, that the INS had violated 8 C.F.R. § 212.12 by relying upon impermissible reasons to support its denial of immigration parole. J.A. at 7. Although Rosales does not appear to pursue this claim on appeal, it lacks merit in any event. The INS denied Rosales immigration parole largely because it was unable to conclude that he would not pose a threat to the community, as evidenced by his recidivist criminal

behavior. J.A. at 133. This explanation plainly constitutes a proper basis to deny immigration parole. See 8 C.F.R. § 212.12(d).

FN20. Insofar as Rosales's appellate brief might be read to assert a violation of 8 C.F.R. § 212.12, any such claim is belied by the record. Among other things, he has been afforded periodic parole review, the services of a translator during his parole interview, decisions translated into Spanish, and notice of his right to have the assistance of a representative during his parole interview. J.A. at 130-139. Although Rosales stresses that he was not represented by counsel during the parole review process, § 212.12 does not guarantee such a right. Furthermore, this court has recognized that an excludable alien has "no constitutional right to counsel at his parole review hearings." Fernandez-Santana v. Chandler, 202 F.3d 268, 1999 WL 1281781 at \*2 (6th Cir. December 27, 1999) (unpublished). Rosales also contends that, as a result of a language barrier, he was unable "to understand or communicate in lay or legal terms with his keepers." As noted above, however, Rosales was informed of his right to have a representative assist with his parole interview. J.A. at   131.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

**Attachment C**

Citation                    Found Document          Rank 1 of 1           Databa
20 I. & N. Dec. 647                                                      FIM-BIA
Interim Decision (BIA) 3199, 1993 WL 165803 (BIA)
**(Cite as: 20 I. & N. Dec. 647)**
**H**

United States Department of Justice
Board of Immigration Appeals

**\*647** MATTER OF CHOW

In Deportation Proceedings

A-18998312
Decided by Board April 13, 1993

(1) Section 241(a)(2)(C) of the Immigration and Nationality Act, 8 U.S.C. §
1251(a)(2)(C) (Supp. II 1990), relating to convictions for certain firearms
offenses, represents the enactment of a new statutory provision that completely
supersedes all former versions of that deportation ground and is not limited
regarding its applicability to convictions which predated its enactment, there
being no restrictions regarding the dates in which a conviction must occur in
order to be included within the scope of the new statute.

(2) An alien deportable under section 241(a)(2)(C) of the Act on the basis of
his conviction for a firearms offense is ineligible for relief from deportation
under section 212(c) of the Act, 8 U.S.C. § 1182(c) (Supp. III 1991), because
there is no exclusion ground corresponding to the deportation ground for
conviction of a firearms offense. Matter of Montenegro, Interim Decision 3192
(BIA 1992);     Matter of Hernandez-Casillas, Interim Decision 3147 (BIA 1990;
A.G. 1991), aff'd, 983 F.2d 231 (5th Cir. 1993); Matter of Granados, 16 I & N
Dec. 726 (BIA 1979), followed.

CHARGE:

  Order:  Act of 1952-Sec. 241(a)(2)(A)(iii) [8 U.S.C. § 1251(a)(2)(A)(iii) ]-
Convicted of aggravated felony
  Sec. 241(a)(2)(B)(i) [8 U.S.C. § 1251(a)(2)(B)(i) ]-Convicted of controlled
substance violation
  Sec. 241(a)(2)(C) [8 U.S.C. § 1251(a)(2)(C) ]-Convicted of firearms violation

ON BEHALF OF RESPONDENT:
Robert D. Ahlgren, Esquire
Ahlgren and Blumenfeld, P.C.
105 West Madison Street, Suite 800
Chicago, Illinois 60602

ON BEHALF OF SERVICE
Harris L. Leatherwood
General Attorney

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

20 I. & N. Dec. 647
**(Cite as: 20 I. & N. Dec. 647, \*647)**

BY:  Milhollan, Chairman;  Dunne, Morris, Vacca, and Heilman, Board Members

In a decision dated October 16, 1992, an immigration judge found the respondent deportable as charged under section 241(a)(2)(B)(i) of the Immigration and Nationality Act, 8 U..S.C. § 1251(a)(2)(B)(i) (Supp. II 1990), a an alien convicted of a controlled substance **\*648** violation, and under section 241(a)(2)(C) of the Act, as an alien convicted of a firearms violation.  He als denied the respondent's application for relief from deportation by way of a waiver of inadmissibility under section 212(c) of the Act, 8 U.S.C. § 1182(c) (Supp. III 1991), and ordered him deported from the United States to the United Kingdom.  The respondent has appealed from that decision.  The appeal will be dismissed.

The respondent is a native and citizen of Hong Kong who was admitted to the United States as a lawful permanent resident on June 16, 1971.  The respondent conviction records and admissions at the deportation hearing reflect that he wa convicted on November 10, 1977, in the Superior Court of New Jersey, Camden County, of unlawful possession of an automatic pistol.  For this crime he was sentenced to a term of imprisonment of not less than 2 years and not more than years.  This sentence was to be concurrent with three consecutive sentences of to 3 years, 5 to 7 years, and 3 to 5 years, for his contemporaneous conviction on multiple counts involving entering the premises of a restaurant with intent to rob, robbery while armed, attempted robbery, atrocious assault and battery, and conspiracy.  These latter crimes were not listed on the Order to Show Cause and Notice of Hearing (Form I-221).  The respondent's conviction records and admissions also establish his conviction, in the United States District Court for the Eastern District of New York, of using a telephone to facilitate the crimes of distribution and possession with intent to distribute heroin in violation of 21 U.S.C. § 843(b) (1988), for which he was sentenced on June 25, 1991, to a term of imprisonment of 2 years.

Based on the respondent's 1977 weapons conviction, the immigration judge foun him deportable as charged under section 241(a)(2)(C) of the Act, as an alien convicted of a firearms violation.  The immigration judge also found the respondent deportable as charged under section 241(a)(2)(B)(i) of the Act, as a alien convicted of a controlled substance violation on the basis of his drug-related conviction, but found that this conviction did not support a finding of deportability under section 241(a)(2)(A)(iii), for conviction of an aggravated felony.  The Immigration and Naturalization Service has not appealed this latte determination of the immigration judge.  In its memorandum in opposition to the respondent's appeal, the Service incorporates by reference the decision of the immigration judge, which it adopts as its own position.

On appeal, the respondent does not contest his deportability under section 241(a)(2)(B)(i) of the Act, but he disagrees with the immigration judge's conclusion that he is deportable under section 241(a)(2)(C), as an alien convicted of a firearms violation.  He argues **\*649** that his 1977 conviction may not be considered for purposes of deportability because it predates the 1988 amendments made to section 241(a)(14) of the Act, 8 U.S.C. § 1251(a)(14) (1982) which was the precursor to section 241(a)(2)(C).  See section 7348 of the Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181, 4473 (effective

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

20 I. & N. Dec. 647
**(Cite as: 20 I. & N. Dec. 647, *649)**

Nov. 18, 1988) ("1988 Act"). The respondent contends that although these amendments expanded the types of weapons violations that would render an alien deportable so as to include the particular offense of which he was convicted, the 1988 Act made these amendments inapplicable to convictions occurring prior to its enactment. The respondent's contention that he is therefore not deportable is without merit.

Prior to the 1988 amendments, the Act provided for the deportability of an alien who

at any time after entry, shall have been convicted of possessing or carryin in violation of any law any weapon which shoots or is designed to shoot automatically or semiautomatically more than one shot without manual reloading, by a single function of the trigger, or a weapon commonly called a sawed-off shotgun.

Section 241(a)(14) of the Act, 8 U.S.C. § 1251(a)(14) (1982) (emphasis added)
The Anti-Drug Abuse Act of 1988 expanded the types of weapons violations to include possessing or carrying any "firearm or destructive device ... or any revolver." Section 7348 of the 1988 Act, 102 Stat. at 4473. Following these amendments, section 241(a)(14) provided for the deportability of an alien who

at any time after entry, shall have been convicted of possessing or carryin in violation of any law any firearm or destructive device (as defined in paragraphs (3) and (4))[sic], respectively, of section 921(a) of title 18, United States Code, or any revolver or any weapon which shoots or is designed t shoot automatically or semiautomatically more than one shot without manual reloading, by a single function of the trigger, or a weapon commonly called a sawed-off shotgun.

Section 241(a)(14) of the Act, 8 U.S.C. § 1251(a)(14) (1988) (emphasis added) [FN1]

The respondent's argument implies that the weapon which he was convicted of possessing was not an automatic weapon, and therefore that he is not deportable under the version of section 241(a)(14) predating the 1988 amendments. However, during the deportation proceedings the respondent admitted the factual allegation contained in the Order to Show Cause (reflecting count 28 of the indictment upon which he was convicted) that one of the weapons he was **\*650** convicted of unlawfully possessing was a .25 caliber automatic pistol. Consequently, his 1977 conviction appears to fall within the provisions of section 241(a)(14) of the Act even prior to the 1988 amendments, and the prospective application of those amendments is thus of no import.

Moreover, even if the respondent's conviction had only involved a weapon that was manually reloaded, his argument fails. As the respondent correctly points out on appeal, the 1988 Act provided that its amendments would only apply to aliens "convicted, on or after the date of the enactment of [the 1988] Act, of possessing any firearm or destructive device referred to in such subsection." See section 7348(b) of the 1988 Act, 102 Stat. at 4473; see also Matter of A-A , Interim Decision 3176, at 10 n.14 (BIA 1992). However, the respondent was no found deportable under former section 241(a)(14) of the Act. The immigration judge found the respondent deportable under section 241(a)(2)(C) of the Act, which was made applicable to proceedings for which notice was provided to the alien on or after March 1, 1991. [FN2] See section 602(d) of the Immigration

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, 5082 ("1990 Act"). Section 241(a)(2)(C) of the Act provides:

CERTAIN FIREARM OFFENSES-Any alien who at any time after entry is convicted under any law of purchasing, selling, offering for sale, exchanging, using, owning, possessing, or carrying in violation of any law, any weapon, part, or accessory which is a firearm or destructive device (as defined in section 921(a) of title 18, United States Code) is deportable.

It is apparent from a comparison of this new statute with its predecessor that the 1990 Act did not simply change the numerical designation of the deportation provisions relating to firearm offenses. It significantly amended the substance of the provisions by increasing the number of weapons offenses that render an alien deportable and by replacing the enumeration of the specific types of weapons within the statute's scope with one all-encompassing definition of "a firearm or destructive device." In essence, section 241(a)(2)(C) of the Act represents the enactment of a new statutory provision that completely supersedes all former versions of that deportation ground.

By its very language, section 241(a)(2)(C) applies to convictions occurring "at any time after entry." Former section 241(a)(14) also contained this language. However, unlike the amendments made to section 241(a)(14) by the 1988 Act, the 1990 Act imposed no limitations regarding its applicability to convictions which predated its enactment. Since the 1990 Act completely substituted section 241(a)(2)(C) of the Act for section 241(a)(14), we conclude that it also *651 made irrelevant any restrictions on the applicability of the provisions of the former statute placed on it by the 1988 Act. The only restrictions on the new provisions embodied in section 241(a)(2)(C) concern the deportation proceedings to which that section is applicable, but none exist regarding the dates on which a conviction must occur in order to be included within the scope of the new statute. See section 602(d) of the 1990 Act, 104 Stat. at 5082. We therefore find that the respondent's deportability under the new provisions set forth in section 241(a)(2)(C) of the Act has been established by clear, unequivocal, and convincing evidence. See 8 C.F.R. § 242.14(a) (1992); Woodby v. INS, 385 U.S. 276 (1966). [FN3]

The respondent further contends on appeal that even if he is deportable under section 241(a)(2)(C) of the Act on the basis of his conviction for a firearms violation, he nevertheless remains eligible for section 212(c) relief. However, we conclude that the immigration judge correctly found the respondent ineligible for a waiver under section 212(c) of the Act because there is no exclusion provision corresponding to the deportation ground for conviction of a firearms violation. In Matter of Granados, 16 I & N Dec. 726 (BIA 1979), we specifically held that section 212(c) of the Act, 8 U . S.C. § 1182(c) (1976), was ineffective to remove deportability for conviction of a firearms violation under former section 241(a)(14) of the Act, because the conviction did not fall within any specified ground of excludability in section 212(a) of the Act. The decision of the Attorney General in Matter of Hernandez-Casillas, Interim Decision 3147 (BIA 1990; A.G. 1991), aff'd, 983 F.2d 231 (5th Cir. 1993), reaffirmed our holding in Matter of Granados, supra, that a section 212(c) waiver is available in deportation proceedings only to those aliens who have been found deportable under a charge of deportability for which there is a comparable ground of

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

20 I. & N. Dec. 647
**(Cite as: 20 I. & N. Dec. 647, \*651)**

excludability.

 On appeal, the respondent asserts that the Attorney General's decision in Matter of Hernandez-Casillas, supra, was in error, pointing to various revisions in the 1990 Act to support his argument.  He further points out that the provisions at issue before the Attorney General were those that existed prior to the revisions made by the Immigration Act of 1990 to section 212(c) and the deportation and exclusion grounds of the Act. He asserts that these amendments **\*652** demonstrate that Congress knew section 212(c) was being used in the deportation context and recognized that it can be applied in cases where there is no comparable ground of excludability.  Contentions similar to those of the respondent were recently considered and found to be without merit in  Matter of Montenegro, Interim Decision 3192 (BIA 1992), where we held that this Board and all immigration judges are strictly bound by the determinations of the Attorney General because our jurisdiction and authority derive from his.    See 8 C.F.R. § 3.0-3.1(d) (1992). Notwithstanding the 1990 revisions, there is no exclusion ground corresponding to the charge of deportability under section 241(a)(2)(C) of the Act. Accordingly, the holdings in Matter of Hernandez-Casillas, supra, and Matter of Granados, supra, are controlling in this case, and the respondent is not eligible for a waiver under section 212(c) of the Act. See Matter of Montenegro, supra.

 The respondent further contends on appeal that the immigration judge committed certain procedural errors during the proceedings.  He specifically points to the immigration judge's failure to rule on a pending motion for his two attorneys to withdraw their representation, and a motion for a change of venue of the proceedings from Oakdale, Louisiana, to Chicago, Illinois, where the respondent resided and where newly obtained counsel also had his offices.

 During the proceedings, the immigration judge concluded that he would only consider a change of venue following the determination of deportability and only if the respondent appeared eligible for any form of relief from deportation. This posture by the immigration judge was correct.  The respondent's deportability had not yet been resolved by the time of the October 16, 1992, hearing, and it is not unreasonable for an immigration judge, in the exercise of discretion, to deny a change of venue where an alien's deportability remains at issue.  See, e.g., Matter of Rivera, 19 I & N Dec. 688 (BIA 1988).  Following the determination of the respondent's deportability, the immigration judge, as noted above, correctly determined that the respondent was ineligible for section 212(c) relief and did not appear eligible for any other form of relief.  At that juncture, there was no need for a change of venue, as it was then appropriate to issue the order of deportation.

 We further find no error in the immigration judge's failure to rule on the motions made by the respondent's attorneys of record in Oakdale and New Orleans, Louisiana, seeking to withdraw as his representatives.  The immigration judge correctly decided prior to the October 16, 1992, hearing to keep them as attorneys of record until a determination of deportability was made, since they had already appeared at a prior hearing on August 17, 1992, when the allegations in the Order to Show Cause were admitted, but deportability was denied.  At that time, counsel had already prepared a lengthy response **\*653** to the charges of deportability. Furthermore, the new attorney seeking to represent the respondent

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

20 I. & N. Dec. 647
**(Cite as: 20 I. & N. Dec. 647, \*653)**

was physically in Chicago, and even though he was scheduled to make an
appearance telephonically for the October 16, 1992, hearing, he did not do so.
At that juncture, it clearly would have been inappropriate to grant the motion
to withdraw, and in fact the two other attorneys did not continue their motion
to withdraw following the immigration judge's finding of deportability and order
of deportation, given the other attorney's failure to be available for the
hearing.  In sum, we find no error in the actions taken by the immigration judge
regarding the motions before him.

   The respondent also asserts on appeal that the immigration judge should have
allowed him the opportunity to apply for asylum and withholding of deportation,
given that he might have a well-founded fear of persecution if he were returned
to the countries that might, in fact, accept him.  He is apparently implying
that the United Kingdom would not accept him.  However, we do not find any error
on the part of the immigration judge or any basis for remanding the record in
order to allow the respondent to apply for such relief.  First, the respondent
neither applied for, nor indicated that he wished to apply for, asylum or
withholding of deportation.  Although the respondent did not designate a country
of deportation, the immigration judge was under no obligation to advise him of
his right to apply for asylum and withholding of deportation where he failed to
express any fear whatsoever of persecution or harm in any country .  See 8
C.F.R. § 242.17(c) (1992).  He has proffered no explanation whatsoever for his
failure to apply for such relief before the immigration judge.  Under these
circumstances, we find no basis for remanding the record to the immigration
judge.

   Accordingly, the appeal will be dismissed.
   ORDER:  The appeal is dismissed.

FN1. Revised and redesignated as section 241(a)(2)(C) of the Act by section
602(a) of the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, 508
(effective Nov. 29, 1990).

FN2. The respondent in this case was served with the Order to Show Cause on July
17, 1992.

FN3. Although not specifically raised as an issue on appeal, we also find that
the respondent's deportability under section 241(a)(2)(B)(i) of the Act, as an
alien convicted of a controlled substance violation, was established by his
conviction under 21 U.S.C. § 843(b) (1988), for using a telephone to facilitate
the crimes of distribution of and possession with intent to distribute heroin.
See Matter of Chang, 16 I & N Dec. 90 (BIA 1977);  see also Matter of Del Risco,
Interim Decision 3119 (BIA 1989).
20 I. & N. Dec. 647, Interim Decision (BIA) 3199, 1993 WL 165803 (BIA)
END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

**Attachment D**

Citation                  Found Document          Rank 1 of 1          Database
20 I. & N. Dec. 750                                                    FIM-BIA
Interim Decision (BIA) 3213, 1993 WL 495142 (BIA)
**(Cite as: 20 I. & N. Dec. 750)**
▷

United States Department of Justice
Board of Immigration Appeals

**\*750 MATTER OF GABRYELSKY**

In Deportation Proceedings

A-13960837
Decided by Board November 3, 1993

(1) A waiver under section 212(c) of the Immigration and Nationality Act, 8
U.S.C. § 1182(c) (Supp. IV 1992), may be used in conjunction with an application
for adjustment of status by an alien who is deportable for both drug and weapons
offenses; thus a lawful permanent resident alien who has been convicted of a
weapons violation is not ineligible to apply for adjustment of status and may
concurrently apply for section 212(c) relief to waive his deportability arising
from his drug conviction.

(2) Under the regulations at 8 C.F.R. § 245.1(e) (1993), an alien may
concurrently apply for adjustment of status and section 212(c) relief.

(3) An applicant for adjustment of status is not precluded from concurrently
applying for a waiver of inadmissibility under section 212(c) of the Act to
waive another deportable offense, even though section 212(c) of the Act would
not separately and independently waive all grounds of deportability.

CHARGE:

Order: Act of 1952-Sec. 241(a)(2)(B)(i) [8 U.S.C. § 1251(a)(2)(B)(i) ]-
Convicted of controlled substance violation
Sec. 241(a)(2)(C) [8 U.S.C. § 1251(a)(2)(C) ]-Convicted of firearms violation

ON BEHALF OF RESPONDENT:
Ramsey Clark, Esquire
Lawrence W. Schilling, Esquire
36 East 12th Street
New York, New York 10003

ON BEHALF OF SERVICE
David M. Dixon
Appellate Counsel

BY: Milhollan, Chairman; Dunne, Morris, Vacca, and Heilman, Board Members

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00100-SHR   Document 6   Filed 02/27/2001   Page 121 of 154

20 I. & N. Dec. 750
**(Cite as: 20 I. & N. Dec. 750, \*750)**

The respondent has appealed from the decision of the immigration judge dated
February 5, 1993, finding the respondent deportable as charged, denying his
requests for adjustment of status under section 245(a) of the Immigration and
Nationality Act, 8 U.S.C. § 1255(a) (1988), and a waiver of inadmissibility
under section 212(c) of the Act, **\*751** 8 U.S.C. § 1182(c) (Supp. IV 1992), and
ordering him deported from the United States. The appeal will be sustained.

The respondent is a native and citizen of Poland, [FN1] who was admitted to
the United States at New York, New York, on December 20, 1965, as a refugee when
he was 14 years old. His status was adjusted to that of a lawful permanent
resident on March 26, 1968. On November 14, 1988, he was convicted in the
Superior Court of California, Tehama County, of possession of a firearm, a
machine gun, and possession of a silencer in violation of sections 12220, 12500
and 12520 of the California Penal Code. Also on that date and in that court, the
respondent was convicted of the offense of manufacture of a controlled
substance, methamphetamine, in violation of section 11379.6 of the California
Health and Safety Code. Although he was sentenced to 5 years of imprisonment for
the controlled substance violation and 8 months each for the weapons violations,
the respondent served less than 5 years of imprisonment for his convictions. In
addition, the respondent indicated in his application for adjustment of status
that he was also convicted of malicious mischief, and of driving under the
influence on two occasions.

At his hearing before the immigration judge, the respondent requested the
opportunity to apply for adjustment of status under section 245 of the Act in
conjunction with a waiver of inadmissibility under section 212(c) of the Act.
The immigration judge denied his requests, reasoning that the respondent was not
separately eligible for adjustment of status and section 212(c) relief, and he
could not "bootstrap" eligibility from one form of relief to the other. On
appeal, the respondent argues that the immigration judge erred by denying his
request for adjustment of status in conjunction with the application for section
212(c) relief. The respondent claims the immigration judge improperly
determined that he was statutorily ineligible for adjustment of status and
section 212(c) relief.

Based on the respondent's admissions at his hearing and the records pertaining
to his convictions that were presented by the Service, we agree that
deportability has been established by the clear, unequivocal, and convincing
evidence required by Woodby v. INS, 276 U.S. 385 (1966), and 8 C.F.R. §
242.14(a) (1993) to support the order of deportation.

We reject the respondent's claim that the immigration judge erred in ordering
him deported while his petition for habeas corpus is pending in the United
States District Court for the Eastern District of California. The fact that the
respondent may be attempting to **\*752** collaterally attack his convictions does
not affect his present deportability. See generally Matter of Khalik, 17 I & N
Dec. 518 (BIA 1980); Matter of Fortis, 14 I & N Dec. 576 (BIA 1974); Matter of
Sirhan, 13 I & N Dec. 592 (BIA 1970). An alien cannot collaterally attack the
legitimacy of a criminal conviction in a deportation or exclusion proceeding.
See Trench v. INS, 783 F.2d 181 (10th Cir. 1986); Zinnanti v. INS, 651 F.2d 420
(5th Cir. 1981). The pendency of post-conviction motions or other forms of
collateral attack, not constituting direct appeals, do not serve to negate the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00100-SHR   Document 6   Filed 03/27/2001   Page 122 of 154

finality of the conviction or the charge of deportability, unless and until the conviction has been overturned pursuant to such a motion.  Okabe v. INS, 671 F.2d 863 (5th Cir. 1982); Aguilera-Enriquez v. INS, 516 F.2d 565 (6th Cir. 1975 , cert. denied, 423 U.S. 1050 (1976).  We therefore conclude that the respondent's convictions are final and fully sustain the charges of deportability.

We find merit however to the respondent's assertion that the immigration judg erred in finding the respondent ineligible for adjustment of status and in concluding he could not combine the remedies of adjustment of status and sectic 212(c) of the Act. The respondent should have been allowed to apply for adjustment of status under section 245(a) of the Act, since he is statutorily eligible for that relief. [FN2]  Section 245(a) of the Act provides for the adjustment of status, in the discretion of the Attorney General, of an alien wh was inspected and admitted or paroled into the United States if:  (1) the alier makes an application for adjustment, (2) an immigrant visa is immediately available to him at the time his application is filed, and (3) the alien is eligible to receive an immigrant visa and is admissible for permanent residence

The record reflects that the respondent was admitted to this country in 1965, and with respect to the first prerequisite, he has submitted an Application for Permanent Residence (Form I-485).  Concerning the second requirement, the respondent's evidence, i.e., his Petition to Classify Status of Alien for Issuance of Immigrant Visa (Form I-130) and Application for Advance Permission to Return to Unrelinquished Domicile (Form I-191), indicate that he is the unmarried son of a United States citizen.  He thus falls within the first-preference family visa category.  See section 203(a)(1) of the Act, 8 U.S.C. § 1153(a)(1) (Supp. IV 1992).  A visa petition filed on his behalf has been approved, and an immigrant visa would be immediately available to him, since first-preference visa numbers are now current.  See Department of **\*753** State Visa Bulletin, Vol. VII, No.  26 (Aug. 1993);  see also Matter of Rainford, Interim Decision 3191, at 3 (BIA 1992).

In regard to the third statutory requirement, we point out that while the respondent's conviction for possession of a firearm establishes his deportability under section 241(a)(2)(C) of the Act, see Matter of Chow, Interi Decision 3199 (BIA 1993), it does not render him inadmissible for purposes of section 245 adjustment, as there is no corresponding exclusion ground.  In Matter of Rainford, supra, the Board specifically held that a conviction for criminal possession of a weapon did not preclude a finding of admissibility in connection with an application for adjustment of status under section 245 of th Act, because it is not a ground of excludability.  Further, although the respondent's controlled substance conviction does render him inadmissible under section 212(a)(2)(A)(i)(II) of the Act, he may utilize section 212(c) of the Ac for the limited purpose of waiving this ground. See generally Matter of Hernandez-Casillas, Interim Decision 3147, at 32-33 n. 6 (BIA 1990;  A.G. 1991) aff'd, 983 F.2d 231 (5th Cir. 1993).

Section 212(c) of the Act provides that aliens lawfully admitted for permanen residence who temporarily proceed abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of 7 consecutive years, may be admitted in the discretion of the Attorney General

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00100-SHR    Document 6    Filed 02/27/2001    Page 123 of 154

20 I. & N. Dec. 750
**(Cite as: 20 I. & N. Dec. 750, \*753)**

without regard to certain specified grounds of exclusion enumerated in section
212(a) of the Act. The respondent is statutorily eligible to apply for this
waiver insofar as he is a lawful permanent resident who apparently has
maintained a lawful unrelinquished domicile in this country for 7 consecutive
years.  See section 212(c) of the Act;  Matter of Edwards, Interim Decision
3134, at 5-6 (BIA 1990).

Although the statute describes a waiver under section 212(c) of the Act which
is available to aliens seeking to eliminate a ground of inadmissibility upon
application to enter the United States, it has been interpreted to include
availability for relief in deportation proceedings as well where the alien has
not departed from the United States subsequent to the acts that rendered him
excludable.  See Francis v. INS, 532 F.2d 268 (2d Cir. 1976); Matter of
Granados, 16 I & N Dec. 726 (BIA 1979);  Matter of Hom, 16 I & N Dec. 112 (BIA
1977), modified, Matter of Wadud, 19 I & N Dec. 182 (BIA 1984); Matter of Silva
16 I & N Dec. 26 (BIA 1976);  see also Matter of Hernandez-Casillas, supra.

The immigration judge properly determined that the respondent could not use
section 212(c) of the Act to waive deportability for his firearms conviction.
An alien deportable on the basis of a firearms conviction is ineligible for
relief under section 212(c) because there is **\*754** no exclusion ground
corresponding to the deportation ground for conviction of a firearms offense.
See Matter of Chow, supra;  Matter of Hernandez-Casillas, supra;  Matter of
Granados, supra.  But see Bedoya-Valencia v. INS, 6 F.3d 891 (2d Cir. 1993)
(extending Francis rule to entry without inspection charge where there could no
conceivably be an analogous ground of exclusion, and allowing application for
section 212(c) relief).  We reject the respondent's claim that his weapons
conviction could be a constituent of a section 212(a)(2)(B) ground of
excludability (multiple criminal convictions) when combined with his conviction
for manufacture of a controlled substance and malicious mischief, which could b
waived by section 212(c).  In Matter of Montenegro, Interim Decision 3192 (BIA
1992), this Board followed the holdings of Matter of Wadud, supra, and Matter o
Granados, supra, and rejected the expansion of section 212(c) to include cases
where the ground of deportability charged is not also a ground of
inadmissibility, even where the alien's conviction would also cause him to be
excludable for having been convicted of a crime involving moral turpitude under
section 212(a)(2)(A)(i)(I) of the Act.

We find support, however, in the federal regulations for the respondent's use
of section 212(c) of the Act in conjunction with his application for adjustment
of status.  The regulations at 8 C.F.R. § 242.17(a) (1993), pertaining to the
creation of the status of an alien lawfully admitted for permanent residence
under sections 244(a), 245, or 249 of the Act, 8 U.S.C. §§ 1254(a), 1255, 1259
(1988 & Supp. IV 1992), provide in pertinent part:

In conjunction with any application for creation of status of an alien
lawfully admitted for permanent residence made to an immigration judge, if the
respondent is inadmissible under any provision of section 212(a) of the Act and
believes he meets the eligibility requirements for a waiver of the ground of
inadmissibility, he may apply to the immigration judge for such waiver.

We specifically note that an alien may apply for both adjustment of status an
section 212(c) relief.  The regulations at 8 C.F.R. § 245.1(e) (1993) provide:

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

20 I. & N. Dec. 750
**(Cite as: 20 I. & N. Dec. 750, \*754)**

Concurrent applications to overcome exclusionary grounds.  Except as provided in parts 235 and 249 of this chapter, an application under this part shall be the sole method of requesting the exercise of discretion under section 212(g), (h), (i), and (k) of the Act, as they relate to the excludability of an alien in the United States.  Any applicant for adjustment under this part may also apply for the benefits of section 212(c) of the Act, for permission to reapply after deportation or removal under section 212(a)(17) of the Act, and for the benefits of section 212(a)(28)(I)(ii) of the Act. No fee is required for filing an application to overcome the exclusionary grounds of the Act if filed concurrently with an application for adjustment of status under the provisions of the Act of October 28, 1977, and of this part. (Second emphasis added.)

This regulation, allowing requests for discretionary waivers of inadmissibility under sections 212(g), (h), and (i) of the Act by aliens **\*755** in the United States, was first promulgated by the Commissioner of the Immigration and Naturalization Service as 8 C.F.R. § 245.1(f) in 30 Fed. Reg. 14,778 (1965), and it was amended at 31 Fed. Reg. 535 (1966). Paragraph (f) of 8 C.F.R. § 245. was amended at 31 Fed. Reg. 2373 (1966), and the " Concurrent applications to overcome exclusionary grounds" heading and the sentence providing, "Any applicant for adjustment under this part may also apply for the benefits of section 212(c) of the Act and for permission to reapply after deportation or removal," were added. The regulation was also amended at 32 Fed. Reg. 9632 (1967) (adding benefits under section 212(a) (28)), and at 43 Fed. Reg. 18,644 (1978) (adding last sentence pertaining to fee).  In 1982, it was redesignated as 8 C.F.R. § 245.1(d) at 47 Fed. Reg. 12,133 (1982) and revised at 47 Fed. Reg 44,237 (1982).  In 1987, it was redesignated in its current form at 8 C.F.R. § 245.1(e).  See 52 Fed. Reg. 6321 (1987).

Under the provisions of 8 C.F.R. § 245.1(e) (1993), there is no requirement that section 212(c) of the Act separately and independently waive all grounds of deportability in order for an applicant for adjustment of status to concurrently apply for relief under sections 245 and 212(c), as argued by the Service. [FN3] Indeed, such a reading would render the regulation at 8 C.F.R. § 245.1(e) (1993 meaningless, for there would be no need to concurrently apply for adjustment of status to overcome exclusionary grounds if a section 212(c) waiver would independently waive all grounds of inadmissibility.  We note that in Matter of Hernandez-Casillas, supra, the Attorney General concluded that although a lawful permanent resident deportable for entering the United States without inspection is ineligible for section 212(c) relief, discretionary relief under section 212(c) is otherwise available in deportation proceedings where the alien requests adjustment of status under section 245 of the Act. Id. at 32 n.6, 47 n.16. Citing Matter of Smith, 11 I & N Dec. 325 (BIA 1965), the Attorney General indicated that if the ground of deportation had been other than illegal entry, **\*756** remand might have been necessary to permit the respondent to seek adjustment of status under section 245 of the Act. Id. at 47 n.16. [FN4]

While we note that the regulation now at 8 C.F.R. § 245.1(e) (1993) was promulgated before Francis v. INS, supra, (expanding section 212(c) relief to deportable aliens who have not temporarily departed from the United States), an Matter of Silva, supra, we are not persuaded by the Service's contention that these cases have mooted the applicability of this regulation and Matter of

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

20 I. & N. Dec. 750
**(Cite as: 20 I. & N. Dec. 750, \*756)**

Smith, supra.  There is no basis to ignore this regulation on the Service's theory that it is moot.  It is a valid, properly promulgated, currently applicable regulation and cannot simply be disregarded.

We note that the respondent is not ineligible for adjustment of status as a result of the weapons offense, and he would not be deportable as a result of th conviction if his status is adjusted to that of a lawful permanent resident. See Matter of Rainford, supra.  In Matter of Rainford we rejected the futility doctrine described in Matter of V-, 1 I & N Dec. 293 (BIA 1942), (that it would be futile to admit someone only to have him immediately become subject to deportation) in the adjustment of status context.  Thus, we held that the alien's conviction for criminal possession of a weapon did not bar him from adjustment of status, and that he would no longer be deportable on the basis of his conviction if granted adjustment of status to that of a lawful permanent resident.  Consequently, we conclude that on the basis of the regulation at 8 C.F.R. § 245.1(e) (1993), the respondent in the instant case is eligible to apply for section 212(c) relief in conjunction with adjustment of status, notwithstanding his weapons convictions.

Having found that the respondent is admissible to the United States and therefore eligible to apply for adjustment of status, as well as for section 212(c) relief, we will remand the case to the immigration judge to allow the respondent to present his applications for relief. [FN5]  We note that to be granted adjustment of status and section 212(c) relief, the respondent will als have to show the immigration judge that he merits **\*757** the granting of relief i the exercise of discretion.  Finally, visa numbers for first- preference classification will still need to be current.

ORDER:  The appeal is sustained and the record is remanded to the immigration judge for further proceedings in accordance with the foregoing opinion and for entry of a new decision.

FN1. The respondent claims his citizenship was revoked by the Polish Government after his parents escaped from that country in 1963.

FN2. The fact that the respondent has been a lawful permanent resident does not preclude him from applying for adjustment of status.  See Tibke v. INS, 335 F.2 42 (2d Cir. 1964);  Matter of Parodi, 17 I & N Dec. 608, 611 (BIA 1980).

FN3. We do not consider the instant case to be analogous to Matter of Roman, 19 I & N Dec. 855 (BIA 1988).  In Matter of Roman, we found the respondent could not establish combined eligibility for nunc pro tunc permission to reapply for admission and a waiver of inadmissibility pursuant to section 241(f) of the Act where she was not separately eligible for either form of relief.  The alien could not "bootstrap" eligibility from one waiver to the other since she would not be eligible for either form of relief without the other waiver having first been granted.  In the instant case, the respondent does not need to have his status adjusted to that of a lawful permanent resident before he is eligible to apply for a waiver under section 212(c) of the Act;  he is already a lawful permanent resident.  In the adjustment of status context, a respondent can appl for several waivers, such as under sections 212(c), (g), (h), and (i) of the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

20 I. & N. Dec. 750
**(Cite as: 20 I. & N. Dec. 750, \*757)**

Act, in conjunction with his application for adjustment of status. See 8 C.F.R. § 245.1(e) (1993).

FN4. In Matter of K-L-, Interim Decision 3200 (BIA 1993), the Board noted that the respondent, who claimed eligibility for adjustment of status under section 245 of the Act, was not precluded from applying for that relief because of his firearms violation, but because he did not present evidence of an approved visa petition. We indicated that his inadmissibility as a drug trafficker under section 212(a)(2)(C) of the Act could not be waived under section 212(h), so he was ineligible for relief. By contrast, in the instant case the respondent is a lawful permanent resident who can use section 212(c) of the Act to waive his inadmissibility under section 212(a)(2)(A)(i)(II).

FN5. In light of our determination in this case, we need not address the other issues raised by the respondent on appeal.
20 I. & N. Dec. 750, Interim Decision (BIA) 3213, 1993 WL 495142 (BIA)
END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

**Attachment E**

Citation                    Found Document            Rank 1 of 1            Databas
20 I. & N. Dec. 598                                                          FIM-BIA
Interim Decision (BIA) 3191, 1992 WL 323809 (BIA)
**(Cite as: 20 I. & N. Dec. 598)**
**C**

United States Department of Justice
Board of Immigration Appeals

**\*598 MATTER OF RAINFORD**

In Deportation Proceedings

A-41651633
Decided by Board September 9, 1992

A respondent who is convicted of criminal possession of a weapon is deportabl
under section 241(a)(2)(C) of the Immigration and Nationality Act, 8 U.S.C. §
1251(a)(2)(C) (Supp. II 1990);  however, such a conviction does not preclude a
finding of admissibility in connection with an application for adjustment of
status under section 245(a) of the Act, 8 U.S.C. § 1255(a) (1988), and it may
not serve as a ground of deportability if the respondent's status is adjusted t
that of a lawful permanent resident. Matter of Rafipour, 16 I & N Dec. 470 (BIA
1978), followed.  Matter of V-, 1 I & N Dec. 293 (BIA 1942), distinguished.

CHARGE:

Order:  Act of 1952-Sec. 241(a)(2)(C) [8 U.S.C. § 1251(a)(2)(C) ]- Convicted
of firearms violation

ON BEHALF OF RESPONDENT:
Rev. Robert Vitaglione
Accredited Representative
Comite Nuestra Senora de Loreto
sobra Asuntos de Inmigracion
856 Pacific Street
Brooklyn, New York 11238-3142

ON BEHALF OF SERVICE
Bernard Mendelow
General Attorney

BY:  Milhollan, Chairman;  Dunne, Morris, Vacca, and Heilman, Board Members

In a decision dated June 17, 1992, the immigration judge found the respondent
deportable as charged, pretermitted his application for adjustment of status,
and ordered him deported to Jamaica.  The respondent has appealed from that
decision.  The appeal will be sustained and the record will be remanded.  The
request for oral argument is denied.  8 C.F.R. § 3.1(e) (1992).
The respondent is a single, 23-year-old native and citizen of Jamaica.  On

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

20 I. & N. Dec. 598
**(Cite as: 20 I. & N. Dec. 598, \*598)**

March 27, 1988, he was admitted to the United States as a lawful permanent
resident.  On April 30, 1991, he was convicted in the Supreme Court of the State
of New York, County of Kings, of criminal possession of a weapon in the third
degree. For this offense, **\*599** he was sentenced to a term of imprisonment of 1
year.  On the basis of this 1991 conviction, the Immigration and Naturalization
Service issued an Order to Show Cause and Notice of Hearing (Form I-221),
charging the respondent with deportability as an alien convicted of a firearms
offense under section 241(a)(2)(C) of the Immigration and Nationality Act, 8
U.S.C. § 1251(a)(2)(C) (Supp. II 1990).  The respondent, through counsel,
conceded deportability.  We find that deportability as charged was established
by clear, unequivocal, and convincing evidence.  See Woodby v. INS, 385 U.S. 27
(1966);  8 C.F.R. § 242.14(a) (1992).

   The record file contains the respondent's Application for Permanent Residence
(Form I-485) and an unadjudicated Petition for Alien Relative (Form I-130) filed
on his behalf by his United States citizen father.  The Form I-485 is supported
by a copy of the respondent's father's Certificate of Naturalization.

   The immigration judge moved to the relief phase of the deportation hearing and
determined that there was no relief available to the respondent.  He stated that
based on Matter of V-, 1 I & N Dec. 293 (BIA 1942), and subsequent cases, an
alien who is not subject to a statutory ground of exclusion, but who would
immediately become subject to deportation upon entry, must be found
inadmissible.  He concluded that the respondent was therefore ineligible for
adjustment of status under section 245(a) of the Act, 8 U.S.C. § 1255(a) (1988).

   On appeal, the respondent contends that the "futility doctrine" no longer
exists because Matter of V-, supra, was replaced by the Immigration and
Nationality Act of 1952, which removed an "implied" ground of excludability.  In
its brief the Service merely concurs with the immigration judge's decision,
without citing or discussing any cases.

   We find merit to the respondent's appeal.  The respondent sought to apply for
adjustment of status.  The burden of proving eligibility for the privilege of
adjustment of status is upon the alien.  See Lennon v. INS, 527 F.2d 187 (2d
Cir. 1975), rev'g Matter of Lennon, 15 I & N Dec. 9 (BIA 1974).  Section 245(a)
of the Act requires that an alien meet three conditions:  1) he must make an
application for adjustment of status;  2) he must be eligible to receive a visa
and be admissible for permanent residence;  and 3) an immigrant visa must be
immediately available at the time of application.  Here, the respondent has made
an adjustment of status application.  If the visa petition filed on his behalf
is approved, an immigrant visa would immediately be available to him, since
first-preference visa numbers are now current. See Department of State Visa
Bulletin, Vol. VII, No. 14 (Sept. 1992). Under 8 C.F.R. § 245.2(a)(2)(i) (1992),
the adjustment application should be retained for processing under these
circumstances.

   **\*600** The remaining issue before us is whether the respondent meets the second
condition that he be admissible to the United States.  We find that the
respondent can meet this second condition.  The immigration judge reasoned that
the respondent, by virtue of his firearms conviction, cannot prove the
requirement of admissibility in section 245(a) of the Act. Specifically, the
immigration judge stated that the respondent is excludable notwithstanding the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

20 I. & N. Dec. 598
**(Cite as: 20 I. & N. Dec. 598, \*600)**

absence of a specific exclusion ground in the Act. The immigration judge found
support for his decision in Matter of V-, supra, in which we held that an alien
could be excluded on the basis of conduct which would be a ground of
deportability, but not a ground of excludability.  The immigration judge noted
that our reasoning for creating such an administrative practice was that it
would be futile to admit someone only to have him immediately become subject to
deportation from the United States.  Id. at 295.

The immigration judge also discussed in his decision Matter of R-G-, 8 I & N
Dec. 128 (BIA 1958), and Matter of Sanchez, 16 I & N Dec. 363 (BIA 1977). In
Matter of R-G- the Board held that notwithstanding the lack of a specific
statutory ground of exclusion, an alien who upon entry would immediately become
subject to deportation should be found excludable.  In both cases the Board held
that an alien deportable under former section 241(a)(5) of the Act, 8 U.S.C. §
1251(a)(5) (1988), would not again become deportable when he had been lawfully
admitted for permanent residence. [FN1]  The immigration judge found these cases
distinguishable because the present respondent would still be deportable based
on his firearms conviction.

In essence, the immigration judge's reasoning is that because the language in
section 241(a)(2)(C), "at any time after entry," does not couple deportability
with any particular entry into the United States, it makes an alien such as the
respondent immediately deportable for the earlier firearms conviction.  There
are no waivers in the Act for this deportation ground.

We reject this position and determine that the rule in Matter of V-, supra, is
inapposite in the adjustment of status context.  It has been the consistent
practice of this Board to interpret the requirement of admissibility in section
245(a) with reference only to the exclusion grounds in the Act. See, e.g.,
Matter of Zangwill, 18 I & N Dec. 22, 28 (BIA 1981), overruled on other grounds;
Matter of Ozkok, 19 I & N Dec. 546 (BIA 1988); Matter of Parodi, 17 I & N Dec.
608, 611 (BIA 1980);  **\*601** Matter of Wolf, 16 I & N Dec. 125, 126 (BIA 1977);
Matter of Smith, 11 I & N Dec. 325, 326-27 (BIA 1965).  Were we now to apply the
rule in Matter of V-, we would be imposing upon an applicant an additional
burden, not appearing in the statute, that he prove not only that he is
admissible, but also that he would not become immediately deportable once
admitted for lawful permanent residence.

Further, the rule in Matter of V- requires an "entry."  An adjustment of
status, however, does not constitute an entry.  As we have repeatedly held, an
adjustment of status is merely a procedural mechanism by which an alien is
assimilated to the position of one seeking to enter the United States.  See
Matter of Connelly, 19 I & N Dec. 156, 159 (BIA 1984);  Matter of Smith, supra;
see also section 101(a)(13) of the Act, 8 U.S.C. § 1101(a)(13) (1988); Matter of
Patel, Interim Decision 3157 (BIA 1991) (noting that we have fashioned a more
precise definition of what an "entry" is through precedent decisions).

We believe that Congress' intent is clearly expressed by the plain language
used in section 245(a) of the Act. [FN2] See Ardestani v. INS,  U.S., 112 S. Ct.
515, 519-20 (1991);  INS v. Cardoza-Fonseca, 480 U.S. 421, 431 (1987); INS v.
Phinpathya, 464 U.S. 183, 189 (1984) (stating that in all cases involving
statutory construction, the starting point must be the language employed by
Congress, and the legislative purpose is expressed by the ordinary meaning of

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

20 I. & N. Dec. 598
**(Cite as: 20 I. & N. Dec. 598, \*601)**

the words used).

   Our decision in Matter of Rafipour, 16 I & N Dec. 470 (BIA 1978), an adjustment of status case, is noteworthy because in that decision, we also declined to apply the rule in Matter of V-, holding instead that the alien would not become deportable again by reason of a prior act, once admitted for lawful permanent residence.

   The alien in Matter of Rafipour was found deportable under section 241(a)(5) of the Act on the basis of a 1975 conviction for giving false statements.  In lieu of deportation, he was granted the privilege of voluntary departure.  No appeal followed.  However, the alien later filed a motion to reopen in order to apply for adjustment of status.  The immigration judge granted the motion and the Service appealed.  It claimed that the alien was ineligible for adjustment of status because, following his admission for lawful permanent residence, he would become immediately deportable on the basis of the 1975 conviction.  See Matter of V-, supra.  We disagreed.  Noting that **\*602** the situation of this alien closely resembled that in Matter of R- G-, supra, we followed the view that the alien would no longer be deportable pursuant to section 241(a)(5) of the Act for his earlier conviction, once he was admitted as a lawful permanent resident.

   We find no meaningful basis to distinguish the circumstances of the instant case from those addressed and resolved in Matter of Rafipour. Although Matter of Rafipour and the cases which preceded it involved section 241(a)(5) of the Act, we have never stated that the reasoning used there was limited to cases addressing section 241(a)(5) solely.  The issue of whether an alien would remain deportable on the basis of prior conduct following his admission for lawful permanent residence apparently arose consistently in the section 241(a)(5) context, but sheerly by happenstance.  See Matter of Sanchez, supra, at 365 n.2. In the instant case, as in Matter of Rafipour, the respondent faces a charge of deportability for which there is no corresponding ground of exclusion in the Act. There is no indication in the Act or its legislative history that Congress ever intended to bar this class of aliens, like those in the section 241(a)(5) context, from becoming lawful permanent residents.  We therefore find no reason for not extending the reasoning of Matter of Rafipour to this ground of deportability.

   Accordingly, we hold that the conviction which renders the respondent deportable under section 241(a)(2)(C) of the Act will not preclude a showing of admissibility for purposes of section 245(a) and that if granted adjustment of status to lawful permanent resident, the respondent will no longer be deportable on the basis of this prior conviction.

   Having found that the respondent is admissible to the United States and therefore eligible to apply for adjustment of status, we will remand the case to the immigration judge to allow the respondent to present his application for that relief.  We note that to be granted adjustment of status, the visa petition on his behalf will have to be approved by the Service.  The respondent will also have to show the immigration judge that he merits adjustment of status in the exercise of discretion.  Finally, visa numbers for first- preference classification will still need to be current.

   ORDER:  The appeal is sustained and the record is remanded to the immigration

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

20 I. & N. Dec. 598
**(Cite as: 20 I. & N. Dec. 598, \*602)**

judge for further proceedings in accordance with the foregoing opinion and for entry of a new decision.

FN1. The grounds of deportability under section 241(a) of the Act have been revised and redesignated by section 602(a) of the Immigration Act of 1990, Pub L. No. 101-649, 104 Stat. 4978, 5077-81 (enacted Nov. 29, 1990), with former section 241(a)(5) now being found at section 241(a)(3)(B).

FN2. In Matter of Hernandez-Casillas, Interim Decision 3147, at 40-41 (BIA 1990 A.G. 1991), the Attorney General stated: "Absent some supervening affirmative justification based upon a requirement of the Constitution or other applicable law, neither the Board nor I may depart-or, in this instance, extend an earlier departure-from the terms of the statute we are bound to enforce."
20 I. & N. Dec. 598, Interim Decision (BIA) 3191, 1992 WL 323809 (BIA)
END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

**Attachment F**

Citation                         Found Document      Rank 1 of 1          Databas
Interim Decision (BIA) 3272                                               FIM-BIA
1996 WL 227774 (BIA)
**(Publication page references are not available for this document.)**
**C**

United States Department of Justice
Board of Immigration Appeals

IN RE JOSE MENDEZ-MORALEZ, RESPONDENT
File A41 940 178-Lincoln
Decided April 12, 1996

(1) In assessing whether an applicant has met his burden of establishing that
a grant of a waiver of inadmissibility is warranted in the exercise of
discretion under section 212(h)(1)(B) of the Immigration and Nationality Act, 8
U.S.C. 1182(h)(1)(B) (1994), the Immigration Judge must balance the adverse
factors evidencing an alien's undesirability as a permanent resident with the
social and humane considerations presented on his behalf to determine whether
the grant of relief in the exercise of discretion appears to be in the best
interests of this country.

(2) Establishing extreme hardship and eligibility for section 212(h)(1)(B)
relief does not create any entitlement to that relief;  extreme hardship, once
established, is but one favorable discretionary factor to be considered.

(3) The equities that the applicant for section 212(h)(1)(B) relief must brin
forward to establish that he merits a favorable exercise of administrative
discretion will depend in each case on the nature and circumstances of the
ground of exclusion sought to be waived and on the presence of any additional
adverse matters, and as the negative factors grow more serious, it becomes
incumbent upon the applicant to introduce additional offsetting favorable
evidence.

(4) Taking responsibility and showing remorse for one's criminal behavior doe
constitute some evidence of rehabilitation, although an alien who claims
innocence and does not express remorse is not precluded from ever presenting
persuasive evidence of rehabilitation by other means.

(5) While the lack of persuasive evidence of rehabilitation may not in itself
be an adverse factor, the absence of this equity in the alien's favor may
ultimately be determinative in a given case concerning the exercise of
discretion under section 212(h)(1)(B) of the Act, particularly where an alien
has engaged in serious misconduct and there are questions whether the alien wil
revert to criminal behavior;  and conversely, evidence of rehabilitation in som
cases may constitute the factor that raises the significance of the alien's
equities in total so as to be sufficient to counterbalance the adverse factors
in the case and warrant a favorable exercise of discretion.

for respondent

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

Clayton H. Brant, Esquire
Lincoln, Nebraska

for the Immigration and Naturalization Service
Paul R. Sctultz
District Counsel

Before: Board En Banc: DUNNE, Vice Chairman;  VACCA, HEILMAN, HOLMES, HURWITZ
VILLAGELIU, FILPPU, COLE, and MATHON, Board Members. Concurring and Dissenting
Opinion:  SCHMIDT, Chairman, joined by, GUENDELSBERGER, Board Member.
Dissenting Opinion:  ROSENBERG, Board Member.

VACCA, Board Member:

## I. PROCEDURAL HISTORY

In a decision dated November 22, 1994, an Immigration Judge found the
respondent deportable as charged under section 241(a)(2)(A)(i) of the
Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2)(A)(i) (1994), as an alie
convicted of a crime involving moral turpitude committed within 5 years of entr
into the United States.  He also denied his application for adjustment of statu
under section 245(a) of the Act, 8 U.S.C. § 1255(a) (1994), as well as his
corresponding application for a waiver of inadmissibility under section 212(h)
of the Act, 8 U.S.C. § 1182(h) (1994), and ordered him deported from the United
States to Mexico.  The respondent has appealed from that decision.  The appeal
will be dismissed.

## II. ISSUE PRESENTED

The respondent, a 42-year-old native and citizen of Mexico, was first admitte
to the United States as a lawful permanent resident on May 2, 1988. He was
convicted in a Nebraska court by a jury verdict on November 19, 1992, of first
degree sexual assault, in violation of section 28-319(1)(c) of the Nebraska
Revised Statutes.  For this crime, committed in April or May 1992, the
respondent was sentenced on January 5, 1993, to an indeterminate sentence of 2
to 3 years.  Reportedly, he was released from prison on parole in January 1995,
after having served 1 year of his sentence.  The respondent conceded his
deportability during the proceedings and has not contested his deportability on
appeal.  The only issue before us is whether the Immigration Judge properly
denied the respondent's application for adjustment of status under section 245
of the Act and, in the exercise of discretion, the corresponding waiver of
inadmissibility under section 212(h) of the Act. We find that he did.

## III. ADJUSTMENT OF STATUS UNDER SECTION 245

Section 245 of the Act provides that the Attorney General may in her
discretion adjust the status of an alien inspected and admitted or paroled into
the United States to that of an alien lawfully admitted for permanent residence

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

if the alien applies for adjustment, the alien is eligible to receive an
immigrant visa and is admissible to the United States for permanent residence,
and an immigrant visa is immediately available.  An alien subject to deportation
proceedings may also apply for adjustment of status before the Immigration Judge
and, if inadmissible under section 212(a) of the Act, may also apply for a
waiver of the ground of inadmissibility.  See 8 C.F.R. § 242.17(a) (1995).

In the case before us the respondent's application for adjustment of status is
based on his February 20, 1987, marriage to a United States citizen and the
immediate relative visa petition she filed on his behalf, which was approved by
the Immigration and Naturalization Service on November 21, 1994.  As such, it
appears that the respondent is eligible for an immigrant visa that is
immediately available to him.  The fact that he is a lawful permanent resident
does not preclude him from applying for adjustment of status under section 245.
Tibke v. INS, 335 F.2d 42 (2d Cir.1964);  Matter of Parodi, 17 I & N Dec. 608
(BIA 1980);  Matter of Loo Bing Sun, 15 I & N Dec. 307 (BIA 1975); Matter of
Krastman, 11 I & N Dec. 720 (BIA 1966);  see also Matter of Gabryelsky, 20 I & N
Dec. 750 (BIA 1993).

### IV. WAIVER OF INADMISSIBILITY UNDER SECTION 212(h)

However, the respondent is not admissible to the United States as required for
eligibility under section 245.  By virtue of his conviction for a crime
involving moral turpitude, he is inadmissible under section 212(a)(2)(A)(i)(I)
of the Act.  An alien who is inadmissible under this section as an alien
convicted of a crime involving moral turpitude may seek a waiver of
inadmissibility under section 212(h) of the Act. Section 212(h) may be used to
waive inadmissibility which would otherwise preclude adjustment of status. See
Osuchukwu v. INS, 744 F.2d 1136, 1139 (5th Cir.1984);  Matter of Goldeshtein, 20
I & N Dec. 382 (BIA 1991), rev'd on other grounds, 8 F.3d 645 (9th Cir.1993);
Matter of Parodi, supra; Matter of Sanchez, 17 I & N Dec. 218 (BIA 1980); Matter
of Shaughnessy, 12 I & N Dec. 810 (BIA 1968).

Section 212(h) provides:

The Attorney General may, in his discretion, waive the application of
subparagraphs (A)(i)(I), (B), (D), and (E) of subsection (a)(2) and subparagraph
(A)(i)(II) of such subsection insofar as it relates to a single offense of
simple possession of 30 grams or less of marijuana if -

(1)(A) in the case of any immigrant it is established to the satisfaction of
the Attorney General that -

(i) the alien is excludable only under subparagraph (D)(i) or (D)(ii) of
such subsection or the activities for which the alien is excludable occurred
more than 15 years before the date of the alien's application for a visa, entry,
or adjustment of status,

(ii) the admission to the United States of such alien would not be contrary
to the national welfare, safety, or security of the United States, and

(iii) the alien has been rehabilitated;  or

(B) in the case of an immigrant who is the spouse, parent, son, or daughter
of a citizen of the United States or an alien lawfully admitted for permanent
residence if it is established to the satisfaction of the Attorney General that

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

the alien's exclusion would result in extreme hardship to the United States
citizen or lawfully resident spouse, parent, son, or daughter of such alien;
and

(2) the Attorney General, in his discretion, and pursuant to such terms,
conditions and procedures as he may by regulations prescribe, has consented to
the alien's applying or reapplying for a visa, for admission to the United
States, or adjustment of status.
No waiver shall be provided under this subsection in the case of an alien who
has been convicted of (or who has admitted committing acts that constitute)
murder or criminal acts involving torture.

The amended version of section 212(h) essentially creates two categories of
immigrants eligible for section 212(h) relief.  The first category includes any
immigrant who meets eligibility criteria that largely concern the type of
exclusion ground involved or when the excludable activity occurred, as well as
issues of the alien's rehabilitation and the national welfare, safety, or
security of the United States.  The second category includes immigrants who
demonstrate the requisite relationship to a United States citizen or lawful
permanent resident, and establish that their exclusion would result in extreme
hardship to that relative.  See Matter of Alarcon, 20 I & N Dec. 557 (BIA 1992)
In the case at hand, the respondent, who is assimilated to the position of an
immigrant for purposes of seeking adjustment of status, is married to a United
States citizen and has three United States citizen children.  As such, he may
demonstrate eligibility under section 212(h)(1)(B) of the Act by establishing
extreme hardship to his United States citizen wife or children if he were
excluded.

In his decision the Immigration Judge in fact found that extreme hardship to
the wife and children had been established, and that the respondent consequentl
was eligible for section 212(h) relief.  However, he denied the section 212(h)
waiver in the exercise of discretion, and accordingly found him ineligible for
adjustment of status because of his inadmissibility resulting from his criminal
conviction.

A. Exercise of Discretion Under Section 212(h)(1)(B): Factors Considered

On appeal, the respondent has contested the discretionary denial of relief,
arguing that he merited a favorable exercise of discretion in light of his
equities and the hardship to his family if he were deported.  In the
respondent's view, the Immigration Judge erred in ruling that he had not
demonstrated rehabilitation and in placing too much emphasis on his claim of
innocence of the crime of which he was convicted.  According to the respondent,
the Immigration Judge also erred in requiring that rehabilitation be shown.

As is true for other discretionary forms of relief, the burden is on the
applicant to establish that a grant of a waiver of inadmissibility under sectio
212(h)(1)(B) of the Act is warranted in the exercise of discretion. See Matter
of Fernandez, 14 I & N Dec. 24 (BIA 1972).  This has been held to be the case
for other waivers of inadmissibility.  See Matter of Marin, 16 I & N Dec. 581
(BIA 1978) (section 212(c) waiver).  As is also true for other waivers of
inadmissibility that would allow an alien to be admitted to the United States a

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

**(Publication page references are not available for this document.)**

a lawful permanent resident, the Immigration Judge must balance the adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented on his behalf to determine whether the grant of relief in the exercise of discretion appears to be in the best interests of this country.  See id.

We find this use of Matter of Marin, supra, as a general guide to be appropriate.  For the most part, it is prudent to avoid cross application, as between different types of relief, of particular principles or standards for the exercise of discretion.  Id. However, our reference to Matter of Marin, supra, is only for the purpose of the approach taken in that case regarding the balancing of favorable and unfavorable factors within the context of the relief being sought under section 212(h)(1)(B) of the Act. See, e.g., Palmer v. INS, 4 F.3d 482 (7th Cir.1993) (balancing of discretionary factors under section 212(h)).  We find this guidance to be helpful and applicable, given that both forms of relief address the question of whether aliens with criminal records should be admitted to the United States and allowed to reside in this country permanently.

What we do not find applicable is the analysis for determining whether adjustment of status under section 245 of the Act is warranted in the exercise of discretion, as set forth in Matter of Arai, 13 I & N Dec. 494 (BIA 1970). There, the Board ruled that generally where there are adverse factors present, favorable factors such as family ties, hardship, length of residence in the United States, etc., will be considered as countervailing factors meriting a favorable exercise of discretion, and that in the absence of adverse factors, adjustment will be ordinarily granted in discretion.  See also Matter of Blas, 15 I & N Dec. 626 (BIA 1974;  A.G. 1976).  This approach has no application to relief under section 212(h) of the Act. A waiver of inadmissibility under section 212(h) necessarily involves at least one adverse consideration, specifically the criminal conviction or activity constituting the ground of exclusion sought to be waived.  See Matter of Marin, supra, at 585.  Thus, there can be no presumption that relief is warranted in the exercise of discretion. Further, this criminal conviction or activity would usually be more severe than any adverse factor present in the application for adjustment of status, presuming admissibility and general eligibility for adjustment of status.

These principles taken from Matter of Marin, supra, are to be applied in the context of the particular considerations that will arise in an application for section 212(h)(1)(B) relief.  Section 212(h)(1)(B) relief is its own distinct form of waiver, with the balancing of factors to be undertaken in view of the particular purposes either stated or inherent in the statute. To exemplify, we would emphasize two considerations that do not often arise in an application for section 212(c) relief.  First, a section 212(h) applicant seeking to adjust his status need not be, and in most cases is not already, a lawful permanent resident, and those lawful permanent residents that do apply may not necessarily have the length of residency attained by those eligible for section 212(c) relief.  Secondly, those found eligible for relief under section 212(h)(1)(B) will by definition have already established extreme hardship to qualified family members, which would be a factor favorable to the alien in exercising discretion.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

We emphasize that establishing extreme hardship and eligibility for section
212(h)(1)(B) relief does not create any entitlement to that relief.  Extreme
hardship is a requirement for eligibility, but once established it is but one
favorable discretionary factor to be considered.  We would note, however, that
an application for discretionary relief, including a waiver under section
212(h), may be denied in the exercise of discretion without express rulings on
the question of statutory eligibility.  Matter of Goldeshtein, supra;  see also
Silva v. Carter, 326 F.2d 315, 320 (9th Cir.1963), cert. denied, 377 U.S. 917
(1964); cf.  INS v. Rios-Pineda, 471 U.S. 444, 449 (1985);  INS v. Bagamasbad,
429 U.S. 24, 25 (1976).  We also emphasize that the discretionary analysis
discussed is specifically applicable only to those aliens applying for relief
under subsection (B) of 212(h)(1), subsection (A) having particular eligibility
criteria that, if met, will affect the exercise of discretion.

In evaluating whether section 212(h)(1)(B) relief is warranted in the exercise
of discretion, the factors adverse to the applicant include the nature and
underlying circumstances of the exclusion ground at issue, the presence of
additional significant violations of this country's immigration laws, the
existence of a criminal record and, if so, its nature, recency and seriousness,
and the presence of other evidence indicative of an alien's bad character or
undesirability as a permanent resident of this country.  See e.g., Matter of
Marin, supra, and cases cited therein.  The favorable considerations include
family ties in the United States, residence of long duration in this country
(particularly where the alien began his residency at a young age), evidence of
hardship to the alien and his family if he is excluded and deported, service in
this country's Armed Forces, a history of stable employment, the existence of
property or business ties, evidence of value and service to the community,
evidence of genuine rehabilitation if a criminal record exists, and other
evidence attesting to the alien's good character (e.g., affidavits from family,
friends, and responsible community representatives).  See, e.g., id., and cases
cited therein.

Upon review of the record as a whole, the Immigration Judge is required to
balance the equities and adverse matters to determine whether discretion should
be favorably exercised.  The basis for the Immigration Judge's decision must be
enunciated in his opinion.  See, e.g., id.  The equities that the applicant for
section 212(h)(1)(B) relief must bring forward to establish that he merits a
favorable exercise of administrative discretion will depend in each case on the
nature and circumstances of the ground of exclusion sought to be waived and on
the presence of any additional adverse matters, and as the negative factors grow
more serious, it becomes incumbent upon the applicant to introduce additional
offsetting favorable evidence.  See, e.g., id.

The underlying significance of the adverse and favorable factors is also to be
taken into account.  For example, if the alien has relatives in the United
States, the quality of their relationship must be considered in determining the
weight to be awarded this equity.  Further, the equity of a marriage and the
weight given to any hardship to the spouse is diminished if the parties married
after the commencement of deportation proceedings, with knowledge that the alien
might be deported.  Ghassan v. INS, 972 F.2d 631 (5th Cir.1992), cert. denied,
507 U.S. 971 (1993).  Similarly, if the alien has a history of employment, it is

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

important to consider the type of employment and its length and stability.
Further, when looking at the length of the alien's presence in the United
States, the nature of his presence during this period must be evaluated.  For
example, a period of residency marked by a term of imprisonment diminishes the
significance of the period of residency.  See generally Douglas v. INS, 28 F.3d
241 (2d. Cir.1994) (residency marked by criminal activity).

### B. Exercise of Discretion in Respondent's Case

Having reviewed the record and the Immigration Judge's decision, and the
contentions made on appeal, we agree with the Immigration Judge that a favorabl
exercise of discretion is not warranted.  The respondent has demonstrated
equities that may be characterized as substantial.  Although he has only been i
this country lawfully for a little more than 7 years, he does have significant
family ties, including his United States citizen wife of 8 years.  His United
States citizen children include a 9-year-old stepson, a 7- year-old daughter,
and a 4-year-old son.  According to the wife's testimony, the respondent has
been a loving father and the children are close to him emotionally.  The
respondent also has a consistent history of employment as an agricultural worke
and mechanic at various ranches, and he has testified that his most recent
employer has assured him of a position as a mechanic at $6 an hour upon his
release from prison.  The record also reflects that the respondent has
continuously supported his family financially before his incarceration, except
for a period in 1991 when he injured his back.  The family began receiving food
stamps that year, and since his incarceration they have also received welfare
payments and housing assistance as well.  The respondent's wife last worked as
cashier for a department store from 1989 to 1991, when she was terminated from
her employment because she was pregnant.

The respondent also has other family ties in the United States, including two
lawful permanent resident brothers living in Colorado and Kansas, a sister
living in Colorado, and his lawful permanent resident parents, who also live in
Colorado and who are self-supporting.  The respondent testified that his sister
was not a lawful permanent resident, but he did not elaborate as to her specifi
status in this country.  The respondent also testified that he has two children
in Mexico, but he has no contact with them and does not know their whereabouts.

As noted above, the Immigration Judge found that the respondent's departure
would cause extreme hardship to his wife and children, as they are dependent
upon him financially and are emotionally close to him.  The wife testified that
if her husband were deported she would remain in the United States with the
children and likely move to Kansas with her adoptive father.  She also testified
that she was receiving psychiatric treatment for depression, noting that she ha
attempted to commit suicide in 1992 after the criminal charges were filed
against her husband, and observing that she was attempting to obtain disability
payments. She also observed that she had a medical condition involving her spin
and hips that precluded her from lifting things.

In sum, the respondent has demonstrated substantial equities in his favor,
including hardship to his wife and children if he were deported.  Some hardship
to the respondent is also apparent in view of his ties to this country and the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

poor economic conditions in Mexico, as documented by news articles submitted by
the respondent, although he has not demonstrated that he would be virtually
precluded from finding employment in Mexico. However, his equities must be
balanced against the adverse factors in his case, particularly the serious crim
of which he was convicted. The seriousness of his crime can be seen from a
reading of the statute under which he was convicted and the surrounding
circumstances. The Nebraska statute in question provides:

Sexual assault; first degree; penalty.
(1) Any person who subjects another person to sexual penetration and (a)
overcomes the victim by force, threat of force, express or implied, coercion or
deception, (b) knew or should have known that the victim was mentally or
physically incapable of resisting or appraising the nature of his or her
conduct, or (c) the actor is nineteen years of age or older and the victim is
less than sixteen years of age is guilty of sexual assault in the first degree.

2) Sexual assault in the first degree is a Class II felony. The sentencing
judge shall consider whether the actor shall have caused serious personal injur
to the victim in reaching his decision on the sentence.

(3) Any person who shall be found guilty of sexual assault in the first
degree for a second time shall be sentenced to not less than twenty-five years
and shall not be eligible for parole.

Neb. Rev. Stat. § 28-319 (1992).

The respondent was convicted under section 28-319(1)(c) of sexually
penetrating a victim under the age of 16. In fact the record before the
Immigration Judge made clear that the respondent's victim was 13 years old at
the time of the sexual assault, at a time when he was 40 years of age. [FN1] Th
young girl, who lived in the same apartment building, frequented the
respondent's home. Apparently she practically lived there, reportedly because
her own mother was mentally disabled to some degree and did not exert much
parental control, and the respondent and his wife were not willing to force her
to leave. The respondent has acknowledged that their unwillingness to force he
to leave led to situations where the young girl was present when he and his wif
were watching sexually explicit movies or engaging in sexual intercourse
themselves. He has also admitted soliciting the victim's mentally disabled
mother for sex, as repayment for money the mother had borrowed from him.
According to the respondent, he did this in order to discourage her from asking
to borrow more money. The circumstances of his crime clearly show its
egregiousness.

We point out that as a matter of law, a 13-year-old child is incapable of
consent where the act is being perpetrated by a grown man 27 years older. Where
a statute makes sexual acts with a child under a specified age a crime, without
regard to consent, such statutes are construed as fixing the age of consent.
The purpose of these statutes is to protect children from illicit acts by
rendering them incapable of consenting . See Matter of Dingena, 11 I & N Dec.
723 (BIA 1966).

Given the nature of the respondent's crime, we do not find that his equities
are sufficient to counterbalance its seriousness. We find this to be
particularly so given that his equities do not include any persuasive evidence
of rehabilitation. We do not find his release from prison after 1 year due to

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

his good conduct in following prison rules in a controlled setting to be
persuasive evidence of rehabilitation from his criminal act of sexually
assaulting a young child. At his hearing, the respondent denied that the sexual
assault ever occurred, stated that he had been "falsely accused," and did not
express remorse for his crime. In addition, when asked whether he had attempted
to get any "sexual offender treatment," he responded, "I believe that I do not
have a sexual problem."

The respondent argues on appeal that his assertion of innocence should not be
used against him because he is, in fact, innocent and the criminal justice
system makes mistakes, and he therefore should not be forced to be dishonest
with himself. However, in ascertaining the effect of a criminal conviction,
neither the Board nor the Immigration Judge may go beyond the judicial record to
determine the guilt or innocence of an alien. See Matter of Edwards, 20 I & N
Dec. 191 (BIA 1990); Matter of Khalik, 17 I & N Dec. 518 (BIA 1980). He must be
considered guilty of the crime. Taking responsibility and showing remorse for
one's criminal behavior does constitute some evidence of rehabilitation. See
Gonzalez v. INS, 996 F.2d 804 (6th Cir.1993); Villareal-San Miguel v. INS, 975
F.2d 248 (5th Cir.1992); Akrap v. INS, 966 F.2d 267 (7th Cir.1992). This is
not to say that an alien who claims innocence and does not express remorse could
never present persuasive evidence of rehabilitation by other means. But the
fact remains that in the case before us, there is no evidence of remorse or of
acknowledgement of guilt. Moreover, the claim of innocence is inconsistent with
the jury verdict and the respondent's own pre-trial admission that he had
engaged in sexual intercourse with the victim. [FN2]

The Board acknowledges the humanitarian concerns in this case, particularly
the hardship to the respondent's wife and children, but the Board also has the
obligation to consider the welfare and safety of the other citizens and
residents of this country in making its discretionary determination. In the
case before us, we have an individual who sexually assaulted a 13-year-old girl.
After serving a short period of imprisonment, he has not offered any significant
evidence that he is rehabilitated from his criminal behavior.

As pointed out by the respondent on appeal, a showing of rehabilitation is not
an absolute prerequisite in all cases involving an alien with a criminal record.
However, rehabilitation or the lack thereof is a factor to be considered in the
exercise of discretion, and it may be ultimately determinative in some cases.
See Matter of Edwards, supra. There will be cases where such a showing is
necessary before a favorable exercise of discretion is warranted in view of the
other aspects of the case. Thus, while the lack of persuasive evidence of
rehabilitation may not in itself be an adverse factor, the absence of this
equity in the alien's favor may ultimately be determinative in a given case,
particularly where an alien has engaged in serious misconduct and there are
questions whether the alien will revert to criminal behavior. Conversely,
evidence of rehabilitation in some cases may constitute the factor that raises
the significance of the alien's equities in total so as to be sufficient to
counterbalance the adverse factors in the case and warrant a favorable exercise
of discretion.

However, having weighed the respondent's equities in this case, which do not
include persuasive evidence of rehabilitation, against the extremely serious

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00100-SHR    Document 6    Filed 03/27/2001    Page 143 of 154

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

nature of his criminal behavior involving a sexual offense against a child, the
Board agrees that the respondent has not met his burden of establishing that a
grant of section 212(h) relief is warranted in the exercise of discretion.
Accordingly, the appeal will be dismissed.
  ORDER:  The appeal is dismissed.

FN1. While the Immigration Judge and this Board may not go beyond the record of
conviction to determine the guilt or innocence of the alien, it is proper to
look to probative evidence outside the record of conviction in inquiring as to
the circumstances surrounding the commission of the crime in order to determine
whether a favorable exercise of discretion is warranted.  Matter of Edwards, 20
I & N Dec. 191 (BIA 1990).

FN2. The respondent underwent a polygraph examination in July 1992.  A copy of
the polygraph report was admitted into evidence at the deportation hearing
without objection.  The report reflects that following the questioning of the
respondent, he acknowledged to the examiner that he had engaged in a sexual act
with the victim.  When questioned about this by the Immigration Judge, the
respondent acknowledged this admission, but testified that the polygraph
examiner kept "moving the needles with his fingers ... and after that [he] was
forced to say yes."  In his decision, the Immigration Judge found that the
respondent's testimony in this regard was not credible.  On appeal, the
respondent does not challenge, or even reference, this evidence and adverse
finding by the Immigration Judge.

CONCURRING/DISSENTING OPINION:  Paul W. Schmidt, Chairman, in which John
Guendelsberger, Board Member, joined

  I respectfully concur in part and dissent in part.  I concur in the analysis
of the general criteria to be applied in exercising discretion under section
212(h) of the Immigration and Nationality Act, 8 U.S.C. 1182(h) (1994), as
contained in parts I, II, III, and IV(A) of the majority opinion.  However, I
dissent from the application of those criteria to the facts of this case, as
contained in Part IV(B) of the majority opinion.
  As recognized by the majority, the respondent has very substantial family
equities in the United States.  He has a United States citizen wife of 8 years,
two United States citizen children, a 7-year-old daughter and a 4-year-old son,
and a 9-year-old United States citizen stepson.  His wife suffers from severe
depression and other medical conditions.  She has not worked in 4 years.  There
has been a finding that the respondent's deportation would cause extreme
hardship to his wife and children, as they are dependent upon him financially
and are emotionally close to him.
  The respondent also has other family ties to the United States, including two
lawful permanent resident brothers and lawful permanent resident parents.  The
majority acknowledges that the respondent's economic outlook in Mexico is bleak
thereby inhibiting his ability to contribute to the support of his family in the
United States.
  It also seems unlikely that his family will be able to afford to visit the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

respondent in Mexico.  The respondent's ability to visit his family in the United States will depend upon the willingness of the United States Department of State to recommend, and the Immigration and Naturalization Service to grant, a waiver of inadmissibility to an inadmissible nonimmigrant. Moreover, from my experience, it is quite possible that, even with a waiver, the respondent would be precluded from future visits as a nonimmigrant because the presence of an immediate family in the United States would be considered evidence of a lack of "proper nonimmigrant intent" on the respondent's part. Therefore, the respondent's deportation is likely to permanently sever the family unit.

The respondent's crime is serious, involving sexual misconduct with a minor. However, the respondent, who is 42 years old with no known prior history of sexual offenses, was required to serve only 1 year of a potential 3-year sentence.  That indicates at least some confidence on the part of the State of Nebraska that the respondent's sexual offense was unlikely to be repeated and that its citizens did not need the extra protection from the respondent that a longer sentence might have offered.

As described by the majority, the respondent was convicted under a Nebraska statute that made the element of consent by the minor irrelevant.  It appears that the rather unusual interrelationship between the respondent's family and the victim's family, which provided the context for the sexual assault on the 13-year-old victim, no longer exists and is unlikely to be replicated. Therefore, although we all admittedly lack clairvoyance, there is some reason, based on this record, to believe that a repetition of the respondent's serious sexual misconduct is unlikely.

In addition to the nature of the crime, the majority's other primary reasons for denying relief are interrelated and involve the respondent's failure to demonstrate remorsefulness, truthfulness, and rehabilitation when confronted with his crime during the hearing before the Immigration Judge. These interrelated adverse considerations, while serious, do not, in my opinion, warrant a denial of the section 212(h) waiver to the respondent. See Matter of Edwards, 20 I & N Dec. 191 (BIA 1990).

This is admittedly a close case.  However, I believe that the extreme hardship that will be suffered by the respondent's United States citizen family, his extensive family ties to the United States, and the evidence of record suggesting a relatively low risk of recidivist behavior outweigh the adverse factors relied upon by my colleagues in the majority.  I therefore would grant the respondent a section 212(h) waiver.

Consequently, I respectfully dissent from Part IV(B) of the majority decision which denies the section 212(h) waiver in the exercise of discretion.

DISSENTING OPINION:  Lory D. Rosenberg, Board Member

I respectfully dissent.

This case involves an individual who has been convicted of one serious crime of moral turpitude.  As a result he has applied for a waiver and demonstrated that he is statutorily qualified for the waiver he needs, as his wife and children will suffer extreme hardship in the event of his deportation.  Despite this, the Immigration Judge denied his waiver application and the majority of

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

this Board affirms that denial.  At issue in the resolution of this appeal is
this Board's interpretation of the statute governing applications for waivers
under section 212(h) of the Immigration and Nationality Act, 8 U.S.C. § 1182(h)
(1994), and this Board's application of the standard it employs in the exercise
of discretion in such cases.

My quarrel with the reasoning and conclusion adopted by the majority goes
beyond a disagreement over the weight to be given the favorable and adverse
factors of record and the outcome of that balancing exercise.  In my view, the
majority makes a fundamental error when it embraces exclusively this Board's
articulation of discretionary factors which make up the entirety of a waiver
adjudication under section 212(c) of the Act. Matter of Marin, 16 I & N Dec. 58
(BIA 1978).  Such an analysis fails to give meaning to the unique statutory
language which characterizes a waiver under section 212(h) and distinguishes it
from other waivers provided by the Act. While the majority cautions that "it is
prudent to avoid cross-application" between different principles or standards
for the exercise of discretion, these well-intentioned words of caution do not
prevent its inevitable descent down this slippery slope.

## I. IMPROPER CONSTRUCTION OF THE STATUTE

The starting point of any interpretation begins with a construction of the
statute.  Chevron, U.S.A., Inc., v. Natural Resources Defense Council Inc., 467
U.S. 837 (1984).  If the statutory language is clear, both the courts and the
Board must give effect to the unambiguously expressed intent of Congress. Matter
of Farias, Interim Decision 3269 (BIA 1996) (Holmes, Rosenberg, concurring);
Matter of Hou, 20 I & N Dec. 513, 519-20 (BIA 1992);  see also K Mart v.
Cartier, Inc., 486 U.S. 281, 291 (in ascertaining "plain meaning," the Board
must look not only to the statutory language at issue, but to the language and
design of the statute as a whole).

The text of the particular section at issue here, which provides a
discretionary waiver for acts of prostitution and crimes involving moral
turpitude, is found in the opinion of the majority.  Notably, as most recently
amended in 1990, it contains two subsections:  one, section 212(h)(1)(A),
governs applications by persons who seek a waiver for offenses which occurred
more than 15 years before the application and explicitly requires a showing of
rehabilitation, but does not require either that certain family relationships
exist or that a showing of extreme hardship to those persons be made as a
predicate for the exercise of discretion.  The other, section 212(h)(1)(B), with
which we are concerned here, does require both the existence of specific family
relationships and evidence of extreme hardship to those designated persons in
the absence of a waiver.  There is no statutory requirement either that any
particular amount of time must have passed since the offense giving rise to the
need for the waiver, or that rehabilitation be demonstrated or that admission be
in the national interest.

This Board, acknowledging the principle underlying the Supreme Court's
decision in INS v. Cardoza-Fonseca, 480 U.S. 421, 449 (1987), has stated: "It is
a well-established rule of statutory construction that, in cases in which
Congress includes particular language in one section of a statute but omits that

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

language in another ..., a presumption arises that the disparate inclusion and
exclusion was intentional and purposeful."  Matter of Hou, supra.  I believe
that the reasoning employed and the result reached by the majority in this case
depart without reason from this important maxim.

In my opinion, to best effectuate the intent of Congress as expressed by the
statutory language of any discretionary waiver within the Act, the equities
should be weighed and balanced differently relative to the statutory eligibilit
factors required. If that is not done in this case, then the statutory language
distinct to section 212(h)(1)(B), as compared to other waivers provided by the
statute, is rendered meaningless.

### A. Section 212(h)(1)(B) Explicitly Requires Evidence of Extreme Hardship to Family Members

In a section 212(h)(1)(B) case, the statutory emphasis is on the existence of
specified close family members and a showing of extreme hardship to those famil
members.  Close family ties and a compelling level of economic, personal, or
professional harm or suffering amounting to extreme hardship are statutory
predicates for the exercise of discretion.  By contrast, in section 212(c)
applications, they are no more than individual considerations, albeit important
and arguably primary ones, in the overall exercise of discretion.

While it might constitute a reasonable exercise of discretion to deny a waive
under section 212(c) despite evidence of close family ties and hardship on the
basis that these are merely factors on the positive side of the discretionary
equation, I cannot conclude that comparable treatment of the same factors in a
section 212(h) waiver case would be appropriate.  The majority tends to ignore
the statutory distinction between these waiver provisions, and fails to treat
the section 212(h) waiver applicant as entering into the discretionary arena
already having met a significant mandatory standard which itself necessitates
the assembly of impressive favorable factors.  Rather, the majority appears to
give little if any weight in the subsequent exercise of discretion to the fact
that a section 212(h) applicant has already established close family ties and
extreme hardship. [FN1]

Further, I take issue with the conclusion of the majority that the precedent
decisions issued by this Board pertaining to adjustment of status under section
245 of the Act are inapposite.  A waiver under section 212(h) historically and
literally arises in connection with an application for admission, since, to
date, this Board has not recognized the availability of this waiver to those
within the United States only seeking to avoid deportation.  Cf. Yeung v. INS,
76 F.3d 337 (11th Cir. 1996). The typical waiver applicant either is not yet a
lawful permanent resident or is a lawful permanent resident seeking that status
anew.  See Matter of Gabreylsky, 20 I & N Dec. 750 (BIA 1994). [FN2] While some
immigrant visas are provided for those approved in asylee, refugee, or
employment-based categories, over two- thirds of immigration to the United
States is based upon family relationships, and family reunification is a
fundamental purpose underlying the terms of Act. I cannot agree that our
decisions concerning the exercise of discretionary factors involving the
admission of close family relatives have no applicability here. [FN3]

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

B. Section 212(h)(1)(B) Explicitly Does Not Require Evidence of Rehabilitation

The majority finds not only that the statutory standard has been satisfied but that substantial equities exist. That being the case, one might ask, why then does the majority conclude the waiver is not warranted? The only bases articulated by the majority are the nature of the conviction involved and the issue of rehabilitation in the respondent's case. While these are not improper factors for consideration in the ultimate discretionary equation in either a section 212(c) or a section 212(h) case, it is notable that the factor of rehabilitation specifically is not a statutory prerequisite to the exercise of discretion in a section 212(h) application submitted under section 212(h)(1)(B).

In my view, however, by importing without distinction the established discretionary factors applicable in a section 212(c) adjudication (where rehabilitation is an equity, see Matter of Marin, supra) into a section 212(h) adjudication, the majority has skewed the basis for a reasonable adjudication consistent with the governing statutory section and the fair exercise of discretion. [FN4] Not only does the majority consider rehabilitation in this case, but it elevates rehabilitation as at least one of two determinative factors in its denial. A reading of the majority decision suggests that the statutorily required elements of close family ties and extreme hardship pale next to the presence or absence of rehabilitation. Moreover, I believe that the emphasis given its finding that rehabilitation is not present (which I dispute) constitutes an improper assessment of rehabilitation contrary to our holdings in both Matter of Arreguin, Interim Decision 3247 (BIA 1995) (stating that absence of one or more favorable factors does not convert such factors into adverse considerations), and Matter of Edwards, 20 I & N Dec. 191 (BIA 1990) (holding that absolute rehabilitation is not required).

## II. IMPROPER BALANCING OF DISCRETIONARY FACTORS

### A. Undue Emphasis on Admission of Guilt

While rehabilitation is not a statutory requirement, it is not unreasonable to consider this factor in light of the fact that a section 212(h)(1)(B) waiver overcomes excludability based upon either criminal conduct or a conviction. However, in its discretionary determination, the majority follows the course set by the Immigration Judge and treats the absence of an outright admission of guilt by the respondent as dispositive of the absence of rehabilitation. Cf. Matter of Roberts, 20 I & N Dec. 294 (BIA 1991). In my view, this constitutes an impermissible treatment of the rehabilitative element of remorse, contrary to the decisions of this Board and the courts of appeals. See Guillen-Garcia v. INS, 999 F.2d 199 (7th Cir.1993); Matter of Edwards, supra. I am inclined to adopt the reasoning of the United States Court of Appeals for the Seventh Circuit, which was articulated most recently in Canales-Lopez v. INS, No. 95-2113, 1996 WL 21673 (7th Cir.), [FN5] that reliance on a failure or refusal to acknowledge guilt, no matter how framed, "does not constitute adequate consideration of all the circumstances surrounding the petitioner's efforts to demonstrate rehabilitation." Id. at 2 (citing Guillen-Garcia v. INS, supra, a

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

205);  see also Guillen- Garcia v. INS, 60 F.3d 340, 344-45 (7th Cir.1995)
(upholding BIA on other grounds), cert. denied, 116 S.Ct. 775 (1996).
 Elevation of a claim of innocence as dispositive of a lack of rehabilitation
actually does what we say we will not do-redetermine guilt or innocence.  Cf.
Matter of Roberts, supra.  Matter of Roberts states clearly that for
discretionary purposes we may look behind the conviction-but we may not
redetermine guilt or innocence.  Id. at 301.  If we are allowed to look at
mitigating factors (and lack of culpability going to an inability to express
remorse for something one has not done would fall into that zone), we should no
penalize an alien who testifies to innocence under oath, barring a showing that
he has intentionally given false testimony.  An individual faces an untenable
situation if subsequent discretionary relief-be it sentencing disposition or
collateral immigration benefits-is conditioned upon an admission of guilt.  As
result, some federal courts have long recognized that even after conviction,
when post-conviction options may have been exhausted, it continues to be unfair
and unreasonable to require a defendant to admit guilt (contrary to his
testimony in the criminal proceedings), as to do so also might be to require hi
to admit perjury. [FN6]
   In this case, the respondent did not plead guilty in his criminal trial but
maintained his innocence and was found guilty. In the record before us, the
respondent admitted to aspects of the criminal conduct in question and denied
the explicit charges underlying his conviction. [FN7] The Immigration Judge
acknowledged that the respondent testified that he recognizes the crime involve
to be a serious one, for which someone should be punished.  The majority
emphasizes the fact of the respondent's responses on the lie detector test
administered prior to trial as compared with his testimony before the
Immigration Judge. [FN8] This not only appears to contravene this Board's
position in Matter of Roberts, supra, but the majority fails to indicate the
ultimate significance of either the respondent's statement or the results of th
test. [FN9] This is particularly so, in light of the fact that the majority
itself acknowledges in the same paragraph that one who claims innocence is not
categorically foreclosed from establishing that he has taken steps towards
rehabilitation.  Matter of Edwards, supra%u.
   In assessing rehabilitation, we are making "an estimate or prediction of an
individual's future conduct." Palacios-Torres v. INS, 995 F.2d 96, 99 (7th
Cir.1993).  The respondent and his wife are well aware of the poor judgment and
unacceptable conduct which characterized their former living situation.  The
family has moved away from the area in which the circumstances giving rise to
the respondent's crime occurred.  There is no evidence of any criminal conduct
whatsoever by the respondent prior to the situation which underlies the
respondent's conviction. Further, there is no evidence of recidivism during the
pendency of the criminal charges or since his release for good behavior
following a 1-year period of incarceration, an early release from a 3-year
sentence. [FN10]
   The majority contends that it is not holding that one who claims innocence an
fails to express remorse is precluded from ever showing persuasive evidence of
rehabilitation.  However, here the respondent has presented his role in his
family, his productive employment, and the absence of any other criminal

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

conduct. The majority's failure to articulate any other basis for its rejection of the respondent's claim of rehabilitation, however, renders its treatment of the absence of an admission of guilt as being determinative of an insufficient level of rehabilitation. Canales-Lopez v. INS, supra; cf. Matter of Edwards, supra. I believe that reliance upon the absence of evidence of remorse, coupled only with the serious nature of the single criminal offense giving rise to this respondent's need for a waiver is not a sound basis on which to deny relief in this case.

### B. Undue Weight Given Criminal Offense

This is a waiver we are adjudicating. It presupposes a violation of the immigration laws. An application under section 212(h) comes before us only when there has been either conduct involving prostitution or conviction or admission of a crime involving moral turpitude. No applicant will ever appear before us who has not committed an offense which we consider, in some degree, reprehensible. In my opinion, the result reached by the majority certainly appears to approach an impermissible per se basis in which to deny a discretionary waiver. See Gonzales v. INS, 996 F. 2d 804, 810 (6th Cir.1993); cf. Matter of Burbano, 20 I & N Dec. 872, 877-78 (BIA 1995). But see Yepes-Prado v. INS, 10 F.3d 1363, 1371-72 (9th Cir.1993).

Indeed, I believe we contravene the statute when we so readily engage in the practice of finding the offense to be waived an adequate basis alone on which to deny relief. [FN11] Moreover, I don't believe that one can read the majority opinion without concluding that it has relegated the significant and compelling factors of family ties and extreme hardship to the back burner. I cannot find that dismissing statutory prerequisites or treating them as no more than a threshold for a discretionary adjudication which demands other factors to overcome the adverse factor of the offense giving rise to the need for a waiver is either reasonable in the exercise of discretion or consistent with the statute.

The respondent is in violation of the immigration laws on account of a single, albeit serious, conviction, giving rise to his need for a section 212(h) waiver. His crime, statutory rape of a young teenager, is not to be dismissed lightly and it should be punished-in the criminal justice system, and examined further-in the exercise of our discretion to waive his deportation. Whether it is an offense such that under no circumstances should this man be allowed to remain in the United States with his family as a lawful permanent resident after being released from prison with good conduct reports and when his wife and children want and need him is another story.

The respondent has established, as the majority concedes, substantial equities relating to the statutory qualifications of close family ties and extreme hardship to be suffered by the family members should the respondent be deported. His wife begs us to allow him to remain, and there is ample evidence in the record that she has suffered depression on account of the circumstances and other hardships due to his absence, which will only be exacerbated by his deportation. Further, his deportation would mean not only a loss of financial support to the household and his children's loss of the presence of their

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

father, but the permanent disruption of this family.

   In addition to the factors emphasized explicitly by Congress, the record reflects that the respondent has resided in the United States for 13 years and has been a lawful permanent resident since 1987.  There is evidence that he is responsible husband and father who previously was regularly employed and supported his family, and that he has employment to which he will return. While in prison he studied towards receiving his GED. The record also contains enthusiastic commendations of his character and of his being an honest, hardworking individual.  Each of these factors individually and cumulatively indicates that he has the character and family base from which he can return to society as a contributor rather than a predator, and that he has taken steps towards rehabilitation from the conduct resulting in his conviction.

   With regard to his conviction, I believe he attempted to provide an explanation for his criminal conduct, and while his unwillingness to acknowledge his offense squarely may be the product of shame or denial, I don't find him to be either an outright liar or an unrepentant criminal.  Nor do I conclude, as apparently the majority does, that his failure to acknowledge culpability to their satisfaction is a reliable indicia of either rehabilitation or future conduct.  With the exception of the poor exercise of judgment in condoning the situation which led to his commission of the crime in question, there is no evidence that the respondent lived other than a normal lifestyle.  He has no criminal record of any kind other than the offense giving rise to these proceedings.  He has no prior immigration violations.  He provided evidence of good conduct while in prison.

   I note that this crime was an aberration in his otherwise law-abiding history and appeared connected to the unorthodox circumstances of the family's living situation in relation to their former neighbors.  That living situation no longer exists.  In my opinion there is absolutely no reason to conclude that he would not move on from this incident, which I view as an aberration in an otherwise regular record, and continue to be a provider for his family and a contributing member of our society.

   I do not contend that this Board may not or should not address either the offense itself or rehabilitation in the course of adjudicating a waiver application under section 212(h) of the Act. However, in this case, the majority not only fails to address any other aspect of rehabilitation present in the record, but concludes, without citing any evidence of record or other authority, that the nature of the crime for which this applicant already has been convicted and imprisoned is serious enough to make him an undesirable member of our society in the future.  I conclude that such a treatment of the record not only constitutes an abuse of our discretion, but does violence to the statutory language.


                              III. CONCLUSION


   I believe it is reasonable to look at the statute in a way which gives meaning and reason to its separate provisions overall.  In my view the majority's failure to truly distinguish section 212(h) from other waiver provisions according to its statutory components impermissibly skews and distorts the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

majority's discretionary assessment.  I believe that discretionary assessment i
flawed further by the majority's over-reliance on an admission of culpability
and the specific crime involved in lieu of a fair consideration, on balance, of
the overwhelming evidence of strong family ties and the hardship the family
faces without the respondent, as well as the respondent's role as a provider,
reports of his good conduct, affirmations of his good character, and no evidenc
of anything other than a good prognosis for the future.  I would grant the
relief requested in the exercise of discretion.

FN1. The majority's citation to INS v. Bagamasbad, 429 U.S. 24, 25 (1976), and
Matter of Goldeshtein, 20 I & N Dec. 382 (BIA 1991), rev'd on other grounds, 8
F.3d 645 (9th Cir.1993), for the proposition that an adjudicator need not even
address the statutory "extreme hardship" predicate for the exercise of
discretion in suspension and section 212(h) adjudications is misleading in the
context of this case.  While it is true that an adjudicator need not make
express rulings concerning statutory eligibility, and may skip ahead to a
discretionary denial in appropriate cases, this does not provide the adjudicato
with a license to ignore relevant factors in rendering that discretionary
determination.

FN2. The respondent has resided in the United States since 1983 and has held th
status of a lawful permanent resident for over 7 years.  He is applying for
lawful resident status anew, in conjunction with his application for a waiver.

FN3. It appears that the reason the majority dismisses as inapplicable the
discretionary evaluations conducted in Matter of Arai, 13 I & N Dec. 494, 495-9
(BIA 1970), modifying Matter of Ortiz-Prieto, 11 I & N Dec. 317 (BIA 1965)
(holding that adjustment of status could be granted only when outstanding
equities were present), is that the adverse factor which triggers the need for
section 212(h) waiver is a criminal conviction.  Nonetheless, I believe it
instructive that we found that Ortiz-Prieto was "too broad in its impact and
probably more demanding than necessary," and concluded that factors such as
family ties, hardship, and length of residence constitute countervailing factor
warranting a favorable exercise of discretion.  Matter of Arai, supra, at 495.

FN4. For example, the majority states that "he has only been in the United
States for a little more than 7 years." (Emphasis added.)  While this may be
relevant in a section 212(c) case, in fact, a waiver under section 212(h) was
originally contemplated to provide a means of overcoming excludability for a ne
immigrant who has not been in the United States at all.

FN5. While I understand that Canales-Lopez v. INS, supra, is an unpublished
decision, it provides a compelling analysis of this Board's consideration of th
element of an admission of guilt in the context of establishing rehabilitation
as a discretionary equity, one which I adopt for purposes of my dissent in this
case.

FN6. See Thomas v. United States, 368 F.2d 941, 945 (5th Cir.1966), in which th

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

court determined that the defendant was "between the devil and the deep blue sea," when the district court told him to repent or receive a longer sentence. See also Miller v. United States, 589 F.2d 1117, 1138 (1st Cir.1978), cert. denied, 440 U.S. 958 (1979); Scott v. United States, 419 F.2d 264 (D.C.Cir.1969). In fact, the Scott court noted that a glib willingness to admit guilt in order to secure something in return may indicate quite the opposite of repentance.

FN7. Evidence in the record, contained in the investigating ng officer's report and in a pre-trial polygraph report, reflects that an unorthodox situation had developed in the apartment complex, that the assaulted child was in counseling with a social worker, that she received no parental control or guidance, that rumors of a sexual relationship between the child and the respondent had been circulated by the child throughout the apartment complex, and that a prior investigation had revealed no evidence of such a relationship. The respondent does not deny having improperly touched the child or having allowed her to remain in his family's apartment, and he admits that he wrestled with her and even that he had, in his wife's presence, lain on top of her.

FN8. The report of the lie detector examination reveals that upon admitting having had sexual intercourse with the complainant, the respondent explained further that the complainant, a neighbor's daughter, approached him in his apartment, and lay down on his bed next to him. While I don't doubt that the alleged sexual contact occurred, I can understand how, in the hearing before the Immigration Judge, the respondent, not being legally trained to understand the concept of a minor's lack of consent, and given the unorthodox situation which preceded this incident, would not think of his conduct necessarily as forcible sex or a sexual assault, as the charge and conviction is worded.

FN9. Under the circumstances, he could honestly admit the act but deny the charge as entitled in the record of conviction without being inconsistent or incredible. See Canales-Lopez v. INS, supra, at 2 (Board's denial of relief as being on account of lack of credibility rather unacceptable, as relief cannot be denied on this basis alone, and lack of credibility for failing to acknowledge guilt is not a separate ground supporting a denial). See also Guillen-Garcia v. INS, supra, at 205.

FN10. The record reflects that while in prison the respondent achieved "exemplary unit conduct and observed work performance," and that he had no infractions and conducted himself according the institution's rules and orders.

FN11. I recognize that we have said consistently in the section 212(c) context that a single factor may be so egregious as to overwhelm any existing equities. Matter of Marin, supra, at 584-85. I do not disagree with that principle nor do I disagree with the majority that we must also consider the safety and well-being of others in our society. I do not foreclose the possibility that, based on concrete evidence of recidivism, a propensity for violence, or actual harm that will be caused by allowing an offender to remain in this country, denial

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3272
**(Publication page references are not available for this document.)**

based upon a single underlying offense might not be appropriate.  However, I
read Matter of Marin to mean that when dealing with the offense to be waived,
such a result, while not impermissible, must be the exception rather than the
rule.  See also Braun v. INS, 992 F.2d 1016, 1020 (9th Cir.1993);  Matter of
Alonzo, 17 I & N Dec. 292 (Comm.1979) (if underlying offense is considered, a
waiver could be denied in every case).
Interim Decision (BIA) 3272, 1996 WL 227774 (BIA)
END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

PAUL TURPIN,                    :
                 Petitioner    :
                               :
        v.                     :  Civil No. 1:CV-01-0168
                               :  (Judge Rambo)
IMMIGRATION AND NATURALIZATION, :
SERVICE                        :
                 Respondent    :

### CERTIFICATE OF SERVICE BY MAIL

        The undersigned hereby certifies that she is an
employee in the Office of the United States Attorney for the
Middle District of Pennsylvania and is a person of such age and
discretion as to be competent to serve papers.

        That on February 27, 2001, she served a copy of

                    RESPONSE TO SHOW CAUSE

by placing said copy in a postpaid envelope addressed to the
person hereinafter named, at the place and address stated below,
which is the last known address, and by depositing said envelope
and contents in the United States Mail at Harrisburg,
Pennsylvania.

Addressee:

Paul Turpin
A No. 12-355-636
Pike County Jail
H.C. 8 Box 8601
Hawley, PA 18428

                                SHELLEY L. GRANT
                                Paralegal Specialist